**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

GILA AFRIAT-KURTZER, )
ERAN KURTZER, )
ESTATE OF ASAF BENOR, )
ZVI BENOR, )
EMANUEL BENOR, )
NOA BENOR, )
ROEY BENOR, )
ESTATE OF ZIVA BENOR, )
ESTATE OF ELAI DAGAN, )
NURIT DAGAN, )
URI DAGAN, )
ELAD DAGAN, )
ADILI DAGAN, )
ADVA GUETA (LEVY), )
ESTATE OF ERAN GUETA, )
OSHRA GUETA, )
VITTORIO GUETA, )
DINA GUETA, )
ESTATE OF ANAN KADOUR, )
NAZEH KADOUR, )
AMENA KADOUR, )
HESHAM KADOUR, )
LINA HASSON, )
SARA KADOUR, )
ANAT KADOUR, )
ESTATE OF REFAEL MIZRAHI, )
MATANA MIZRAHI, )
ITZHAK MIZRAHI, )
CHAGIT MIZRAHI, )
EFRAT MIZRAHI, )
MICHAL MIZRAHI-BALULO, )
ESTATE OF ADI ROSEN, )
OFER ROSEN, )
INBAL ROSEN, )
RACHEL ROSEN, )
ESTATE OF DAMIAN ROSOVSKY, )
ALBERTO ROSOVSKY, )
MARTA ROSOVSKY, )
ESTATE OF YEHIEL SHARVIT, )
MOSHE SHARVIT, )
YAFFA SHARVIT, )
HAGIT SHARVIT (BRIN), )

**CIVIL ACTION**

**CV 05 - 388**
Case Number:

GERSHON, J

CHREIN, J.

1

YOSI SHARVIT,                          )
ESTATE OF SAMI HASON,                  )
KEREN DAGAY-HASON,                     )
IDIT BEN ARIEH,                        )
ESTATE OF AMIR HIRSHENSON,             )
MIRYAM HIRSHENSON,                     )
AHARON HIRSHENSON,                     )
LIAT HIRSHENSON-SHTERENLIB,            )
HADAS HIRSHENSON-HESS,                 )
TAMAR CHOMSKI,                         )
YAIR HILLEL,                           )
ANNYA HILLEL,                          )
ORI HILLEL,                            )
TOMER INBAR,                           )
YAKOV BUARON,                          )
TIKVA BUARON,                          )
SHAY BUARON,                           )
AMIR BUARON,                           )
ESTATE OF EYTAN PERETZ,                )
ELI PERETZ,                            )
JACQUELINE PERETZ,                     )
OFER PERETZ,                           )
ODELIA PERETZ,                         )
MAYA PERETZ,                           )
YVES ARNAUD LUKSENBURG,                )
RONEN BEN HAIM,                        )
ESTATE OF EYAL LEVY,                   )
MORDEHAY LEVY,                         )
HELEN LEVY,                            )
EFRAT LEVY,                            )
ADVA LEVY,                             )
ESTATE OF GILAD GALON,                 )
TAMAR GALON-FRADE,                     )
LEA GALON,                             )
MORDECHAI GALON,                       )
ESTATE OF SHABTAY MACHPOUD,            )
AVIVA MACHPOUD,                        )
MATAN MACHPOUD,                        )
ORI ZAMIR,                             )
AVRAHAM ZAMIR,                         )
YAEL ZAMIR,                            )
ADI ZAMIR,                             )
AMIR WEISS,                            )
NACHSHON KOKHAVI,                      )
GIL KOKHAVI,                           )
YOSSI ZINNI,                           )

ODED AVRLINGI,                          )
ESTATE OF DANIEL TSICHASHVILI,          )
MIRIAM TSICHASHVILI,                    )
ELIAHU TSICHASHVILI,                    )
ESTER COHEN,                            )
ESTATE OF SOLI MIZRAHI,                 )
ITZAK MIZRAHI,                          )
RUTI MIZRAHI,                           )
MIRIT MIZRAHI,                          )
TZAFRIR BEN-SHELOMO,                    )
ELIYAHO BEN-SHELOMO,                    )
GILA BEN-SHELOMO,                       )
IRIT BEN-SHELOMO,                       )
YEHELA BEN-SHELOMO,                     )
MOSHE FRAIBERG,                         )
ESTATE OF YANIV WAISER,                 )
ITZAK WAISER,                           )
DALIA WAISER,                           )
ORIT WAISER,                            )
MICHAL WAISER,                          )
ESTATE OF DAVID BEN ZINO,               )
MAIMON BEN ZINO,                        )
RIKA BEN ZINO,                          )
IZKHAK BEN ZINO,                        )
YAAKOV BEN ZINO,                        )
IRIT BEN ZINO,                          )
RAHEL BITON,                            )
VERED BEN ZINO,                         )
ESTATE OF DAVID HASON,                  )
MIRIAM HASON,                           )
                                        )
                                        )
            v.                          )
                                        )
                                        )
    ARAB BANK, PLC,                     )
                                        )
            Defendant.                  )

# C O M P L A I N T

What follows are averments and allegations, including the foundational facts pled in the Introduction, applicable to each cause of action pled herein:

## INTRODUCTION

1.      For the better part of the last decade, groups of Palestinian militants in the West Bank and Gaza Strip have acted with a united purpose to eradicate the State of Israel through a campaign of terror, genocide and crimes against humanity.

2.      The acts giving rise to this action are the result of a systematic and widespread campaign of suicide bombings and other murderous attacks that have been authorized, directed and/or committed by the Islamic Resistance Movement ("Hamas"), the Palestinian Islamic Jihad ("PIJ"), the Al-Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP") – all of whom have been listed for years by the United States Department of the Treasury as Specially Designated Global Terrorists ("SDGTs")  and also have been designated by the United States Department of State as foreign terrorist organizations ("FTOs").

3.      The Defendant in this action, Arab Bank, plc ("Arab Bank"), has provided both explicit and tacit support for the goals espoused by these terrorist organizations in their attempt to destroy the State of Israel.  The Chairman of Arab Bank, Abdul Majeed Shoman, has repeatedly and very publicly expressed Arab Bank's stance supporting the eradication of the State of Israel.

- In a July 2000 interview published in the Jordanian newspaper *Al-Dustour* entitled "The Jews Have No Right to Palestine"– prior to the renewed outbreak of violence -- Shoman "said that for him a just solution would be the return [sic] of all Palestinian lands to their legitimate historical residents, i.e., the Palestinian people and the Arab nation. Shoman said he was against a Palestinian compromise [based on] a partial return [which included] the loss of some land, and that the Jews had no right to the land of Palestine."

4

- According to an October 2000 article published in *Al-Dustour* Shoman held a meeting at the head offices of the Arab Bank [in Jordan], at which he led a discussion on the Popular Committee for Support of the Intifada. The Committee gives financial support directly to the families of Palestinian "martyrs" and the wounded. At the meeting, Dr. Mamduh al-Abadi, chairman of the board, announced that they would continue giving direct financial aid to the families of *shaheeds* (martyrs) and the wounded of the Al-Aqsa intifada. Shoman made a personal contribution to the Al-Aqsa Intifada and also received contributions from his employees, who donated 5% of their salaries in support of the Al-Aqsa Intifada.

- An article published in *Al-Bayan*, a UAE newspaper, on May 31, 2001, cites a press release in which Shoman stated that "most of the institution's [Popular Committee for Support of the Intifada] activities centered around supporting the Intifada [the ongoing violent Palestinian-Israeli confrontation] and the Al-Aqsa Fund, which the institution had established at the beginning of the confrontation. He called upon Arab and Palestinian businessmen to make generous donations to the Al-Aqsa Intifada Fund, which provides emergency support for the families of "martyrs" and those wounded in the Intifada.

4.    This civil action is being brought on behalf of victims of this latest surge of Palestinian terror which has been accomplished with the complicity of a number of financial institutions within the Middle East – primary among them, the Defendant, Arab Bank. It is brought by United States nationals and foreign nationals who are close family members of those killed along with those injured by the terrorist attacks carried out in violation of the laws of nations, United States' statutes, and general federal common law.

5.    The claims of the victims are brought on behalf of United States nationals pursuant to the Antiterrorism Act of 1990, 18 U.S.C. § 2331, *et seq.*, and on behalf of foreign nationals pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350.

6.    Hamas', PIJ's, AAMB's, and PFLP's suicide bombings and other murderous attacks have involved the use of explosives, incendiary weapons, and other lethal devices which were designed and built so as to maximize resulting death and serious bodily injury. To this end,

5

Hamas', PIJ's, AAMB's, and PFLP's suicide bombings and other murderous attacks involved the intentional delivery, placement, discharge, and/or detonation of explosives, incendiary weapons, and lethal devices in public places, State, government, and public facilities, and in public transportation system(s), including buses.

7.    While separate organizations, Hamas, PIJ, AAMB, and PFLP have long and openly adhered to a shared mission: to topple and eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestinian state through the use of suicide bombings and other shockingly egregious violent acts which constitute violations of fundamental and universally recognized precepts of international law which are reflected in a multitude of international accords.

8.    In a series of Friday sermons which aired on Palestinian TV ("PATV"), Dr. Muhammad Ibrahim Madi clearly stated this "lofty goal" when he cried out: "Shame upon he who does not educate his children the education of Jihad [armed struggle against the infidels, or holy war]...blessings upon he who dons a vest of explosives on himself or on his children and goes in to the midst of the Jews and says: Allah Akbar [Allah is Great]..." [Dr. Muhammad Ibrahim Madi, Friday sermon, PA television, June 8, 2001].

9.    A few months later on August 3, 2001, Dr. Madi recounted a conversation he had with a 14 year old boy who wanted to blow himself up and kill Jews. His blood-curdling sermon broadcast live on PATV that day went:

"I was uplifted when a youth said: 'Oh, Sheikh, I am 14 years old, I have 4 more years and then I will blow myself up among Allah's enemies, I will blow myself up among the Jews.' I said to him, 'Oh young child, may Allah let you merit Shahada [martyrdom] and let me merit Shahada...

'All the weapons must be aimed at the Jews, Allah's enemies, the cursed nation in the Koran, whom Allah describes as monkeys and pigs, worshippers of the calf and idol

6

worshippers... Nothing will deter them except the color of blood in their filthy nation...unless we blow ourselves up, willingly and as our duty, in their midst...'

May Allah make the Moslem rule over the Jew. We will blow them up in Hadera, we will blow them up in Tel-Aviv and in Netanya so that Allah will make us masters over this riff-raff. We will fight against them and rule over them until the Jew will hide behind the trees and stones and the tree and stone will say: 'Moslem! Servant of Allah, there is a Jew behind me, kill him.' We shall enter Jerusalem as conquerors, and Jaffa as conquerors, and Haifa as conquerors and Ashkelon as conquerors.... Blessings upon he who educates his sons in the path of Jihad and Shahada!"    [Dr. Muhammad Ibrahim Madi, Friday sermon, PATV, August 3, 2001]

10.    At a Muslim Arab Youth Association Conference in Los Angeles in 1994, Sheikh Muhammed Siyam (who at the time was Hamas' representative to the Sudan) stated: "I've been told to restrict or restrain what I say...I hope no one is recording me or taking any pictures, as none are allowed...because I'm going to speak the truth to you.  It's simple.  Finish off the Israelis.  Kill them all!  Exterminate them!  No peace ever!  Do not bother to talk politics."

11.    Ariel Sharon, the Prime Minister of the State of Israel, has himself declared that Hamas leaders have "...only one objective: the destruction of Israel."

12.    Consistent with their goals and objectives, Hamas, PIJ, AAMB, and PFLP cooperate in the planning and commission of joint terrorist attacks.  Using suicide bombings and other shockingly egregious acts of international terror directed at Plaintiffs and other unarmed Israeli civilians, those groups have for years systematically and continuously terrorized, injured and killed thousands of unarmed innocent members of the Israeli civilian population through repeated suicide bombings, or "martyrdom" operations.

13.    Plaintiffs herein were injured or killed in Hamas, PIJ, AAMB and/or PFLP suicide bombings and other murderous attacks committed in Israel, the West Bank or the Gaza Strip.

14.    To successfully plan, fund, and carry out these attacks, Hamas, PIJ, AAMB and PFLP rely upon an open, notorious, well known, and formalized system of terrorist financing which incentivizes and incites the attacks by paying families of suicide bombers. As the Israeli government, former Secretary of State Colin L. Powell, Defense Secretary Donald H. Rumsfeld, Deputy Defense Secretary Paul D. Wolfowitz, and even captured suicide bombers have stated, payments to families of suicide bombers encourage suicide bomb attacks.

15.    One fifteen (15) year old boy captured by Israeli soldiers before he was able to blow himself up in a suicide mission at an Israeli checkpoint was asked by a BBC Reporter whether AAMB promised him anything in return for carrying out the attack. The little boy responded: "Of course they did. They told me, once you carry out the operation and the soldiers come and demolish your home, we'll stand by your parents and rebuild your house and give them money."

16.    In hearings in 1990 regarding the then-pending Antiterrorism Act of 1990, Joseph A. Morris, a former Department of Justice attorney and former General Counsel of the United States Information Agency, testified:

> International terrorism has become, in many respects, an industry. It rests on a foundation of money. Money is often more important to the masters of terrorism than are people. That they care little for their victims goes without saying; but it is instructive of many terrorist organizations appear to care little for their own operatives, treating them as fungible and dependable.

17.    Defendant Arab Bank solicited, collected, transmitted, disbursed and provided the financial resources that allowed Hamas, PIJ, AAMB and PFLP to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradicate the Israeli presence from the Middle East landscape. Arab Bank has knowingly and intentionally, both

directly and indirectly, aided and abetted, intentionally facilitated, and/or recklessly disregarded the commission of these attacks by Hamas, PIJ, AAMB, and PFLP.

18.   In addition to maintaining accounts at its bank for well known terrorist front groups and individuals who supported their causes, Defendant Arab Bank also empowered Hamas, PIJ, AAMB, and PFLP by providing instructions to the general public on how to qualify and collect money; and by serving as the "paymaster" to the families of those genocidal murderers and maimers who carried out suicide bombings and other murderous attacks against innocent United States nationals, Israeli nationals, and nationals of other countries who happened to be in Israel when these bombings took place. With the aid of public and private donations deposited in numerous accounts established at financial institutions in the Middle East – primary among them the Arab Bank – and opened for the explicit purpose of providing funds to families of the martyrs of Hamas, PIJ, AAMB and PFLP, these foreign terrorist organizations were given free reign to continue their campaign of terror and to expand their terrorist objectives throughout the State of Israel.

19.   In its opinion regarding the appeal of Sheikh Ra'ed Salah, head of the Northern faction of the Islamic movement, the Israeli Supreme Court noted the following regarding the "charitable societies" and their relation to Hamas:

> The modus operandi of the organization [known as] Hamas, as described by professional opinion and [demonstrated by] the evidence, shows that its civilian activities provide an infrastructure for its terrorist activities by supporting, reinforcing and encouraging them…transferring funds to support the families of suicide bombers and security detainees can certainly be considered an incentive and encouragement for the perpetrating of lethal terrorist attacks and has nothing in common with ordinary religious behests to contribute to the welfare of the needy and indigent, which the complainant [sheikh Ra'ed Salah] and his representatives would like to use to camouflage their actions.

(From the decision rendered by the Israeli Supreme Court regarding the appeal of sheikh Ra'ed Salah, head of the northern faction of the Islamic Movement, page 7 paragraph 5, August 18, 2003).

20.    In Saudi Arabia, two specific groups were created to raise funds to aid in the proliferation of the terrorist objectives of Hamas, PIJ, AAMB, and/or PFLP. These groups, called the Popular Committee for Assisting the Palestinian Mujahideen and another group formed in 2000 known as the Saudi Committee for Aid to the Al-Quds Intifada, set up Account 98 Accounts at banks all over Saudi Arabia to raise funds specifically for the families of the martyrs of Hamas, PIJ, AAMB, and PFLP. In addition, the committees solicited private donations directly to accounts at Arab Bank.

21.    Funds deposited into Account 98 Accounts (hereinafter collectively referred to as "Account 98") at banks in Saudi Arabia were transferred to accounts at the Arab Bank. The Arab Bank would then transfer these funds to the families of the martyrs through the branch offices of the Arab Bank within the West Bank and the Gaza Strip. Often, if not always, Account 98 funds went through Arab Bank's branch in New York, NY, USA, before being transferred to accounts in the Middle East.

22.    By serving as the ultimate paymaster to the families and charitable committees in the West Bank and Gaza Strip operated on behalf of Hamas, PIJ, AAMB, and PFLP, the Arab Bank facilitated the increase in terrorist operations carried out by these organizations by incentivizing this conduct. The individual terrorist knew that if he committed a suicide operation, his family would be supported by funds held in their name by the Arab Bank.

23.    The following chart demonstrates the relationship between this funding and the proliferation of terrorist attacks:

10

| YEAR | Terror Attacks Israel (suicide and other bombs) | Popular Committee for Assisting the Mujahideen | Committee for the Al-Quds Intifada & Al-Aqsa Funds | TOTAL |
|---|---|---|---|---|
| 1998 | 1 | 3,600,000 | 0 | 3,600,000 |
| 1999 | 0 | 3,490,000 | 0 | 3,490,000 |
| 2000 | 4 | 8,418,348 | 0 | 8,418,348 |
| 2001 | 36 | 9,473,628 | 14,454,190,000 | 14,463,663,628 |
| 2002 | 44 | 266,575,791 | 350,000,000 | 616,575,791 |
| 2003** | 22 | 7,226,384 | 720,003,150 | 727,229,534 |
| TOTALS | | 298,784,151 | 15,524,193,150 | 15,822,977,301 |

(all amounts above are in Saudi Riyals)

24.    In addition to violating well established international laws and principles, Arab Bank's acts and omissions violated national policies of the United States. On January 23, 1995, President Clinton issued Executive Order 12947 declaring a national emergency on the grounds that "grave acts of violence committed by foreign terrorists that disrupt the Middle East peace process constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States, and hereby declare a national emergency to deal with that threat."

25.    President George W. Bush stated in a joint session of Congress on September 20, 2001: "We must starve terrorists of funding, turn them against one another, drive them from place to place until there is no refuge or no rest." On June 25, 2003, President Bush called for "swift, decisive action against [Palestinian] terror groups such as Hamas, to cut off their funding and support." On October 17, 2003, Vice President Richard B. Cheney described the Bush doctrine: "Any person... that *supports*, protects or harbors terrorists is complicit in the murder of the innocent and will be held to account" (emphasis added).

11

26.     The legislative and judicial branches have affirmed these principles. Article I, section 8 of the Constitution of the United States gives the Congress the power to "define and punish Piracies and Felonies committed on the high Seas, and Offences against the Law of Nations." Congress did just that in 1789 when it passed the Alien Tort Claims Act which provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C.A. 1350.

27.     In addition, The Antiterrorism Act of 1990, seeks to accomplish these ends by opening the courthouse door to victims of international terrorism. The Senate Report on the Antiterrorism Act of 1990 remarks that the legislation, with "its provisions for compensatory damages, treble damages, and the imposition of liability at **any point along the causal chain of terrorism**" would "interrupt, at least imperil, the flow of money." S. Rep. 102-342, at 22 (1992). These principles were affirmed and strengthened by Congress in the passage of the USA Patriot Act of 2001, Pub. L. 107-56 (Oct. 26, 2001) and by the Courts, which have indicated that they will heed the will of Congress and the expression of purpose by the executive branch to apply aggressively statutory remedies to compensate victims and to punish anyone who provides material support to, or aids and abets, international terrorist organizations.

28.     Plaintiffs bring this action in furtherance of (i) policies of the United States and the rest of the world which universally condemn acts of genocide, crimes against humanity, international terrorism, and the financing of international terrorism; (ii) the intent of the Congress to compensate victims of such acts and assure that support for them shall not be a cost-free undertaking, and (iii) the will of the international community, to hold accountable all persons who financially aid, or otherwise provide material support to, violations of the law of nations

12

including, but not limited to, genocide, crimes against humanity, international terrorism, and the financing of international terrorism.

## PARTIES

### Plaintiffs

29.    Plaintiffs, described below, are victims of international terrorism, genocidal conduct and crimes against humanity. They include persons injured and close family members or representatives of persons killed or injured in suicide bombings and other shockingly egregious acts of international terror, and are citizens of the United States, Israel, Argentina and France.

### The Suicide Bombings and Other Acts of Terrorism Carried out in Furtherance of the Campaign of Genocide and Crimes Against Humanity

30.    Suicide bombers and other genocidal murderers and maimers supported, encouraged and enticed by funds collected and disbursed by Arab Bank were responsible for the following acts of international terrorism, which were committed with the intent to destroy the State of Israel by the systematic murder of Jews and other Israelis, including the plaintiffs herein:

(1)    January 22, 1995:   Suicide bombers set off two consecutive bombs which exploded at the Beit Lid junction near Netanya, killing nineteen people and injuring countless others. The PIJ claimed responsibility for the attacks.  Among those who were killed were:  Asaf Banor (survived by plaintiffs Zvi Benor (brother), Emanuel Benor (father), Noa Benor (sister), and Roey Benor (brother)); Elai Dagan (survived by plaintiffs Nurit Dagan (mother), Uri Dagan (father), Elad Dagan (brother), and Adili Dagan (brother)); Eran Gueta (survived by plaintiffs Adva Gueta Levy (sister), Oshra Gueta (sister), Vittorio Gueta (father), and Dina Gueta (mother)); Anan Kadour (survived by plaintiffs Nazeh Kadour (father), Amena Kadour (mother), Hesham Kadour (brother), Lina Hasson (sister), Sara Kadour (sister), and Anat Kadour

13

(fiancee)); Refael Mizrahi (survived by plaintiffs Matana Mizrahi (mother), Itzhak Mizrahi (father), Chagit Mizrahi (sister), Efrat Mizrahi (sister), and Michal Mizrahi-Balulo (sister)); Adi Rosen (survived by plaintiffs Ofer Rosen (father), Inbal Rosen (sister), and Rachel Rosen (mother)); Damian Rosovsky (survived by plaintiffs Alberto Rosovsky (father), Diego Rosovsky (brother), and Marta Rosovsky (mother)); Yehiel Sharvit (survived by plaintiffs Moshe Sharvit (father), Yaffa Sharvit (mother), Hagit Sharvit Brin (sister), and Yosi Sharvit (brother); Eyal Levy (survived by plaintiffs Mordchay Levy (father), Helen Levy (mother), Efrat Levy (sister), and Adva Levy (sister)); Gilad Galon (survived by plaintiffs Tamar Galon-Frade (sister), Lea Galon (mother), and Mordechai Galon (father)); Shabtay Machpoud (survived by plaintiffs Aviva Machpoud (wife) and Matan Machpoud (son)); Daniel Tsichashvili (survived by plaintiffs Miriam Tsichashvili (mother), Eliahu Tsichashvili (brother), and Ester Cohen (sister)); Soli Mizrahi (survived by plaintiffs Itzak Mizrahi (father), Ruti Mizrahi (mother), and Mirit Mizrahi (sister)); Yaniv Waiser (survived by plaintiffs Itzak Waiser (father), Dalia Waiser (mother), Orit Waiser (sister), and Michal Waiser (sister)); David Ben Zino (survived by plaintiffs Maimon Ben Zino (father), Rika Ben Zino (mother), Izhak Ben Zino (brother), Yaakov Ben Zino (brother), Irit Ben Zino (sister), and Rahel Biton (sister)); David Hason (survived by plaintiffs Miriam Hason (mother), estate of Sami Hason (father), Keren Dagay-Hason (sister), and Idit Ben Arieh (sister)); Amir Hirshenson (survived by plaintiffs Miryam Hirshenson (mother), Aharon Hirshenson (father), Liat Hirshenson-Shterenlib (sister), Hadas Hirshenson-Hess (sister), and Tamar Chomski (sister)); and Eyton Peretz (survived by plaintiffs Eli Peretz (father), Jacqueline Peretz (mother), Ofer Peretz (brother), Odelia Peretz (sister)), and Maya Peretz (sister)).

14

(2)      Among those injured in the attacks were the following:  plaintiff Ori Zamir (son of plaintiffs Avraham Zamir and Yael Zamir and brother of plaintiff Adi Zamir); plaintiff Amir Weiss; plaintiff Kokhavi Nachson (father of plaintiff Gil Kokhavi); plaintiff Yossi Zinni; plaintiff Oded Avrlingi; plaintiff Tzafrir Ben-Shelomo (son of plaintiffs Eliyaho Ben-Shelomo and Gila Ben-Shelomo, brother of plaintiff Irit Ben-Shelomo, and husband of plaintiff Yehela Ben-Shelomo); plaintiff Moshe Fraiberg; plaintiff Gila Afriat-Kurtzer (wife of plaintiff Eran Kurtzer); plaintiff Yair Hillel (husband of plaintiff Annya Hillel and father of plaintiff Ori Hillel); plaintiff Tomer Inbar; plaintiff Yakov Buaron (son of plaintiff Tikva Buaron and brother of plaintiffs Shay Buaron and Amir Buaron); plaintiff Yves Arnaud Luksenburg; and plaintiff Ronen Ben Haim.

31.      Plaintiffs were injured and/or their decedents were killed in these terrorist attacks.

32.      Defendant knew or should have known that the funds deposited in the accounts established and maintained by it, or otherwise belonging to, disbursed by or under the control of it, were used to support, encourage, entice and make possible these suicide bombings and other murderous attacks in that Defendant established, maintained and administered an elaborate and highly organized program to make financial payments to the families of Palestinian "martyrs," including suicide bombers and other genocidal murderers and maimers, and to Foreign Terrorist Organizations and their front organizations.

**Defendant**

33.      Arab Bank is a Jordanian banking institution with a branch office for the transaction of business located at 520 Madison Avenue, New York, New York. Arab Bank conducts business in, and is registered to conduct business under, the laws of the State of New

15

York. It has operated a federally chartered branch in New York for over twenty years. The New York branch is designated as a wholesale bank, and among the banking and financial services that it conducts in New York is the provision of clearing and correspondent bank services to its foreign bank branch offices and affiliated banking institutions that are also owned and/or controlled by the Arab Bank Group as well as other foreign banks.

34.     Arab Bank is also one of the largest financial institutions in the Middle East. Headquartered in Jordan, it operates through a global network of more than 400 branches and offices in over twenty-five countries. Arab Bank maintains a business presence in every Arab country where private banking is permitted, as well as twenty-two local branches throughout the West Bank and Gaza Strip. Arab Bank also benefits from and operates through its various sister institutions, subsidiaries, and affiliates, which collectively make up the "Arab Bank Group". To this end, Arab Bank owns a 40% interest in Saudi Arabia's Arab National Bank.

## JURISDICTION AND VENUE

35.     Jurisdiction arises pursuant to 28 U.S.C. §1330(a), §1331 and §1332(a)(2), 18 U.S.C. §§ 2334, 2338. Jurisdiction also arises pursuant to 28 U.S.C. §1350 ("Alien Tort Claims Act") and 18 U.S.C. §1367. This Court has both personal and subject-matter jurisdiction over the Defendant herein.

36.     Venue is both proper and convenient in this District pursuant to 28 U.S.C. §1391 and 28 U.S.C. §2334.

16

## FACTUAL ALLEGATIONS

### I.    Arab Bank

37.    Arab Bank is the largest bank in Jordan with reported total assets of $23 billion. Based in Amman, Jordan, its common stock is publicly traded on the Amman Stock Exchange. Arab Bank is majority owned and controlled by the shareholders of Arab Bank Group, a Jordanian holding company, which is controlled by the Shoman family, a Jordanian family of Palestinian descent. Arab Bank and Arab Bank Group constitute a single Jordanian banking institution, and they own, control and/or operate offices and branches worldwide, including branches in every Arab country and 15 branches that are located in Palestinian Authority-administered territories in the West Bank and Gaza.

38.    According to a recent Arab Bank press release, "It is worth mentioning that Arab Bank was established in Palestine in 1930." Indeed, since at least the mid 1990s, Arab Bank has been the preferred channel for the transfer of funds from institutional sources into the Palestinian Authority-administered territories and into the hands of terrorists, their front organizations and their dependents. For example, Arab Bank has provided banking services to the Islamic Resistance Movement ("Hamas"), named as a Specially Designated Terrorist Entity ("SDT") in 1995, as a designated Foreign Terrorist Organization ("FTO") in 1997 (and subsequently in 1999, 2001, and 2003), and as a Specially Designated Global Terrorist Entity ("SDGT") in 2001, directly through its El-Mazra Branch Account # 3-810-622473-0330 in Beirut, Lebanon, which collected funds directly in the name of Hamas. Similarly, the Hamas web site directed its supporters to make contributions to Account # 38924/510 at Arab Bank's Gaza branch. As described below, Arab Bank also administers the financial infrastructure that supports terrorism by distributing monies to designated families of Palestinian "martyrs", including suicide bombers

and those killed, wounded or imprisoned in perpetrating terrorist attacks, and to other terrorist operatives and front organizations.

39.     Advertisements publicized throughout the Middle East call for donations to Arab Bank accounts to help support the intifadah.

40.     On October 3, 2000, during the early days of the ongoing violent Palestinian-Israeli confrontation, the Orbit TV (an Arabic cable TV network backed by the powerful Mawarid Group of Saudi Arabia) ' Ala al-Hawaa' ["On the air"] program interviewed Hezbollah leader Sheikh Hassan Nasrallah and Sheikh Ahmad Yassin, the former Hamas leader who was killed in an Israeli targeted attack on March 22, 2004. The program showed a slide of the names of banks and account numbers where donations could be deposited for the Palestinians participating in the violent confrontation with Israel:  Arab Bank, Geneva Branch, account number 2225200; and Arab Bank, Al-Shamissani, Amman, account number 9171.1.510

41.     The Voice of Al-Aqsa Internet site (www.aqsavoice.net) (which served Hamas) posted an announcement on May 3, 2004, condemning the Israeli air force's attack on the station. The announcement read as follows: "In order to help renew our broadcasts, you can donate to the Al-Ribat Lil-I'lam account, number 100835 at the Al-Rimal [ Gaza] branch of the Arab Bank or [account] number 20669 at the Arab Islamic Bank in Gaza."

42.     A call was sent out over the Hamas Internet site asking for contributions to the Palestinian publicity effort (the "holy war of words") through the Beirut branch of the Arab Bank. The Hamas Internet site posted the following message on October 9, 2002: "For the blessed victory of Al-Aqsa, and the uprising of the valiant Palestinian people, to expose the Zionist acts of slaughter against the defenseless Palestinian people and to show the Zionist danger to the Arab and Islamic world -- contribute to the Palestinian Information Center on the

18

Internet [the Hamas Internet site, www.palestine-info.info] for the honor of participating in the

'holy war of words'…contribute to the support of the site so that it can continue to expand…"

43.    The following appeal from the chairman of the Tulkarem Charitable Society to

the Arab Bank director about transferring financial support from the Saudi Commiettee in

Support of the intifadah was posted on the Hamas Internet site on July 10, 2004:

> "To save the holy Temple Mount and the intifada [violent insurrection] of the valiant Palestinian people…to reveal the Zionist danger to the Arab and Islamic world… to save Jerusalem and Al-Aqsa, to support the fighters and to publicize their courage and brave resistance… to expose the truth others are trying to hide, ignore and distort…the Palestinian Information Center [the Hamas Internet site], Palestine's voice to the world… [calls upon you to] contribute to the Palestinian Information Center site on the Internet, contribute to support the site, so that it can continue to expand… help us, participate in the truth by supporting Palestinian and Islamic media. The Palestinian Information Center accepts contributions and financial participation. The account is in American dollars."

44.    In addition to operating all over the Middle East, Arab Bank has operated a

federally chartered branch in New York since 1983. The bank is supervised by the Board of

Governors of the Federal Reserve System, the Office of the Comptroller of the Currency and the

FDIC.

45.    Arab Bank has a duty to conduct itself in conformity with high ethical standards,

comply with the laws and regulations applicable to the industry, avoid use of the bank's services

for illegal purposes, and cooperate fully and appropriately with law enforcement authorities. On

these points, in 1988, the Basel Committee[1], an international banking standards organization that

---

[1]    The Basel Committee was established as the Committee on Banking Regulations and Supervisory Practices by the central-bank Governors of the Group of Ten countries at the end of 1974. The Committee's objective is to improve supervisory understanding and the quality of banking supervision worldwide by, inter alia, setting minimum supervisory standards and guidelines and recommending statements of best practice.

19

formulates broad supervisory standards and guidelines and recommends statements of best

banking practice, stated the following principles:

- ▪ "Banks' management should ensure that business is conducted in conformity with high ethical standards and that laws and regulations pertaining to financial transactions are adhered to."

- ▪ "[B]anks should not set out to offer services or provide active assistance in transactions which they have good reason to suppose are associated with money-laundering activities."

- ▪ "Banks should cooperate fully with national law enforcement authorities to the extent permitted by specific local regulations relating to customer confidentiality. Care should be taken to avoid providing support or assistance to customers seeking to deceive law enforcement agencies through the provision of altered, incomplete or misleading information.

- ▪ "Where banks become aware of facts which lead to the reasonable presumption that money held on deposit derives from criminal activity or that transactions entered into are themselves criminal in purpose, appropriate measures, consistent with the law, should be taken, for example, to deny assistance, sever relations with the customer and close or freeze accounts."

*(Basel Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA Manual, Section 1501.0 (September 1997), at 3-4.)*

46.    Arab Bank admits that it is "at the forefront of preventing money-laundering and

terrorist financing."[2] It admits that, "[a]s a matter of general policy, the Bank deliberately

applies the strictest of the rules as set out by the various regulators."[3] It admits, "[m]ost

importantly, in order to counter terrorist financing transactions, Arab Bank applies the Office of

Foreign Assets Control's list (commonly known as the "OFAC list"), as well as other lists,

---

[2]    Declaration of Shukry Bishara, filed in support of Defendants' Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint, Linde, et al. v. Arab Bank, Civ. Action No. 04 CV 2799 (NG)(ASC) (EDNY), at ¶ 44, [hereinafter "Bishara Decl."].

[3]    Id. at ¶ 45.

including local lists developed by the jurisdictions in which the bank operates."[4] In fact, Arab Bank admits that "[i]ndependently of any regulatory requirements, the Bank has been at the forefront of creating and implementing strict standards on its own."[5] As Arab Bank acknowledges that it is at the forefront of terrorist financing regulations and that it has independently created even stricter standards of its own, it is obviously aware of, and contends to be compliant with, all United States federal laws and all international standards that apply to financial institutions.

47. Despite those assertions, Arab Bank maintained accounts for terrorists and supporters of extremist organizations such as Hamas and Al Qaeda, including Yassin Al Qadi, Waleed Abu Shaikah, Adel Al Harithy, Omar Saleh Saeed Al Amoudi, and Cambridge Engineering Systems. In addition, Arab Bank maintained the following accounts:

- Account no. 544134, belonging to Muhammad Nazih Salah Abu 'Abah (Hamas operative from Qalqiliya);

- Account no. 582310, belonging to Muntasser Abu Ghalyon (head of Fatah/Tanzim in Jenin);

- Account no. 431387, belonging to Na'if Abu Sharakh (head of Fatah/Tanzim in Nablus);

- Account no. 579639, belonging to Ibrahim Mustafa Ibrahim Abu Shaduf of Jenin (father of suicide bomber member of the Palestinian Islamic Jihad); and

- Account no. 36972, belonging to Tahaani Muhammad Mahmoud Manameh from the Gaza Strip (the wife of a senior Hamas operative who was killed in May 2001).

---

[4]    Defendants' Memorandum of Law in Support of its Motion to Dismiss the First Amended Complaint, Linde, et al. v. Arab Bank, Civ Action No. 04 CV 2799 (NG)(ASC) (EDNY), at 5.

[5]    Bishara Declaration at ¶ 50.

48.     Sheikh Yusuf Al-Qaradawi, a leading Islamic cleric in the Middle East whose *fatwas*, or religious edicts, have been adopted by Hamas and PIJ among others, has issued *fatwas* sanctioning the use of suicide bombings both by men and women against the people of Israel as a permissible activity in Islam.   Qaradawi has stated, "These operations [suicide bombings] are among the most respectable forms of Jihad.  This legitimate terror is allowed by the Qur'an."

49.     In addition to issuing *fatwas* sanctioning the use of suicide bombings in a campaign of terrorism against the people of Israel, Qaradawi helped found and currently heads an organization known as the Coalition of Benevolence [in Arabic, "I'talaf Al-Khair"].  This organization is comprised of a number of charities throughout the world that have been implicated specifically with Hamas including, among others, the Palestinian Relief and Development Fund – Interpal in the United Kingdom (which has been designated as a Specially Designated Global Terrorist Entity by the United States based on its relationship with Hamas), the Comité de Bienfaisance et de Secours aux Palestinien ("CBSP") in France, the Al-Aqsa Foundation in Germany, the Netherlands, and Belgium, and Al-Quds Fund for Humanitarian Services in Canada.  The Coalition of Benevolence is a product of the 101 Days Campaign initiated by a number of Hamas front organizations in the Middle East, Europe, and North America.

50.     A Hamas-affiliated website has called for donations to "Al-Aqsa and the brothers in Palestine" through organizations around the world including Interpal, Al-Aqsa Foundation, and CBSP – all members of Qaradawi's coalition.  The website also requested donations to be deposited in the account of the "101 days organization" at the Arab Bank's branch in Lebanon.  Furthermore, the 101 Days Campaign published a request on its official website that visitors to

its website donate to the organization through its accounts in any branch of the Arab Bank. As stated in French publications in July 2003, the CBSP also holds an account in the Arab Bank.

51.    Furthermore, members of the coalition have transferred money to the accounts held by the Humanitarian Relief Association (the "HRA") in the West Bank branch of the Arab Bank. The HRA, a charitable organization registered and located in Israel, was formed by the Islamic Movement in Israel. Both the HRA and the leaders of the Islamic Movement have been indicted in Israel and are accused of conspiring "to aid and hold funds for an unlawful organization" – Hamas. The Supreme Court of the State of Israel has affirmed that the HRA's activities with the Arab Bank encouraged the creation of a home front for the support of terrorist attacks, including suicide bombings and other murderous attacks, perpetrated by Hamas.

52.    In addition, Arab Bank maintained accounts for organizations affiliated with terrorist organizations including, but not limited to:

| Branch | Account No. | Name on Account | Associated Terrorist Organization |
|--------|-------------|-----------------|-----------------------------------|
| Jenin | 581345 | Jenin Charitable Society | Hamas |
| Nablus | 400271 | Nablus Al-Tadamun Charitable Society | Hamas |
| Nablus | 400336 | Nablus Islamic Aid Committee | Hamas |
| Qalqiliya | 542042 | Al-Qur'an wa al-Sunnah Society Qalqiliya | Hamas |
| Tulkarem | 500010 | Tulkarem Charitable Society | Hamas |
| Tulkarem | 503375 | Tulkarem Charitable Society | Hamas |
| Nablus | 445444 | Al-Lod Charitable Society | Hamas |
| Nablus | 400415 | Social Center, Rehabilitation Committee, Al-Wafaa' Building Charitable Society | Hamas |
| Qalqiliya | 540939 | Qalqiliya Charitable Society | Hamas |
| Nablus | 400739 | Tubas Charitable Society | Hamas |
| Ramallah | 666473 | Jama'ah al-Islamiya | Hamas |
| Al-Manara-Qalqiliya | 610686 | Ramallah Charitable Society | Hamas |
| Al-Bireh | 649611 | Al-Bireh Al-Islah Society | Hamas |
| Bethlehem | 717520 | Bethlehem Elehssan Society | Hamas |
| Bethlehem | 709966 | Bethlehem Society for Orphans | Palestinian Islamic Jihad |

23

| Hebron | 760376 | Hebron Young Muslims' Society | Hamas |
|--------|--------|------------------------------|-------|
| Hebron | 750049 | Hebron Young Muslims' Society | Hamas |
| Hebron | 751100 | Hebron Young Muslims' Society | Hamas |
| Bethlehem | 713392 | Zakat Committee Dehaishe Refugee Camp | Hamas |
| Hebron | 751542 | Hebron Elehssan Society | Hamas |
| Bethlehem | 711161 | Al-Islah Charitable Society | Hamas |
| Al-Bireh | 609509 | Al-Huda Society – Ramallah | Hamas |
| Gaza | 124109 | Central Islamic Society – Gaza Strip | Hamas |
| Ramal | 100208 | Charitable and Children's Mercy Society – Gaza Strip | Hamas |
| Gaza | 10188 | House of the Qur'an and Sunnah Society | Hamas |
| Ramal | 100605 | Trusteeship for the Care of the Aged Society | Hamas |
| Ramal | 100541 | Al-Ansar Society | Identified with Iran |
| Ramal | 120655 | Al-Ansar Society | Identified with Iran |
| Gaza | 3683 | The Islamic Society | Hamas |
| Gaza | 365459 | The Al-Nur Prisoner Society | Hamas |
| Khan Yunis | 2001438 | Khan Yunis Charity and Mercy Society | Hamas |
| Gaza | 5858 | Nusseirat Islamic Society | Hamas |
| Gaza | 150/3 | Khan Yunis Charitable Society | Hamas |
| Gaza | 35287 | Gaza Charitable Society for the Sick | Hamas |
| Gaza | 3155 | The Islamic University – Gaza | Hamas |
| Khan Yunis | 200139 | Qararah Islamic Society | Hamas |
| Gaza | 15115 | Jabalia Islamic Society | Hamas |
| Rafah | 2036 | Rafah Islamic Society | Hamas |
| Azariya | 302656 | Azariya Society for the Fostering of Women | Hamas |
| Gaza | 39435 | Nur Al-Ma'rifah Society | Hamas |
| Jenin | 578669 | Jenin Elehssan Society | Palestinian Islamic Jihad |

## II.    Standards Applicable To Financial Institutions, Including Arab Bank

53.    The statutory and regulatory duties incumbent upon financial institutions operating in the United States are set out in the Bank Secrecy Act ("BSA")[6] and the regulations

---

[6]    Titles I and II of Public Law 91-508, Oct. 26, 1970, as amended, codified at 12 U.S.C. 1829b, 12 U.S.C. 1951-1959, and 31 U.S.C. 5311 et seq; Money Laundering Control Act (1986), 18 U.S.C. 1956; The Money Laundering Prosecution Improvements Act, 31 U.S.C. 5312, 5321; The Annunzio-Wylie Anti-Money Laundering Act (1992) (Pub.L. 102-550, Title XV, Oct. 28,

appertaining thereto. Other applicable industry standards support and clarify the duties of financial institutions.

54.    The BSA and the BSA regulations that the Department of Treasury ("Treasury") has issued apply to all financial institutions and specifically apply to banks. A principle purpose of the BSA is to require financial institutions to maintain appropriate records and file certain reports which are particularly useful in investigating and uncovering money laundering, drug activities, terrorism and other illegal activities.

55.    The BSA requires financial institutions operating in the United States, and their directors, to undertake a number of anti-money laundering ("AML") efforts to ensure that financial institutions do not become conduits for terrorist financing or criminal proceeds, or facilitators of money laundering. Key provisions require financial institutions and their directors to establish AML programs that include explicit written policies and procedures which are approved by the banks directors with a notation of such approval in the minutes of the directors' meetings, to designate a qualified bank employee as the BSA compliance officer with day-to-day responsibility for all aspects of the compliance program, to train employees, to establish an internal audit function, to verify the identity of persons seeking to open and maintain accounts (often termed "Know Your Customer" requirements), and to file reports identifying suspicious activities and currency transactions greater than US$10,000 to guard against money laundering.

56.    In addition to the BSA requiring financial institutions to implement AML procedures, international standards applicable to the financial services industry would similarly require implementation and enforcement of AML procedures. To the extent that the United States has accepted membership or agreed to implement standards or principles of any

---

1992, 106 Stat. 4044), 31 U.S.C. 5318(h); The Money Laundering and Financial Crimes Strategy Act (1998), 31 U.S.C. 5341(b) and 5342(b).

25

organization promulgating such standards or principles, the standards or principles are requirements for financial institutions to conduct business in the United States.

57.    One example of such international standards comes from the Financial Action Task Force ("FATF"). The FATF is an intergovernmental body originally established by the 1989 Paris G-7 Summit to develop and promote standards and policies to combat money-laundering. The FATF includes 31 countries and two international organizations, including the major financial center countries of Europe, North America and Asia.

58.    In April 1990, and updated in 1996 and 2003, the FATF issued a set of Forty Recommendations that established a minimum for international AML standards and that has been endorsed by more than 130 countries. In October 2001, the FATF dealt specifically with terrorist financing by establishing a set of Eight Special Recommendations on Terrorist Financing, complementary to the Forty Recommendations. In particular, SR IV recommends that banks that "suspect or have reasonable grounds to suspect that funds are linked or related to, or are to be used for terrorism, terrorist acts or by terrorist organisations," are required to report their suspicions to the proper authorities.    The FATF Forty and the Eight Special Recommendations have been recognized by the International Monetary Fund and the World Bank as the international standards for combating money laundering and the financing of terrorism.

59.    Among the FATF's 40 Recommendations regarding AML laws is Recommendation 15, recommending the following:

>  15. Financial institutions should develop programmes against money laundering and terrorist financing. These programmes should include:
>
>  (a) the development of internal policies, procedures and controls, including appropriate compliance management arrangements, and

26

adequate screening procedures to ensure high standards when hiring employees;

(b) an ongoing employee training programme....

60.    Financial institutions must ensure that appropriate bank personnel are trained in all aspects of the regulatory requirements of the BSA and the banks internal BSA compliance and AML policies and procedures. According to the *Bank Secrecy Act/Anti-Money Laundering Comptroller's Handbook, September 2000, at 6-7,* an effective training program includes provisions to ensure that:

- All bank personnel, including senior management, who have contact with customers (whether in person or by phone), who see customer transaction activity, or who handle cash in any way, receive appropriate training. Those employees include persons involved with branch administration; customer service; lending; private, or personal banking; correspondent banking (international and domestic); trust; discount brokerage; funds transfers; safe deposit/custody; and vault activities.

- Training is ongoing and incorporates current developments and changes to the BSA, anti-money laundering laws, and OCC and FinCEN regulations. New and different money laundering schemes involving customers and financial institutions should be addressed. It also should include examples of money laundering schemes and cases, tailored to the audience, and in ways in which such activities can be detected or resolved.

- Training focuses on the consequences of an employee's failure to comply with established policy and procedures (e.g., fines or termination). Programs should provide personnel with guidance and direction in terms of banking policies and available resources.

61.    **"Know Your Customer" standards must be met.**  At all relevant times, the standard within the financial institution industry has been to have "Know Your Customer" practices to insure the immediate detection and identification of suspicious activity. *(BSA Manual Section 601.0 (September 1997), at 1.)*  In a 1988 Statement of Principles, the Basel Committee stated the following principle regarding the "Know Your Customer" policy:

27

"With a view to ensuring that the financial system is not used as a channel for criminal funds, banks should make reasonable efforts to determine the true identity for all customers requesting the institution's services."

*(Basel Committee, Prevention of Criminal Use of the Banking System for the Purpose of Money-Laundering, Statement of Principles (December 1988), reprinted in BSA Manual, Section 1501.0 (September 1997), at 3.)*

62.    In addition to identifying a customer, an integral part of an effective "Know Your Customer" policy is a comprehensive knowledge of the transactions carried out by the customers of the financial institution. Therefore, the "Know Your Customer" procedures established by the institution must allow for the collection of sufficient information to develop a "customer profile."    The primary objective of such procedures is to enable the financial institution to predict with relative certainty the types of transactions in which a customer is likely to be engaged. The profile should allow the financial institution to understand all facets of the customer's intended relationship with the institution, and, realistically, determine when transactions are suspicious or potentially illegal. *(BSA Manual Section 601.0 (September 1997), at 2.)*

63.    **Due Diligence is necessary when opening and maintaining accounts.** According to the Wolfsberg AML principles[7], global anti-money laundering standards and

---

[7]    The Wolfsberg Group is an association of large global banks that came together in 2000, at the Château Wolfsberg in north-eastern Switzerland, which agreed to a set of global anti-money-laundering guidelines for international private banks.    The banks initially involved included ABN AMRO Bank, Barclays Bank, Banco Santander Central Hispano,S.A., The Chase Manhattan Private Bank, Citibank, N.A., Credit Suisse Group, Deutsche Bank AG, HSBC, J.P. Morgan, Société Générale, and UBS AG.    The Group's purpose is to develop financial services industry standards for Know Your Customer, Anti-Money Laundering and Counter Terrorist Financing policies.    The Wolfsberg Anti-Money Laundering Principles for Private Banking were published in October 2000 (and revised in May 2002). In January 2002, the Group published a Statement on the Financing of Terrorism and, in November 2002, released the Wolfsberg Anti-Money Laundering Principles for Correspondent Banking. The Wolfsberg Group's most recent Statement, on Monitoring Screening and Searching, was published in September 2003. The standards are widely known.

guidelines established by the world's largest banks, a "bank will endeavor to accept only those clients whose source of wealth and funds can be reasonably established to be legitimate... Mere fulfillment of internal review procedures does not relieve the private banker of this basic responsibility."

64.     The Wolfsberg AML principles require that, for all accounts, the bank must exercise the following due diligence principles to identify the principle beneficial owners of an account:

- Natural persons:  when the account is in the name of an individual, the private banker must establish whether the client is acting on his/her own behalf.  If doubt exists, the bank will establish the capacity in which and on whose behalf the account holder is acting.

- Legal entities:  where the client is a company, such as a private investment company, the private banker will understand the structure of the company sufficiently to determine the provider of funds, principal owner(s) of the shares and those who have control over the funds, e.g. the directors and those with the power to give direction to the directors of the company.  With regard to other shareholders the private banker will make a reasonable judgment as to the need for further due diligence.

- Unincorporated associations:  the above principles apply to unincorporated associations.

65.     To meet the due diligence standards established by the Wolfsberg AML principles, banks should meet the client before opening the account and must collect and record the following information about each account:  Purpose and reasons for opening the account; Anticipated account activity; Source of wealth (description of the economic activity which has generated the net worth); Estimated net worth; Source of funds (description of the origin and the means of transfer for monies that are accepted for the account opening); and References or other sources to corroborate reputation information where available.

66.     The FATF warns that mere financial accounting and auditing might be insufficient protection against the abuse.  "Direct field audits of programmes may be, in some

29

instances, the only method for detecting misdirection of funds. Examination of field operations is clearly a superior mechanism for discovering malfeasance of all kinds, including diversion of funds to terrorists." FATF Task Force on Money Laundering, Combating the Abuse of Non-Profit Organisations," at ¶ 11, p. 3 (October 11, 2002).

67.    Non-profit Organizations, particularly those held out as charitable organizations, constitute high-risk accounts warranting enhanced due diligence and scrutiny, because the mechanism of charitable fundraising has, "in numerous instances ... been used to provide a cover for the financing of terror." FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 4, p. 1 (October 11, 2002).

68.    Although "[j]urisdictions may differ on the scope of purposes and activities that are within the definition of 'charity,' ... all should agree that ['charity'] does not include activities that directly or indirectly support terrorism, including actions that could serve to induce or compensate for participation in terrorist acts." FATF, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 5, p. 2 (October 11, 2002).

69.    The misuse of non-profit organizations for the financing of terrorism has been a crucial weak point in the global struggle to stop such funding at its source. This issue has captured the attention of the Financial Action Task Force (FATF), the G7, and the United Nations, as well as national authorities in many regions. FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 1, p. 1 (October 11, 2002).

70.    The FATF recognizes that the importance of requiring charitable fund-raising and transfer of funds to go through formal or registered channels underscores the benefit of enlisting the established powers of the bank regulatory system – suspicious activity reporting, know-your-

customer (KYC) rules, etc – in the fight against terrorist abuse or exploitation of non-profit organisations.    FATF on Money Laundering, "Combating the Abuse of Non-Profit Organisations: International Best Practices," at ¶ 21, p. 5 (October 11, 2002).

71.    Recommendation VIII of the FATF Special Recommendations on Terrorist Financing provides:

> Countries should review the adequacy of laws and regulations that relate to entities that can be abused for the financing of terrorism.  Non-profit organisations are particularly vulnerable, and countries should ensure that they cannot be misused:
>
> (i) by terrorist organisations posing as legitimate entities;
>
> (ii) to exploit legitimate entities as conduits for terrorist financing, including for the purpose of escaping asset freezing measures; and
>
> (iii) to conceal or obscure the clandestine diversion of funds intended for legitimate purposes to terrorist organisations.

72.    Offering guidance regarding the process of determining when increased scrutiny is necessary, the Financial Action Task Force has recommended the following in its Guidance for Financial Institutions in Detecting Terrorist Financing:

> Determining when increased scrutiny is necessary?
>
> 7. Financial institutions are encouraged to develop practices and procedures that will help to detect and deter those transactions that may involve funds used in terrorist financing. The increased scrutiny that may be warranted for some transactions should be seen as a further application of the institution's due diligence and anti-money laundering policies and procedures and should lead, when appropriate, to reporting of such financial activity as suspicious or unusual under applicable transaction reporting regimes for a particular jurisdiction.
>
> ...
>
> [Financial institutions] should ascertain whether transactions are unusual, suspicious or otherwise indicative of criminal or terrorist activity.

> *[FATF Guidance for Financial Institutions in Detecting Terrorist Financing, at 2-3.]*

73.    The FATF cautions that the methods terrorists use to secure funds are generally the same as other criminals engaged in money-laundering schemes:

Laundering of terrorist related funds

15. From a technical perspective, the methods used by terrorists and their associates to generate funds from illegal sources differ little from those used by traditional criminal organisations. [...] It follows then that terrorist groups must similarly find ways to launder these funds in order to be able to use them without drawing the attention of authorities. In examining terrorist related financial activity, FATF experts have concluded that terrorists and their support organisations generally use the same methods as criminal groups to launder funds. Some of the particular methods detected with respect to various terrorist groups include: cash smuggling (both by couriers or bulk cash shipments), structured deposits to or withdrawals from bank accounts, purchases of various types of monetary instruments (travellers' cheques, bank cheques, money orders), use of credit or debit cards, and wire transfers. There have also been indications that some forms of underground banking (particularly the hawala system) have had a role in moving terrorist related funds.

*[FATF Guidance for Financial Institutions in Detecting Terrorist Financing, at 5.]*

74. Notwithstanding these standards and guidelines requiring increased scrutiny and due diligence to prevent non-profit organizations, or alleged charitable organizations, from being used as a cover for terror financing, Arab Bank nonetheless facilitated the banking needs for each of the organizations identified in paragraphs 38-43, 47, and 50-52, becoming a conduit for terrorist financing, despite knowledge that each of the organizations was being used, abused, misused, or exploited to aid, abet, facilitate and otherwise support Hamas, PIJ, AAMB, and PFLP in committing terrorist acts.

75. **Enforcement is required.** Pursuant to the Bank Secrecy Act, 31 U.S.C. §§ 5311 to 5324, the Secretary of the Treasury has prescribed regulations governing financial institutions' obligations to report certain currency transactions. 31 U.S.C. § 5313. In prescribed circumstances, financial institutions, including the defendants, must file Suspicious Activity Reports (Treasury Department Form 90-22.47), pursuant to section (a) of 31 CFR § 103.18 (Treasury), 12 CFR 21.11 (OCC), 12 CFR §§ 208.60 and 208.62 (Federal Reserve), 12 CFR §§

32

353.1 and 351.3 (FDIC) and 12 CFR § 563.180 (OTS) and Currency Transaction Reports (IRS Form 4789), pursuant to 31 CFR § 103.22.

76.     Banks must have a written policy on the identification of and follow-up on unusual or suspicious activities. Some examples of unusual or suspicious activities may include:

- Account transactions or other activities which are not consistent with the customer's business or the account's due diligence file;

- Cash transactions over a certain amount;

- Account transactions or other activities that seek to avoid reporting or record keeping requirements;

- Wire, pass-through, and in-and-out transactions

77.     Following the September 11th attacks far greater terrorist financing legislation was enacted. As President Bush stated "[w]e put the world's financial institutions on notice: if you do business with terrorists, if you support them or sponsor them, you will not do business in the United States of America."[8]

78.     Arab Bank, acting in accordance with these banking regulations knew that accounts opened within its branches were being used to fund suicide bombing attacks in Israel sponsored and facilitated by Hamas, PIJ, AAMB, and PFLP who, in turn, engaged in suicide bombings and other murderous attacks in Israel. Moreover, as is discussed in greater detail below, Arab Bank engaged in correspondence with known members of Hamas wherein the bank was instructed to send payments to the families of suicide bombers. Arab Bank Board members and officials publicly called for donations and contributions to the Palestinian Intifada knowing that some portions of those funds would be used to encourage, support, and facilitate suicide bombing and other murderous attacks.

---

[8]     Remarks of President George W. Bush in his address to the Financial Crime Enforcement Network in Vienna, Va., Nov. 7, 2001.

**III.    Historical Background**

### Origins of Palestinian Terror

79.    Almost since the formation of the State of Israel in 1948, Palestinian paramilitary and terrorist organizations have sought to destroy it, through, inter alia, the systematic murder of Jews and other civilians in Israel. In December 1987, a collective Palestinian popular uprising -- or *intifada* -- erupted against Israel in the West Bank and in Gaza. The *intifada* developed into a well-organized rebellion orchestrated by the Palestinian Liberation Organization ("PLO") from its headquarters in Tunis. A second Palestinian *intifada*, which erupted in late September 2000, engulfed Palestinians and Israelis in violent armed conflict that continues to this day. It is popularly called the Al Aqsa Intifada or the Intifada Al Quds.

80.    Each *intifada* was characterized by systematic and widespread terror campaigns designed not only to kill Jews and Israelis, but to intimidate and coerce the civilian population of Israel, to cause Israel to cede territory to the Palestinians and ultimately, to destroy the Jewish state.

81.    With the outbreak of the second *intifada*, Hamas and other Palestinian terrorist organizations – notably PIJ, AAMB, and PFLP – intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks within Israel, the West Bank and Gaza.

82.    Like Hamas, PIJ, AAMB, and PFLP are similarly committed to the destruction of the State of Israel. According to some estimates, attempted attacks have numbered approximately 21,000 and have targeted Jews, other civilians and those in innocent proximity, resulting in the death and injury of thousands of individuals, an overwhelming majority of which are civilians.

83.     Hamas, PIJ, AAMB, and PFLP rewarded these suicide bombings and other murderous attacks and provided incentives for future acts by financially subsidizing family members of suicide bombers and other terrorist operatives who were killed, injured and imprisoned, and by ensuring that the families of such "martyrs" were revered in the community.

84.     Palestinians terrorist organizations have long used the financial support of "martyrs", including suicide bombers, as a key inducement to terror.  Ibrahim al-Yazuri, an original participant in the founding of Hamas, explained in a London newspaper interview: "The Hamas movement is concerned about its individuals and its elements, especially those who engage in the blessed *jihad* against the hateful Israeli occupation.... The movement takes care of their families and their children and provides them with as much material and moral support as it can.... The movement provides this aid through the support and assistance it gives to *zakat* committees and the Islamic associations and institutions in the Gaza Strip."  According to the late Hamas leader Sheikh Ahmed Yassin, Hamas, as of 2001, distributed $2 to $3 million each month to relatives of Palestinian suicide bombers.

### Hamas

85.     Harakat al-Muqawamah al-Islamiyya is Arabic for "The Islamic Resistance Movement" and is known by its acronym of Hamas.  Hamas is a terrorist organization based in the West Bank and Gaza Strip that is well-known throughout the World.  It has been targeted as an institution of terror and consequent genocidal conduct since the early 1990's.

86.     Hamas was founded by Sheikh Ahmed Yassin in 1987.  In August 1988, Hamas published its charter called the Covenant of the Islamic Resistance Movement which states that the purpose of Hamas is to create an Islamic Palestinian state throughout Israel by eliminating

the State of Israel and its citizenry and innocent bystanders through *violent jihad*. This charter was distributed throughout the Occupied Territories, Jordan, the Middle East and throughout the World first in booklet form and, with the advent of the Internet, *via* this medium.

87.    The charter states that "Israel will exist and will continue to exist until Islam will obliterate it, just as it obliterated others before it." The charter sets forth Hamas' slogan:

> "Allah is its target, the Prophet is its model, the Koran its constitution: *Jihad is its path and death for the sake of Allah is the loftiest of its wishes.*"

88.    Hamas condemns all peaceful solutions to the Palestinian Israeli conflict. "Initiatives and so-called peaceful solutions and international conferences, are in contradiction to the principles of the Islamic Resistance Movement....There is no solution for the Palestinian question except through Jihad. Initiatives, proposals and international conferences are all a waste of time and vain endeavors."

89.    Hamas achieves its goals through a military and a social wing. The military wing, called Izz el-Din al-Qassam Brigades, carries out suicide bombings and other murderous attacks within Israel, the West Bank and Gaza. These attacks target civilians and have resulted in deaths and injuries to hundreds of individuals including Plaintiffs in this action who number in excess of 600 individuals as of this filing. The number of those killed or maimed or injured since September of 2000 is estimated to exceed 20,000.

90.    As the Israeli Supreme Court noted in its opinion regarding the appeal of Sheikh Ra'ed Salah:

> "The modus operandi of the organization [known as] Hamas, as described by professional opinion and [demonstrated by] the evidence, shows that its civilian activities provide an infrastructure for its terrorist activities by supporting, reinforcing and encouraging them...transferring funds to support the families of suicide bombers and security detainees can certainly be considered an incentive and encouragement for the perpetrating of lethal terrorist attacks and has nothing in common with ordinary religious behests to contribute to the welfare of the

needy and indigent, which the complainant [sheikh Ra'ed Salah] and his representatives would like to use to camouflage their actions."

*(Sheikh Raed (Bin Salah) Mahajneh v. State of Israel*, Supreme Court of Israel, Case No. 7223/03, page 7 paragraph 5 (August 18, 2003)).

91.    Hamas' social wing, called *Dawa*, provides food and educational assistance to religious and academic institutions which facilitate the teachings of Hamas. The social wing of Hamas is responsible for instilling a fundamentalist ideology at an early age in order to recruit suicide bombers, and "instill the spirit of jihad in the heart of the nation."

92.    In a July 31, 2001, Reuters article, Abdel-Aziz al-Rantissi, a senior Hamas official and spokesman stated, "The (Hamas) political leadership has freed the hand of the brigades to do whatever they want against the brothers of monkeys and pigs." The term "brigades" refers to the group's military wing, Izz el-Din al-Qassam brigades. Rantissi further stated, "I urge all the brigades to chase and target the Israeli political leaders and members of parliament, the killer (Prime Minister Ariel) Sharon and the criminal (Foreign Minister) Shimon Peres."

93.    The charter states that it is "necessary that scientists, educators and teachers, information and media people, as well as the educated masses, especially the youth and sheikhs of the Islamic movements, should take part in the operation of awakening (the masses)." The charter calls for basic changes to the school curriculum, to cleanse it of traces of the ideological invasion … of the Crusaders…."

94.    The ideological affect on young children cannot be overstated. It has been widely reported that Hamas recruits children to conduct suicide bombing attacks.

95.    An August 13, 2001 *USA Today* article describes how Hamas' social infrastructure, in this case Hamas-run schools, serve Hamas' ends:

> In Hamas-run kindergartens, signs on the walls read: "The children of the kindergarten are the shaheeds (holy martyrs) of tomorrow." The classroom signs

37

at Al-Najah University in the West Bank and at Gaza's Islamic University say, "Israel has nuclear bombs, we have human bombs." At an Islamic school in Gaza City run by Hamas, 11-year-old Palestinian student Ahmed states, "I will make my body a bomb that will blast the flesh of Zionists, the sons of pigs and monkeys . . . I will tear their bodies into little pieces and cause them more pain than they will ever know." "Allah Akbar," his classmates shout in response: "God is great." "May the virgins give you pleasure," his teacher yells, referring to one of the rewards awaiting martyrs in paradise. Even the principal smiles and nods his approval. "You don't start educating a shaheed at age 22," says Roni Shaked, a terrorism expert and former officer in Israel's Shin Bet secret service. "You start at kindergarten so by the time he's 22, he's looking for an opportunity to sacrifice his life."

96.     In 1995, the U.S. government named Hamas a "Specially Designated Terrorist" entity, at which time its assets subject to U.S. jurisdiction were blocked by Executive Order 12947 and implementing regulations. The Executive Order prohibits transactions, including financial transactions, with organizations and individuals so designated. This designation was well-known by Arab Bank and by all financial institutions. Former Hamas Political Bureau Chief and current Deputy Chief Mousa Abu Marzook was designated as a Specifically Designated Terrorist on August 29, 1995.

97.     On October 8, 1997, Hamas was designated a Foreign Terrorist Organization by the U.S. Secretary of State pursuant to 8 U.S.C. § 1189, by publication in the Federal Register. It became unlawful to provide material support and resources, including currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of Hamas.

98.     The designation of Hamas was a public event well-known to the entire banking community including Arab Bank. On October 12, 1997, the Jordanian newspaper *Al-Ra'y* listed the designation of Hamas as a foreign terrorist organization.

99.     Arab Bank provided financial services and direct financial contributions to Hamas knowing that Hamas was listed in as a Specially Designated Terrorist entity in 1995, as a

designated Foreign Terrorist Organization in 1997, and as a Specially Designated Global Terrorist Entity in 2001.

**Palestinian Islamic Jihad**

100.    The Palestinian Islamic Jihad –Shiqaqi Faction ("PIJ") is an international terrorist organization with "cells" or units located throughout the world.  PIJ is also known as "the Islamic Movement in Palestine," "The Movement," and "The Family."

101.    PIJ published a document describing its organizational structure, goals and principles entitled "Manifesto of the Islamic Jihad in Palestine."  The PIJ Manifesto is widely distributed throughout the Occupied Territories, Jordan, the Middle East and the entire world.

102.    The Manifesto states that: "The Islamic Jihad Movement in Palestine is a revolutionary 'Jihad' movement embracing Islam as Religion and State (Form of Government). It is the vanguard of the Islamic Revolutionary Movement.   The guiding principle or characteristic is that "Jihad is the solution to liberate Palestine and topple the infidel regimes."

103.    PIJ, like Hamas, states as its political constant "the rejection of any peaceful solution for the Palestinian Cause, and the affirmation of the Jihad Solution and the Martyrdom style as the only choices for liberation."  PIJ's general goals include the "realization of the Islamic unity through Collective Jihad [and] the liberation of the Holy Land from the Zionist occupation."

104.    PIJ's Manifesto lists specific means by which it plans to obtain its general goals which include:

- "triggering a continual attrition of the abilities and capacities of the enemy, and striking its economical and financial sources."

- "The creation of a situation of terror, instability and panic in the souls (minds) of Zionists and especially the groups of settlers, and force them to leave their houses."

- "The creation of a psychological barrier between the Jews and the Muslim Palestinian people; and the implementation of a conviction that the coexistence is impossible; and resisting the heralds of the idea of coexistence between Arabs and Israelis."

- "coexistence is impossible; and resisting the heralds of the idea of coexistence between Arabs and Israelis."

105.    PIJ even published slogans, such as the following, to entice people to engage in suicide bombings and other murderous attacks:

- Jihad is the way to liberation.

- Jihad is the way to Unity and Union is the way to consolidation.

- Martyrdom awards life.

- The Muslim Populations are the dimension of the Intifada.

- Blood is the dower for Freedom.

- Victory or Martyrdom, the way for Jihad.

106.    PIJ also has established Committees including: a Cultural Committee to publish leaflets, booklets and prepare videotapes and audiotapes to spread the message of the Movement; a Financial Committee to collect financial contributions, invest those contributions, and distribute the contributions to "different fields of action;" a Public Relations Committee to be the spokesmen of the Movement and to spread PIJ's message; the Committee for Prisoners and Martyrs to spread money received from abroad to the families of "martyrs" and prisoners.

107.    In January 1995, PIJ was listed as a Specially Designated Terrorist Entity ("SDT") by the U.S. Department of Treasury pursuant to Executive Order 12947 prohibiting transactions with groups that threaten to disrupt the Middle East peace process.

108.    On October 8, 1997, PIJ was designated a Foreign Terrorist Organization by the U.S. Secretary of State pursuant to 8 U.S.C. §1189, by publication in the Federal Register.    It

40

became unlawful to provide material support and resources, to include currency or monetary instruments, financial services, personnel, transportation and other provisions, to any component of PIJ.

109.    The designation of PIJ was a public event well-known to the entire banking community including Arab Bank.

110.    Arab Bank provided financial services and direct financial contributions to PIJ knowing that PIJ was designated in 1995 as Specially Designated Terrorist entity, as a designated Foreign Terrorist Organization in 1997, and as a Specially Designated Global Terrorist Entity in 2001.

### Al-Aqsa Martyrs' Brigade

111.    The Al-Aqsa Martyrs' Brigade (Kata'ib Shuhada' al-Aqsa) ("AAMB") acts with the help of senior officers of other elements of the Palestinian Authority's armed entities, the Tanzim and Force 17 who have provided illegal weapons, training and intelligence to help carry out the attacks.

112.    The AAMB organized some of the most gruesome terrorist attacks in Israel, especially during the escalation of violence in 2001 and 2002. In that period, the al-Aqsa Martyrs' Brigade increased the level of its cooperation with other terrorist organizations, including Hamas, PIJ and PFLP. A number of bombings and shootings were perpetrated by the AAMB, individually or in partnership with other terrorist groups.

113.    On April 2, 2002 Israel made public an invoice that was found among documents taken by Israeli troops in Arafat's Ramallah compound during Operation Defensive Shield. The invoice, titled "Financial Report" and dated September 16, 2001, appears to be a bill to the Palestinian Authority from the AAMB. It requests from Arafat's government payment for,

41

among other things, electrical and chemical components for 30 bombs: "We need about 5-9 bombs a week for our cells in various areas." The payment was approved.

114.    AAMB recruited 15-year-old boys to carry out suicide bombing attacks. AAMB promised the people they recruited for suicide bombings that payments would be made to their families after the attacks were conducted.

115.    Zakariyya Muhammad 'Abd Al-Rahman Zubeidi is head of the terrorist infrastructure of AAMB in the Jenin area. In recent interviews with Israeli and foreign media, he has repeatedly stated he regards his orders as holy, and that he will "fight and not stop..." Zubeidi also admitted to a BBC correspondent that he had received money from the AAMB (his share of the $50,000 Fatah gives AAMB every month).

116.    The terrorist activities and ideology AAMB espouses are well-known throughout the Occupied Territories, Jordan, the Middle East and the world. Its terrorist attacks are widely reported and the group publicly advertises its involvement in terrorist attacks. AAMB publishes information for distribution in the Middle East including the Occupied Territories and Jordan and maintains a website which is available for the world to view.

117.    Furthermore, on March 27, 2002, pursuant to the authority of section 1(b) of Executive Order 13224 of September 23, 2001, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, has designated the AAMB (also known as the Al-Aqsa Martyrs Battalion) as a Specially Designated Global Terrorist ("SDGT").

118.    On March 27, 2002, pursuant to section 1(a)(ii)(A) of the Executive Order 12947 of January 23, 1995, the Deputy Secretary of State, acting under the authority delegated to him by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney

General determined that AAMB (also known as the Al-Aqsa Martyrs Battalion) has committed, or poses a serious risk of committing, acts of violence that have the purpose or effect of disrupting the Middle East Peace Process.

119.    Arab Bank provided financial services and direct financial contributions to the AAMB knowing that the group was engaged in terrorist acts. This financial support continued even after AAMB was designated as Specially Designated Global Terrorist entity and a Foreign Terrorist Organization.

### Popular Front for the Liberation of Palestine

120.    The PFLP was founded on December 11, 1967 with the union of two left-wing Palestinian organizations. Its leaders were Wadi' Haddad (who later became responsible for terrorist operations) and George Habash, the general secretary. The PFLP is a Marxist organization which advocates armed insurrection. It perpetrates show-case, media-oriented attacks, particularly the hijacking of planes, to bring the Palestinian cause to public attention.

121.    In 1971, under the leadership of Habash, the organization took a more pragmatic line. Nevertheless, the PFLP never agreed to recognize Israel and left the PLO after the acceptance of the "Stage Strategy" (June 1974) as adopted in Cairo by the Palestinian National Council. Although the PFLP continued its pragmatic line, it is still opposed to the Oslo accords and is critical of the Palestinian Authority, despite the fact that it made its peace with Arafat and returned to the ranks of the PLO.

122.    In May 2000, George Habash resigned as general secretary because of failing health and was replaced by Abu Ali Mustafa. Mustafa directed the organization to perpetrate terrorist attacks against Israel. He was killed in a targeted attack on August 21, 2001 in Ramallah and replaced by Ahmad Sadat. Sadat directed the assassination of Rehavam Ze'evi, Israeli

43

Minister of Tourism (October 17, 2001). In the wake of Israeli and international pressure Sadat was arrested by the Palestinian Authority and is today in "custody" in Jericho. The PFLP's political leadership resides in the PA-administered territories and Syria, and a small operational-terrorist wing in the PA-administered territories (the Shaheed Abu 'Ali Mustafa Battalions).

123.    During the current violent confrontation the PFLP called for an armed insurrection and perpetrated a number of terrorist attacks despite the fact that its operational-terrorist wing is smaller than those of the other Palestinian terrorist organizations. It is party to the inter-organizational dialogues but refused to participate in the hudna when Abu Mazen was prime minister.

124.    In 1995 the PFLP was named a Specially Designated Terrorist Organization pursuant to Executive Order 12947. Two years later in 1997, like Hamas and PIJ, the PFLP was designated as an FTO.

125.    Arab Bank provided financial services and direct financial contributions to the PFLP knowing that the group has engaged and continues to engage in terrorist acts. This financial support continued even after the PFLP was designated as Specially Designated Terrorist entity and an FTO.

126.    Arab Bank and its leading shareholders have knowingly supported the terrorist, genocidal, and human rights atrocities described herein.

### The Mujahideen Committee and Historical Saudi Support for the *Intifada*

127.    The *intifada* has been supported financially through different mechanisms. In recent year, the Kingdom of Saudi Arabia has provided one of the most significant and systematic avenues of support. Historically and as a matter of state policy, the Kingdom of Saudi Arabia has morally, politically and financially supported the *intifada*. The de facto ruler of

44

the Kingdom of Saudi Arabia, Crown Prince Abdullah has stated: "We, in the Kingdom, will not show any slackness in defending our brothers in Palestine led by my brother the *mujahid* [holy warrior], Yasser Arafat." In furtherance of this national policy, following the Arab-Israeli war in 1967, the Kingdom of Saudi Arabia formed the Popular Committee for Assisting the Palestinian Mujahideen (the "Mujahideen Committee") for the express purpose of "assisting the freedom fighters of Palestine," and "extending assistance to members of the families of the martyrs." In February 1994, King Fahd Ibn Abd Al-Aziz issued an updated directive to Prince Salman Ibn Abd Al-Aziz, the Governor of Riyadh who heads the Mujahideen Committee, to support the Palestinians with a national fund-raising campaign in the Kingdom. The Mujahideen Committee provided the Palestinian Liberation Organization with millions of dollars.

128.    Terrorist groups interact and support one another in a matrix of international logistical, financial and sometimes operational terrorist activity.  *See*, Matthew Levitt, "The Political Economy of Middle East Terrorism," *Middle East Review of International Affairs*, Vol. 6, No. 4 (December 2002).

129.    A task force on terrorist financing, sponsored by the Council on Foreign Relations, recently highlighted this interaction, noting: "[o]ther Islamic terrorist organizations, Hamas and Hizballah specifically, often use the very same methods-and even the same institutions-[as al-Qa'ida] to raise and move their money. And more recently, published reports suggest that al-Qa'ida has formed additional tactical, ad-hoc alliances with these terrorist organizations to cooperate on money laundering and other unlawful activities."  *Id; citing,* Maurice R. Greenberg, Chair, "Terrorist Financing: Report of an Independent Task Force Sponsored by the Council on Foreign Relations," The Council on Foreign Relations, October

2002. In fact, while there is no shortage of examples of operational and logistical links between disparate militant Islamist groups, these interactions are most pervasive in the realm of financing.

130.    The same global interconnectedness concerning all Islamic terrorist groups is found in the activities of Hamas and PIJ. These groups share the same ideology and methodology to accomplish their purposes. The groups share logistical and tactical information, jointly conduct operations and terrorist attacks, and actively reap the benefits of a financial matrix. As the financial support is given as social or "charitable" donations, distinctions between various groups and their operational, military and political wings are fundamentally flawed.

131.    Other Palestinian terrorist groups such as the AAMB and the PFLP, though not Islamic in orientation, have served to benefit from the financial support that has been fed into the Palestinian territories since the outbreak of the Al-Quds Intifada. Possessing the same ultimate goal as their Islamic counterparts of eradicating the State of Israel, these groups have also engaged in a campaign of suicide bombings and other similarly egregious terrorist attacks against the Israeli civilian population. The families of those involved in these attacks have also received the support of funds emanating from the Arab Bank's coffers.

132.    The government of the United States reportedly opposed and condemned the funding of Hamas by Saudi individuals. In 1994, for example, President Clinton reportedly requested that Saudi Arabia stop providing financial support to the Palestinian uprising and to Hamas.

133.    In spite of this warning, the Kingdom of Saudi Arabia increased its support for the Palestinian uprising throughout the 1990s and into the new century, and openly and officially supported suicide bombings and other murderous attacks. Beginning in the mid-1990s, the official Saudi religious establishment began blessing suicide bombings and other murderous

attacks by Hamas and other Palestinian terrorist organizations. In early May 2002, Saudi Arabia's Minister of Islamic Affairs publicly stated: "[t]he suicide bombings are permitted," adding that "the victims are considered to have died a martyr's death."

134. Arab Bank knew that it was financially supporting terrorist attacks in Israel. Arab Bank assisted its customers by maintaining and facilitating an account dedicated to Hamas, and accounts maintained by Hamas NGO's. Arab Bank knew that individuals in Saudi Arabia were publicly collecting donations for terrorist attacks and Arab Bank provided material support to terrorist groups by facilitating the transfer of these funds. Through these acts, Arab Bank financially supported genocide and human rights violations by assisting in and facilitating the financial incentivization of terrorism.

## IV.    The Saudi Committee for Aid to the Al Quds Intifada

135. In order to further encourage, incite and make possible the second *intifada* – including its campaign of systematic suicide bombings and other murderous attacks – the Kingdom of Saudi Arabia in October 2000 established the Saudi Committee for Aid to the Al Quds Intifada ("Intifada Committee"). According to official Saudi sources, the purpose of the Intifada Committee was to support financially, among others, the families and dependents of Palestinian "martyrs."

136. As noted above, the Al Quds Intifada erupted in late September 2000. Almost immediately, the Kingdom of Saudi Arabia intentionally adopted and implemented a national policy decision to support financially the *intifada*. On or about October 9, 2000 King Fahd Ibn Abdul Aziz issued directives to the governors of all administrative regions of Saudi Arabia to gather donations from the public to support the Al Quds Intifada, including through the Intifada Committee, a new entity established by the Saudi government pursuant to Royal Decree # 8636

on or around October 16, 2000. The Intifada Committee was to be headed by Prince Nayef bin Abd Al-Aziz, the Interior Minister of Saudi Arabia and the half-brother of Saudi Crown Prince Abdullah. According to a 2004 U.S. government report, the Intifada Committee "has served as the main conduit for Saudi financial and material aid to the Palestinian territories since its establishment."

137.    In late October 2000, the Arab League held an emergency summit in Cairo to discuss the second *intifada*. At the summit, Saudi Crown Prince Abdullah proposed to multilateralize Saudi Arabia's financial support of the second *intifada*. The Crown Prince told the summit: "[o]ur support for our Palestinian brothers should not only be political and moral. It should include all possible [financial] means. Accordingly, we propose the establishment of a special trust under the name of the 'Al Quds Intifada Fund' with a capital of 200 million US dollars. This amount will be allocated to the families and education of the children of the Palestinian martyrs who sacrificed their lives in the struggle.... The Kingdom shall contribute 25% of the amount allocated [to the Al Quds Intifada Fund]." The Arab League adopted the Saudi proposal.

138.    The Intifada Committee would thus be capitalized by both government funds and private donations. Whereas official funds from the Saudi and other Arab governments were collected in, among other institutions, the Islamic Development Bank, funds from the private donation campaigns launched in the Kingdom pursuant to royal decree were collected in special dedicated bank accounts in certain commercial banks located in the Kingdom.

139.    The private donation campaign was immediately highly successful. In October 2000, the Intifada Committee collected 150,000,000 Saudi *riyals* (SR) in the Riyadh region alone, according to published reports; and, in November 2000, according to published reports,

48

"Saudi authorities were busy disbursing financial assistance to casualties and relatives of martyrs of the Al Quds Intifada in Palestine." As of early April 2001, according to Saudi Minister of Finance and National Economy Dr. Ibrahim Al Assaf, cash donations from the people of Saudi Arabia to the Intifada Committee exceeded SR 240,000,000, or approximately $64 million.

140.    That same month, Saudi state-run television broadcast a "telethon" to benefit the Intifada Committee that included appeals from, among others, senior Saudi officials. That "telethon" reportedly raised over $100 million in donations. In Senate testimony on April 24, 2001, U.S. Secretary of State Colin Powell was asked whether he knew how the $100 million raised in the Spring 2001 telethon for the Intifada Committee was disbursed. He said: "We have seen some indications some of the money…would be going to elements of Hamas. So there are some troubling aspects as to how that telethon money would be distributed."

141.    Money was transferred from the Saudi institutions and organizations to Chase Manhattan Bank, New York, NY and Citibank, Buffalo, NY then to The Arab Bank in Tulkarem, where it was deposited into the account of the Tulkarem Charity Committee which has been identified with Hamas.

142.    Indeed, Dr. Assaf, the Saudi Minister of Finance and National Economy, stated around the time of the "telethon" that the Intifada Committee had pledged SR 20,000 [$5,333] to each Palestinian family that had suffered from martyrdom. He said that SR 124 million [$33.07 million] had been transferred for this purpose.

143.    The web page of the Royal Embassy of Saudi Arabia in Washington contained similar declarations. A March 20, 2001 posting read: "The fund… targets the families of victims of the *intifada* (i.e. the perpetrators). The Committee has pledged a sum of $5,333 to each family that has suffered from martyrdom. A total of $33.07 million has been transferred for this

purpose, and to provide for the injured." An April 1, 2001 posting read: "Financial assistance is currently being provided to the families of those martyred."

144.   In June 2001, Prince Nayef, Saudi Minister of the Interior, chaired the second meeting of the representatives to the Intifada Committee of the regions' governorates in Jeddah. At the meeting, representatives reviewed fundraising campaigns in various regions. Prince Nayef announced that more than SR 160,709,000 had been provided to families of Palestinian "martyrs." According to published reports, he also urged citizens and residents to support the Intifada Committee.

145.   In July 2001, according to published reports, Prince Nayef directed the Intifada Committee to distribute SR 5.57 million to, among others, 28 families of "martyrs" and 29 Palestinian charity ("*zakat*") committees.    According to published reports, assistance to Palestinian charity committees was undertaken in coordination with large Saudi-based charities including the Muslim World League (MWL) and the World Assembly of Muslim Youth (WAMY).

146.   Prince Nayef further stated: "The [Intifada Committee] will continue to provide direct assistance to the families of Palestinian martyrs and those wounded while resisting the occupation."

147.   Accordingly, in April 2002, King Fahd chaired a meeting of the Council of Ministers that reviewed Saudi support for the Al Quds *intifada*. According to Saudi Minister of Information Dr. Fouad Ibn Abdul Salam Al Farsy, the Council of Ministers expressed satisfaction with the support of the Saudi people for the Al Quds *intifada*, citing contributions to the Intifada Committee. At the same time, in connection with the Council of Ministers meeting, another Royal decree was issued to launch a fundraising campaign to support the *intifada*. The

fundraising campaign was announced by Saudi Television and Radio, and an eleven-hour telethon was held on Saudi Arabian Television to benefit the Intifada Committee. A statement released in connection with the telethon and fundraising campaign specified that "The [Intifada Committee] will continue to provide direct assistance to the families of Palestinian martyrs and those wounded while resisting the occupation."

148.    The money raised by the Intifada Committee in the telethon and from numerous other donations was delivered to Palestinian martyrs and their families, and the families of prisoners, though a process developed in cooperation with Arab Bank.

149.    In May 2002, following that "telethon," Mubarak Al Biker, Executive Manager of the Intifada Committee, explained in an English-language press report in *Arab News* that the Intifada Committee made no distinction in paying families of suicide bombers and families of Palestinians killed by Israel military action.

150.    In May 2003, a report issued by the Intifada Committee indicated that the Intifada Committee had raised SR 658,091,218, of which SR 411,181,881 had been spent to support, among others, the families and dependents of Palestinian "martyrs," including suicide bombers, the injured and the imprisoned.

151.    The Intifada Committee kept records of its disbursements to the families of Palestinian "martyrs." It maintained personnel in the Palestinian territories to help identify beneficiaries and supervise remittances to families. In some cases, the Intifada Committee's local personnel worked in coordination with organizations in the West Bank and Gaza that were, according to the U.S. Department of Justice, front organizations for Hamas and other Palestinian terrorist groups. In order to insure that only families of "martyrs" received disbursements, the Intifada Committee required beneficiaries to present registration cards to local branches of the

Arab Bank to receive remittances and documented each remittance with a unique identifying reference number.

152. The Intifada Committee posted on its website voluminous records relating to its remittances through spring 2002. The Intifada Committee's archived website reveals that the Intifada Committee provided financial support to, among others, the families of approximately 67 Palestinian terrorists who perpetrated attacks against Israeli, U.S. and other civilians from October 26, 2000 through March 20, 2002, including the plaintiffs to this action and their survivors. According to a 2004 U.S. government report: "These individuals include suicide bombers and gunman who were killed during actual and attempted attacks inside Israel and the Palestinian territories."

153. These documented payments to the families of terrorists incentivized and made possible scores of future terrorist attacks by Palestinian terrorist organizations.

154. One fifteen (15) year old boy who was captured by Israeli soldiers before he was able to blow himself up in a suicide mission at an Israeli checkpoint was asked by a BBC Reporter whether AAMB promised him anything in return for carrying out the attack. The little boy responded: "Of course they did. They told me, once you carry out the operation and the soldiers come and demolish your home, we'll stand by your parents and rebuild your house and give them money."

155. The following chart perfectly illustrates the connexity between the funding and terror attacks in Israel:

| YEAR | Terror Attacks Israel (suicide and other bombs) | Popular Committee for Assisting the Mujahideen | Committee for the Al-Quds Intifada & Al-Aqsa Funds | TOTAL |
|---|---|---|---|---|
| 1998 | 1 | 3,600,000 | 0 | 3,600,000 |
| 1999 | 0 | 3,490,000 | 0 | 3,490,000 |
| 2000 | 4 | 8,418,348 | 0 | 8,418,348 |
| 2001 | 36 | 9,473,628 | 14,454,190,000 | 14,463,663,628 |
| 2002 | 44 | 266,575,791 | 350,000,000 | 616,575,791 |
| 2003** | 22 | 7,226,384 | 720,003,150 | 727,229,534 |
| TOTALS | | 298,784,151 | 15,524,193,150 | 15,822,977,301 |

Before Account 98 was opened, very few terrorist attacks occurred in Israel. The tremendous increase in the number of bombings which occurred is directly attributable to the establishment of Account 98 which was crucial to the development of the terrorist infrastructure.

156. In the spring of 2002, around the same time the Israeli Defense Forces (IDF) launched Operation Defensive Shield, a military action in the West Bank directed against Palestinian terrorists and their supporters, the Intifada Committee ceased updating on its website records relating to remittances to the families of Palestinian "martyrs." As described below, Operation Defensive Shield yielded, among other things, detailed financial records specifying how money from the Intifada Committee was distributed to Palestinian "martyrs" and their families and dependents. The captured records corroborate the records maintained by the Intifada Committee and posted, at one time, on its website.

## V.    The Banking Channels

### Background

157. As noted above, commencing in late 2000, the Saudi government launched a national fundraising effort to encourage Saudi citizens to donate money to support the second

*intifada* and its attendant suicide bombings and terror campaign, including specifically through donations to the Mujahideen Committee and the Intifada Committee.

158.    A dedicated account known as Account 98 was established at several commercial banks located in Saudi Arabia to accept donations to the Intifada Committee. The following banks located in Saudi Arabia, among others, opened Accounts 98: the Saudi-American Bank, the Saudi-British Bank, the Saudi-Dutch Bank, Saudi-French Bank, National Commercial Bank and Arab National Bank (the "Banks").

159.    Certain of the Banks are or were during relevant periods managed by Western joint venture partners.

160.    Through Account 98, the Banks collected donations to the Mujahideen Committee and the Intifada Committee. The web page of the Intifada Committee indicated that donations to the Intifada Committee would be accepted and collected in Account 98. In a statement released in October 2000, Saudi Prince Salman Bin Abdulaziz, the governor of the Riyahd region and the head of the Mujahideen Committee, identified certain of the Banks as sponsors of Account 98, encouraged citizens to deposit donations in Account 98 and noted that it would be possible to do so at branches of these banks. According to published accounts, the SR 150,000,000 raised in October 2000 alone to support the Intifada Committee "was deposited in the unified account number 98."

161.    In this manner, the Banks collected donations in support of the Intifada Committee. Widespread publicity surrounded efforts to raise private donations for the Intifada Committee, including, as described above, television and newspaper accounts (including, as early as February 2001, newspaper accounts that listed the names of Palestinian prisoners and the

names of Palestinian "martyrs" who received financial benefits), along with at least two fund-raising "telethons" on Saudi state-run television.

162.    During this period, the Banks transferred or caused to be transferred Account 98 funds to, among other places, concentration accounts at National Commercial Bank, whose longstanding controlling family, the Bin Mahfouz family, has reportedly and allegedly directly or indirectly sponsored, aided, abetted and encouraged international terrorism.

**The Distribution Process**

163.    Once collected, transferred and concentrated in this manner, such funds were delivered to their intended beneficiaries through a structured financial path:

♦    The Intifada Committee used information provided by welfare societies and official Palestinian sources to prepare a list of potential beneficiaries.    The beneficiaries included "the families of martyrs" and "the families of prisoners".

♦    The Intifada Committee verified the names of the beneficiaries, their contact information, and their injury with Palestinian officials.

♦    The Intifada Committee then coordinated with the National Arab Bank.    Specifically, the Intifada Committee opened a bank account in the beneficiary's name and then deposited a standard amount of Saudi riyals or U.S. dollars into the account.

♦    As the Intifada Committee raised funds in Saudi Riyals, which cannot conveniently be converted into Israeli currency (most commonly used in Palestinian controlled areas), Arab Bank converted those funds into U.S. dollars through its New York branch and then routed the funds back to its local branches.

♦    After the deposits were transferred to Arab Bank branches in the West Bank and the Gaza Strip, the money was withdrawn by the beneficiaries.    The Intifada Committee's original website posed this question: "What has been done with your donations?" The answer: "Opening a bank account for every entitled [Palestinian] through Arab Bank in Palestine."

164.    Account 98 funds were also transferred to accounts maintained by charity ("*zakat*") committees at Arab Bank branches in the West Bank and Gaza acting on behalf of, and under the control of, designated Foreign Terrorist Organizations such as Hamas. For example, such funds were transferred to accounts maintained for the Tulkarem Charity Committee at Arab Bank's branch in Tulkarem, including Account # 9070-500010-6/500. According to the U.S. Department of Justice, the Tulkarem Charity Committee is a Hamas front organization, and it is in fact controlled by Hamas operatives.

165.    Arab Bank actively participated in a formalized process which required the families of "martyrs" to obtain an official certification of their deceased relative's status as a bona fide "martyr", replete with an individualized identification number.

166.    Arab Bank, in turn, provided detailed lists consisting of the names of the "martyrs", personal information and details concerning the date and manner of death and other information provided to it by the Saudi Committee and representatives of the leading terrorist groups via their charitable front organizations.

167.    Arab Bank, in consultation with the Saudi Committee and local representatives of Hamas, finalized the lists, maintained a database of persons eligible to receive payments and opened a dollar account for each beneficiary. Every eligible Palestinian family was encouraged to collect the terrorism payment through a local branch of the Arab Bank in the West Bank or Gaza, including through advertisements placed in Palestinian newspapers in 2001 and 2002 by the Intifada Committee and Hamas-controlled *zakat* committees. According to the Intifada Committee's 2001 annual report, monies were deposited directly into the accounts of 986 individual beneficiaries, including specifically the families of Palestinian suicide bombers, with each "victim" receiving SR 10,000.

168.     If the family chose to collect the payment, the families were required to present to the bank an "official" certification from the Palestinian Authority (replete with a unique identification number) establishing the bona fides of the "martyr."

169.     If the documentation proved satisfactory, Arab Bank issued a receipt to the designated recipient of the martyrdom payment. For example, Dia A-Tawil perpetrated a suicide bombing attack on March 27, 2001 on behalf of Hamas. He was designated Palestinian Authority Martyr No. 449. His father, Hussien Mohamed Favah Tawil, presented the "official" certification to the defendant, Arab Bank, and received a confirmatory receipt stating that the benefit was paid to his Arab Bank account in Ramallah.

170.     In this manner, Arab Bank provided substantial material support to Palestinian terrorist organizations, including designated Foreign Terrorist Organizations or their fronts, and provided a meaningful incentive, both to prospective recruits and to individuals contemplating the commission of independent acts of violence in the name of the "popular resistance."

171.     Arab Bank had actual knowledge that the terrorist financing system it helped to develop, and its knowing and intentional receipt, transfer, and disbursement of Intifada Committee funds, substantially assisted and facilitated Hamas, PIJ, AAMB and PFLP attacks.

172.     Arab Bank knowingly advanced the methods and means by which Hamas and other Palestinian terrorist organizations sought to carry out their objectives.

173.     Arab Bank management and employees were knowing participants in contributing to Account 98 and Account 90. Arab Bank management and employees donated funds in support of the Al-Quds Intifada.

174.     Arab Bank's support of, and commitment to, the violent goals of terrorist organizations are embodied by the personal commitment of Arab Bank's Chairman, Abdul

Majeed Shoman who, according to published reports in *Al Bayan* (a newspaper in the United Arab Emirates), traveled to Qatar to a meeting to raise money to finance and support the intifada.

175.    In a published report in July 2000 in the Jordanian daily newspaper *Addustour* Abdul Majeed Shoman is described as favoring the destruction of the State of Israel.

176.    A published report in the October 2000 issue of the Jordanian daily newspaper *Addustour*, stated that both the management and employees of Arab Bank were donating funds to support the *intifada*.

177.    Arab Bank knew that Account 98 and Account 90 funds were raised, deposited, transferred and disbursed through a system that proximately resulted in the creation of a self-sustaining terrorist financing system.

178.    For example, following a supermarket bombing by an 18-year-old Palestinian girl, a Saudi telethon reportedly raised more than $100 million for the Palestinians. Similarly, Colonel Munir al Maqda, also known as Abu Hassan, used the Arab Bank to funnel Iranian funds to AAMB. Starting in 2001, over $40,000 was transferred to an Arab Bank account for use in purchasing weapons, expenses, and bomb-making materials. Further, a handwritten letter by Abu Mazen, the PA Representative to the Kingdom of Saudi Arabia, on December 30, 2000, to Saudi Prince Salman, complains that Saudi donations in the Gaza Strip were going to an organization called al-Jamiya al-Islamiya (the Islamic Society), which Abbas explained "belongs to Hamas." Indeed, in the past Hamas openly revealed the use it made of the Arab Bank by soliciting donations and posting account numbers on its Internet site.

179.    Arab Bank also knew that the widespread and systematic campaign of suicide bombings resulted in an increased pattern of suicide bombings. It is a matter of public record that there have been at least 40,000 Account 98 or Account 90 transactions since October of

2000. From September 2000 through September 2004, there have been just shy of 140 suicide attacks, and another 440 or more suicide attacks thwarted. Widely reported statistics available to Arab Bank further establish the widespread impact of suicide bombings on Plaintiffs and other Israeli civilians: between 2000 and 2002 alone, suicide attacks represented only 1% of the total number of terrorist attacks in Israel, but caused approximately 44% of the Israeli casualties. And since September 2000, Palestinian terrorists have attempted approximately 21,000 attacks, resulting in more than 6,000 casualties, including over 1,000 civilian deaths.

180.    Arab Bank's public statements that it "never participated in any activity knowingly that could lead to violence" is belied by the fact that the Executive Manager of the Intifada Committee, who has stated to Arab News that "we support the families of Palestinian martyrs, without differentiating between whether the Palestinian was a bomber or was killed by Israeli troops." Further, the Intifada Committee's website has long contained records reflecting that money being funneled through Arab Bank as described above went to over 60 families whose main breadwinner(s) were known Palestinian militants who carried out indiscriminate terrorist attacks, including suicide bombers and gunmen who were killed during actual and attempted attacks:

> ♦    Said Hassan Hussein Hotari - identified as suicide bomber in June 1, 2001, attack on Dolphinarium nightclub in Tel Aviv. Hamas claimed responsibility. The attack resulted in the killing of 22 people including Liana Saakian, daughter of plaintiff Marina Berezouskya and twin sister of plaintiff Piotr Saakian; Aleksei Lupalo, son of plaintiffs Ivan Lupalo and Larysa Lupalo and brother of plaintiff Lyubov Lupalo; Uri Shahar, son of plaintiff Madlen Shahar; Elena Nalimova and Yulia Nalimova, daughters of plaintiff Ella Nalimova and sisters of plaintiff Alex Nalimova; Yulia Sklianik, daughter of plaintiffs Irina Sklianik and Oleg Sklianik and sister of plaintiff Lior Sklianik; Jenya Dorfman, daughter of plaintiff Faina Dorfman; Mariana Medvedenko, daughter of plaintiff Victor Medvedenko; Irina Nepomnyashchy, daughter of plaintiff

59

Raina Nedpomnyashchy and sister of plaintiff Pavel Zichroni; Ilia Gutman, son of plaintiffs Boris Gutman and Larisa Gutman and brother of plaintiff Michael Gutman; Katrin Talker, daughter of plaintiff Ludivia Talker; and Sergei Panchenko, son of plaintiff Natalia Sannikova. The attack also resulted in 83 wounded including plaintiffs Lior Sklianik, Tamara Fubrickunt, Margarita Sherman, Polina Valis, Anna Pistunov, Ivgeni Moldavski, Oksana Datlov; plaintiff Tanya Weiz, daughter of plaintiff Ludmila Weiz; and plaintiff Alexander Plotkin, son of plaintiff Elena Plotkin.

♦    Izzedin Shahil Ahmed Masri - identified as suicide bomber in August 9, 2001 attack on Sbarro pizza restaurant in Jerusalem. Hamas claimed responsibility. This attack resulted in the death of 15 Israelis including Yoched Soussan, sister of plaintiff Kerovah Soussan, and Tehila Maoz, daughter of plaintiff Hanna Maoz. There were also 110 wounded, including plaintiffs Kerovah Soussan, Orna Amit and Miryam Sara Shushan.

♦    Maher Muhiaddin Kamel Habeishi - identified as suicide bomber in December 2, 2001, attack on Haifa bus. Hamas claimed responsibility. This attack resulted in 15 deaths including Riki Hadad, daughter of plaintiff Irit Assaraf; Inna Frenkel, mother of plaintiff Michael Frenkel; Yitzak Ringal, brother of plaintiff Michael Ringal; Ronen Kachlon, son of plaintiffs Zori Kachlon and Panina Kachlon, father of plaintiff Sasai Kachlon, and brother of plaintiffs Dior Kachlon and Galit Kachlon; Mara Fishman, wife of plaintiff Ilia Fishman and mother of plaintiff Alex Fishman; Zizilia Kuzmin, mother of plaintiff Evgeny Kuzmin; and Tatiana Borovik, daughter of plaintiff Alla Borovik. In addition 35 were wounded, including plaintiff Ronen Arrahami.

♦    Wa'fa Ali Khalil Idris - female, identified as suicide bomber in January 27, 2002 street attack in Jerusalem. The AAMB claimed responsibility. Pinhas Tokatly, father of plaintiff Yoel Tokatly, was killed in this attack. An additional 150 individuals were injured as a result of this attack.

♦    Mohammed Ahmed Abdel-Rahman Daraghmeh - identified as suicide bomber in March 2, 2002 attack on Orthodox Jewish neighborhood in Jerusalem. The AAMB claimed responsibility. Those killed in this attack were Lidor and Oriya Ilan, children of plaintiffs Ronit Ilan and Shimon Ilan; Eliyahu Nehamed and Shuli Nehamed, sons of plaintiffs Dahlia Nehamed and Ezra Nehamed; and Tzafia Eliyau and Jacob Avraham, wife and son of plaintiff Ofer Eliyahu. The attack resulted in 50 wounded.

181.    Most of the Intifada Committee records assigned to individuals whose names match or closely resemble those of suicide attackers list "assassination" as the cause of death— however upon information and belief other records credit "martyrdom." Other records indicate that the individuals they refer to were killed during a "martyrdom operation."

## VI.    Discovery and Condemnation

### Operation Defensive Shield

182.    In April 2002 as part of Operation Defensive Shield, Israeli Defense Forces raided the offices of the Tulkarem Charitable Society.

183.    The Tulkarem Charitable Society is one of the Hamas civilian infrastructure's most prominent West Bank institutions and also supports the movement's operational-terrorist activities; it was therefore outlawed by Israel in 2002. It was also targeted by the Palestinian Authority, as early as December 2001, when the PA froze the funds transferred from the Al-Hussein branch of the Arab Bank in Jordan to the Tulkarem Charitable Society's account.

184.    For several years the Tulkarem Charitable Society has been headed by Hamas activist Hosni Hassan Hussein al-Khawajah. Born in 1928 near Tulkarem, he was a teacher, school principal and merchant. His signature was found on documents captured at the Society's offices in Tulkarem in February 2004. The three authorized signatures are those of individuals also identified with Hamas.

185.    The Tulkarem Charitable Society purports to conduct a wide range of social, religious and economic activities. In actuality, the Tulkarem Charitable Society is supported by organizations abroad which provide aid for the infrastructure of Hamas, PIJ, AAMB, and PFLP in the PA-administered territories, including the following well known Hamas front

organizations: the Holy Land Foundation for Relief and Development in the United States ("HLF"), World Assembly of Muslim Youth ("WAMY") in Saudi Arabia, the Palestinian Relief and Development Fund in Britain ("Interpal"), Committee for Palestinian Charity and Aid ("CPSP") in France, and the International Relief Fund for the Afflicted and Needy in Canada ("IRFAN").

186.    The Tulkarem Charitable Society received funds from these organizations and from other institutions all over the world, including many Arab countries, in support of the terrorist infrastructure. Arab Bank facilitated many of these transfers through its branches around the world including its New York branch.

187.    Among the documents recovered in the raid, Israeli officials discovered a spreadsheet detailing how $545,000 received from the Intifada Committee was allocated to families of Palestinian suicide bombers and other terrorist operatives.

188.    The spreadsheet identifies, among other things, suicide bombers, by name, the date of the bombing for which the suicide bomber was responsible and the number of people killed in the bombing, as well as other Hamas operatives directly involved in planning or executing terrorist attacks.

189.    The spreadsheet and other captured documents corroborate information from the Intifada Committee's own detailed and voluminous records. For example, the following suicide bombers, whose families received payments from the Intifada Committee, are identified on the spreadsheet and in records contained on the Intifada Committee's archived website:

(1)    Ahmad Amr Hamdan Alyan who committed a "suicide act on Netanya" on March 4, 2001 in which plaintiff Yael Levi was seriously injured;

(2)    Mahmud Ahmad Mahmid Marmash who committed a "suicide act" at the Hasharon Mall in Netanya on May 18, 2001, in which Miriam Vaxman, the

wife of plaintiff Josef Vaxman and the mother of plaintiffs Hanach Vaxman and Hen Vaxman, Terza Polonsky, the wife of plaintiff Ahikam Plonsky were killed and plaintiff Josef Vaxman, plaintiff Hila Hen, plaintiff Israel Haizler and plaintiff Ludnila Glantz were injured;

(3)     Abdel Rahman Hamad, a Hamas operative, and Salled Al Hotari the suicide bomber, who were responsible for the June 2001 bombing of the Dolphinarium disco in Tel Aviv which killed Liana Saakian, the daughter of plaintiff Marina Berezouskya and the twin sister of plaintiff Piotr Saakian, Aleksei Lupalo, the son of plaintiffs Ivan Lupalo and Larysa Lupalo and the brother of plaintiff Lyubov Lupalo, Elena Nalimova and Yulia Nalimova, the daughters of plaintiff Ella Nalimova and the sisters of plaintiff Alex Nalimova, Yulia Sklianik, the daughter of plaintiffs Irina Sklianik and Oleg Sklianik and the sister of plaintiff Lior Sklianik, Jenya Dorfman, the daughter of plaintiff Faina Dorfman, Mariana Medvedenko, the daughter of plaintiff Victor Medvedenko, Irina Nepomnyashchy, the daughter of plaintiff Raina Nedpomnyashchy and the brother of plaintiff Pavel Zichroni, Ilia Gutman, the daughter of plaintiffs Boris Gutman and Larisa Gutman and the sister of plaintiff Michael Gutman, Katrin Talker, the daughter of plaintiff Ludivia Talker, and which seriously injured plaintiff Lior Sklianik, plaintiff Tamar Fubrickunt, Tanya Weiz, the daughter of plaintiff Ludmila Weiz, plaintiff Margarita Sherman, Alexander Plotkin, the son of plaintiff Elena Plotkin, plaintiff Ivgeni Moldavski, plaintiff Polina Valis, and plaintiff Oksana Diatlov;

(4)     Fadi Sttalluh Yousef Amr, who committed a suicide attack at the Neveh Yamin/Kfar Sabba Junction on March 28, 2001 in which Eliron Rosenberg, the son of plaintiff Yoram Rosenberg, was killed;

(5)     Izzaddin Shahil Ahmad Al Marsu, the suicide bomber responsible for the attack at the Sbarro restaurant in Jerusalem on August 9, 2001 in which Yoched Soussan, the sister of plaintiff Kerovah Soussan, was killed and plaintiffs Kerovah Soussan, Orna Amit and Miryam Sara Shushan were seriously injured;

(6)     Osama Mohammed Abed Baher, the suicide bomber responsible for an attack on Ben Yehuda Street in Jerusalem on December 1, 2001 in which Asaf Avitan, the son of plaintiff Mery Avitan was killed and plaintiff Yafit Levy was seriously injured;

(7)     Maher Kamel Mulhui el-Din Hubeishi, the suicide bomber responsible for the bombing of a No. 16 Egged bus in Haifa on December 2, 2001 which killed Inna Frenkel the mother of plaintiff Michael Frenkel, Yitzak Ringal, the brother of plaintiff Michael Ringal, Ronen Kachlon, the son of plaintiffs Zori Kachlon and Panina Kachlon, the father of plaintiff Sasai Kachlon, the brother of plaintiff Dior Kachlon and the sister of plaintiff Galit Kachlon, Mara

Fishman, the wife of plaintiff Ilia Fishman and the mother of plaintiff Alex Fishman, and Zizilia Kuzmin, the mother of plaintiff Evgeny Kuzmin, and which seriously injured plaintiff Ronen Arrahami;

(8)     A'sim Hasan Rehen, who was responsible for the suicide attack on a No. 189 Dan bus near the entrance to the settlement of Emmanuel on December 12, 2001 which killed Yair Amar, the son of plaintiff Oren Amar, and Yaacov Zarfati and Hananya Zarfati, the son of plaintiff Dvora Zarfati and the brothers of plaintiffs Eidit Zarfati and Rivka Zarfati, and which seriously injured plaintiffs Naftali Lilzari, Rachel Uzan, Miryam Uzan, Arie Uzan and On Uzan;

(9)     Mohammed Ahmad Daraghmah, who was the suicide bomber responsible for the attack near a *yeshiva* in Beit Yisrael neighborhood of Jerusalem on March 2, 2002 which killed Lidor Ilan and Oriya Ilan, the children of plaintiffs Ronit Ilan and Shimon Ilan, Tzofia Eliyahu, the wife of plaintiff Ofer Eliyahu, Jacob Eliyahu, the son of plaintiff Ofer Eliyahu, Eliyahu Nehamed and Shuli Nehamed, the sons of plaintiffs Dahlia Nehamed and Ezra Nehamed.

190.    Another document mentions a PIJ suicide bomber named Murad 'Abd al-Fatah al-Asl , who on September 9, 2001, perpetrated the suicide bombing attack at the Beit Lid intersection, near Netanya. Through the Arab Bank, his family was compensated for his death, the razing of their house and the incarceration of his cousin. The total sum was 20,105 Jordanian dinars [approximately $29,000] and was paid to them through the Bank 's Tulkarem branch.

191.    Another document showed the transfer of money to the family of PIJ operative Rami Muhammad Jamil Mutlaq Ghanem, who perpetrated the suicide bombing attack at the London Café in Netanya (in the central part of the country) on March 30, 2003; 34 civilians were injured in the attack. His family received the exceptional sum of around $5,000 - $7,000 for his action and approximately $14,000 to compensate for the razing of the family's house, in addition to their increased monthly allowance.

192.    In each case, the beneficiaries received the funds through the Tulkarem branch of the Arab Bank. According to other documents confiscated from the offices, the bank manages all

the society's financial business, including the receipt of funds from external sources and the payment of funds to the families of shaheeds , wounded, wanted and imprisoned Palestinian terrorists.

193.    As a result, funds collected, received and disbursed by Arab Bank directly supported, encouraged, incited and made possible the carrying out of suicide bombings and other murderous attacks by providing payments aggregating in the millions of dollars to the families and dependants of suicide bombers, prisoners and other terrorist operatives.

194.    Based upon the foregoing, Arab Bank knew or should have known that funds that it distributed to finance the activities of the Intifada Committee would ultimately be disbursed to support the infrastructure for, and activities of, Palestinian terrorist organizations, including designated Foreign Terrorist Organizations such as Hamas, PIJ, AAMB, PFLP, and their other front organizations.

### United States' Condemnation of Terror Attacks

195.    The United States government has affirmed the causal effectiveness of such payments in fomenting acts of terror.  A November 2001 Federal Bureau of Investigation memorandum concerning Hamas funding notes that through such financial support, "Hamas provides a constant flow of suicide volunteers and buttresses a terrorist infrastructure heavily reliant on moral support of the Palestinian populaces..."

196.    The United States, at the highest levels, has also specifically condemned the provision of financial support to families of suicide bombers.  U.S. Secretary of State Colin Powell has stated: "I think it's a real problem when you incentivize in any way suicide bombings." U.S. Vice President Richard B. Cheney cited such financial support as a factor for the U.S. military campaign against the regime of Saddam Hussein, noting in late 2003 that the

former Iraqi regime "cultivated ties to terror," by, among other things, "making payments to the families of suicide bombers in Israel." In July 2004, Vice President Cheney similarly criticized Hussein for "providing financial rewards to the families of suicide bombers in Israel." And in July 2004, President George W. Bush said that Hussein "def[lied] the world" by, among other things, "subsidiz[ing] the families of suicide bombers."

197.   On July 27, 2004, the United States criminally indicted the Holy Land Foundation for Relief and Development and various individuals for violations of federal law (including the Anti-Terrorist Act) based on their provision of material support to the families of Palestinian suicide bombers through, inter alia, zakat committees, including specifically, among others, the Tulkram Charity Committee. The indictment charges that the defendant "provided financial support to the families of Hamas martyrs, detainees and activists...[I]n this manner, the defendant effectively rewarded past, and encouraged future, suicide bombings and terrorist activities on behalf of Hamas." The indictment further stated: "This type of support was critical to Hamas' efforts to win the hearts and minds of the Palestinian people and to create an infrastructure solidifying Hamas' presence."

### Palestinian Authority Condemnation of Terror Attacks

198.    In addition to condemnation of these terror attacks by the United States government, the government of the Palestinian Authority has also joined in condemning these attacks.

199.    Yasser Arafat, the former Chairman of the Palestinian Authority, publicly declared the "necessity to completely stop these attacks...to preserve the high national interest." He further stated, "I personally, and the Palestinian Authority, are completely against it (the attacks)."

### Universal Condemnation of Financing of Terrorism

200.    The international community has universally condemned the financing of terrorism thus incorporating this offense into the law of nations pursuant to the ATCA.

201.    The following international conventions and/or United Nations Security Council Resolutions support the premise that the financing of terrorism is incorporated into the law of nations:

    i.    The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GA OR, 54th Sess., 76th mtg., Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002);

    ii.    Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

    iii.    Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

    iv.    Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

    v.    Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

vi.     Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

vii.     Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

viii.     Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

ix.     Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

x.     Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance...terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

xi.     Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

xii.     Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

## Universal Condemnation of Genocide

202.     The international community has universally condemned the crime of genocide

thus incorporating this offense into the law of nations pursuant to the ATCA.

203.     The following international conventions and/or United Nations Security Council

Resolutions support the premise that the crime of genocide is incorporated into the law of

nations:

i.     The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277;

ii.     The Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. S/25704;

iii.        The Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994);

iv.        The Rome Statute of the International Criminal Court, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6.

**Universal Condemnation of Crimes Against Humanity**

204.    The international community has universally condemned crimes against humanity

thus incorporating this offense into the law of nations pursuant to the ATCA.

205.    The following international conventions and/or United Nations Security Council

Resolutions support the premise that the act of crimes against humanity is incorporated into the

law of nations:

v.        The Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284;

vi.        The Statute of the International Criminal Tribunal for the Former Yugoslavia, Art. 5;

vii.        The Statute of the International Criminal Tribunal for Rwanda, Art. 3;

viii.        The Rome Statute of the International Criminal Court, Art. 7.

## COUNT ONE

### 18 U.S.C. § 2331 *et seq.* ("THE ANTITERRORISM ACT")

206.    Plaintiffs incorporate herein by reference the averments contained in all preceding

paragraphs.

207.    The Defendant herein engaged in acts of international terrorism; activities that

involve violent acts dangerous to human life that are in violation of the criminal law of the

United States and appear to be intended to intimidate or coerce a civilian population; to influence

policy of a government by intimidation or coercion; or to affect the conduct of a government by assassination.

208.    Defendant, through its acts and omissions, committed, furthered, supported, encouraged and made possible acts of international terrorism, within the meaning 18 U.S.C. §2331, in that it:

(a)    violated Section 2339A by providing material support or resources, including without limitation currency and financial services, knowing or intending that they were to be used in preparation for, or in carrying out certain prohibited criminal acts, including those with respect to killing, maiming, or injuring persons in a foreign country and killing a United States national outside the United States;

(b)    violated Section 2339B(a)(1) by knowingly providing material support or resources, including without limitation currency and financial services, to a foreign terrorist organization, specifically designated as such by the Secretary of State;

(c)    violated Section 2339B(a)(2) by becoming aware that they had possession of or control over, funds in which a foreign terrorist organization, or its agent, had an interest, and they failed to (i) retain possession of, or maintain control over, such funds or (ii) report to the Secretary of the Treasury the existence of such funds; and

(d)    violated Section 2339C by, directly and indirectly, collecting funds with the intention that such funds be used, or with the knowledge that such funds are to be used, in full or in part, in order to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act.

209.    This activity transcends international boundaries in terms of the means by which they are accomplished, the persons they appear to intend to intimidate or coerce, or in terms of the locale in which the perpetrators operate or seek asylum. 18 U.S.C. 2331.

210.    Nationals of the United States injured in his or her person, property or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefore in any appropriate district court of the United States and shall recover threefold the damages they sustain and the costs of suit, including attorneys fees. 18 U.S.C. 2333.

211.    As set forth above, Defendant proximately caused the deaths and injuries to the United States Citizen Plaintiffs and/or their decedents described herein through and by reason of acts of international terrorism that were encouraged, enticed, rewarded, carried out and made possible as a result of funds Defendant collected and disbursed. As a result, the acts of international terrorism described herein were reasonably foreseeable consequences of Defendant's collecting and disbursing such funds.

212.    As set forth above, Defendant committed, conspired, or otherwise engaged in or provided material support for the acts of international terrorism, including but not limited to providing material support and/or aiding and abetting assistance to Hamas, AAMB, the PIJ, and international terrorism. This material support and/or aiding and abetting of acts of international terrorism allowed Hamas, AAMB, and the PIJ to carry out the terrorist attacks described herein.

213.    As a result of Defendant's acts of international terrorism, including but not limited to financial sponsorship, logistical, and other material support, Plaintiffs who are U.S. nationals suffered damages as set forth herein.

71

214.    Pursuant to 18 U.S.C. §2333, the estates, survivors and heirs of the decedents who are nationals of the United States are entitled to recover threefold the damages they have sustained and the cost of suit, including attorneys' fees.

**WHEREFORE**, Plaintiffs, who are nationals of the United States, demand judgment in their favor against Defendant in an amount to be determined by a jury, not less than the statutory amount of $75,000, and demand treble damages pursuant to statute, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again committing such terrorist acts again.

## COUNT TWO

## AIDING AND ABETTING VIOLATIONS OF THE ANTITERRORISM ACT

215.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

216.    Hamas, PIJ, AAMB and other international terrorist organizations engaged in acts of international terrorism, as defined in 18 U.S.C. §2331, in violation of 18 U.S.C. §2333. The acts of international terrorism committed by Hamas, PIJ, AAMB and other foreign terrorist organizations, as described herein, caused death and injury to the United States Citizen Plaintiffs and their decedents.

217.    Defendant aided and abetted these acts of international terrorism, in that defendant collected and disbursed funds knowing that such funds would be used to support, encourage, entice, reward, carry-out and make possible terrorist activities in Israel, including

suicide bombings and murder. Defendant knew the goals of Hamas, PIJ, AAMB and other international terrorist organizations and knowingly advanced those goals.

218.    This aiding and abetting of acts of international terrorism allowed Hamas, PIJ, AAMB and other international terrorist organizations to carry out the suicide bombings and other murderous attacks described above.

**WHEREFORE**, Plaintiffs, who are nationals of the United States, demand judgment in their favor against Defendant and demand in an amount to be determined by a jury, not less than the statutory amount of $75,000, and demand treble damages pursuant to statute, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again aiding and abetting the commission such terrorist acts again.

## COUNT THREE

## FINANCING OF TERRORISM IN VIOLATION OF THE LAW OF NATIONS

219.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

220.    The financing of suicide bombings and other murderous attacks committed by PIJ, Hamas, AAMB, and PFLP against Plaintiffs and the unarmed members of the civilian Israeli population constitutes a crime in violation of the law of nations.

221.    The crime of terrorist financing rests on a clear and definite norm of international law which is universally accepted by the civilized world. The International Convention for the Suppression of the Financing of Terrorism, G.A. Res. 54/109, U.N. GAOR, 54th Sess., 76th mtg.,

Supp. No. 49, U.N. Doc. A/Res/53/108 (1999) (In force Apr. 2002) ("Convention") is declaratory of existing international law. It has been signed by 132 states, and, as of December 8, 2004, was in force among 117 states. *See* http://untreaty.un.org/ENGLISH/Status/Chapter_xviii/treaty11.asp. The Convention condemns the funding of terrorism and requires that the provision or collection of funds for terrorist offenses be criminalized. The United States ratified this Convention on June 26, 2002.

222.    The Convention follows the precedents set by numerous other sources of international law that reflect the universal condemnation of terrorist financing.

223.    First, the Convention defines offenses by incorporating eleven existing anti-terrorism conventions. Thus, a Convention offense includes providing or collecting funds for any act falling within the International Convention for the Suppression of Terrorist Bombings, adopted by the General Assembly of the United Nations Jan. 12, 1998, G.A. Res. 164, U.N. GAOR 52nd Sess., U.N. Doc. A/RES/52/164 (1998), 37 I.L.M. 249 (1998) (In force May 23, 2001) ("Bombing Convention"), which itself has been ratified by 123 nations. The United States ratified the Bombing Convention on June 26, 2002.

224.    Convention offenses also encompass providing or collecting funds for "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in hostilities in a situation of armed conflict, when the purpose of the act, by its nature or context, is to intimidate a population, or to compel a government or an international organization to do or to abstain from doing any act."

225.    Second, the Convention supplements existing international authority in the form of U.N. Security Council Resolutions which reflect the international community's collective denouncement of terrorist financing:

74

- ♦ Resolution 1267 (1999) of October 15, 1999 on the freezing of the funds and other financial resources of the Taliban.

- ♦ Resolution 1269 (1999) of October 19, 1999 calling upon states to take steps to deny those who finance terrorist acts safe haven.

- ♦ Resolution 1333 (2000) of December 19, 2000 on the freezing of the funds and other resources of Usama bin Laden and the Al-Qaida organization.

- ♦ Resolution 1363 (2001) of July 30, 2001 on the establishment of a mechanism to monitor the implementation of measures imposed by Resolutions 1267 (1999) and 1333 (2000).

- ♦ Resolution 1373 (2001) of September 28, 2001 on threats to international peace and security caused by terrorist acts, and mandating the formation of the Counter-Terrorism Committee.

- ♦ Resolution 1377 (2001) of November 12, 2001 calling upon states to implement fully Resolution 1373 (2001).

- ♦ Resolution 1390 (2002) of January 16, 2002 effectively merging the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- ♦ Resolution 1455 (2003) of January 17, 2003 on measures to improve the implementation of the freezing measures of Resolutions 1267 (1999), 1333 (2000), and 1390 (2002).

- ♦ Resolution 1456 (2003) of January 29, 2003 reaffirming that "measures to detect and stem the flow of finance and funds for terrorist purposes must be urgently strengthened"; stating that states must "bring to justice those who finance...terrorist acts"; and urging states to become parties to the 1999 Terrorism Financing Convention; calling on Counter-Terrorism Committee to intensify efforts to implement Resolution 1373 (2001).

- ♦ Resolution 1526 (2004) of January 30, 2004 calling upon states to implement fully Resolution 1373 (2001), and measures to improve the freezing measures of Resolutions 1267 (1999) and 1333 (2000).

- ♦ Resolution 1535 (2004) of March 26, 2004 calling upon states to implement fully Resolution 1373 (2001).

226.    U.N. Security Council Resolution 1373 was unanimously adopted under Chapter VII of the U.N. Charter.  Under Article 25, decisions taken by the Security Council under Chapter VII of the Charter are legally binding on all members.

227.    Resolution 1373 is unequivocally directed at the prevention, prosecution, and punishment of the financing of terrorism, and characterizes acts of terrorism as threats to international peace and security.  By characterizing acts of terrorism as threats to international peace and security, the Security Council is entitled to take the collective measures (or "sanctions") envisioned by Chapter VII of the United Nations Charter. The measures that the Council decides to take in these circumstances are mandatory for all the members of the United Nations by virtue of Articles 25 and 48 of the Charter.

228.    Under Resolution 1373, "all States shall...prevent and suppress the financing of terrorist acts" and "criminalize the willful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist attacks." States are equally bound to "[e]sure that any person who participates in the financing" of terrorism "is brought to justice."  Resolution 1373's prohibition against "acts, methods, and practices of terrorism" which are "contrary to the purposes and principles of the United Nations" – including knowingly financing, planning and inciting terrorist acts – is declaratory of the fact that terrorist financing is contrary to existing Treaty obligations of member states as expressed in the purposes and principles of the U.N. Charter, which all member states are obliged to honor.

229.    World condemnation of terrorist financing is equally reflected in various regional conventions, which prohibit the financing of terrorist acts.  *See* Annex to Resolution No.: 59//26P; 1999 Convention of the Organization of the Islamic Conference on Combating

International Terrorism, Art. 3; 1999 OAU Convention on the Prevention and Combating of Terrorism (Algiers, July 14, 1999), Art. 3; 1998 Arab Convention for the Suppression of Terrorism (Cairo, April 1998), Art. 3.

230.    Terrorist financing is likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the ATCA was enacted.

231.    Consistent with its condemnation of terrorism financing, the world community has also joined in defining who can be held liable. The Convention explicitly provides that liability for terrorist financing reaches those that directly or indirectly provide or collect funds with the intention or knowledge that the funds will be used to carry out a defined terrorist offense, regardless of whether the funds were actually used. Specifically, the Convention reaches every accomplice and every person who organizes or directs others in the terrorist financing effort.

232.    Furthermore, legal entities may be held civilly liable for the offenses set out in the Convention. This comports with the general international consensus embodied in the Bombing Convention, which also reaches all persons who "participate[] as an accomplice" in a terrorist bombing or "organizes others to commit them or in any other way contributes to their commission."

233.    Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or indirectly providing funds to PIJ, Hamas, AAMB, and PFLP with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention, the Bombing Convention and international law:

i.    Starting on or about October, 2000, PIJ, Hamas, AAMB, and PFLP engaged in numerous terrorist bombings that were part of a systematic and widespread attack on a civilian population, in which they murdered and seriously injured Plaintiffs and several thousand innocent Israeli civilians, in furtherance of the overarching goal of toppling Israel and persecuting and completely destroying Plaintiffs and the Israeli population.

ii.    PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks were intended to cause death or serious or serious bodily injury to Plaintiffs and other Israeli civilians not taking part in the hostilities in a situation of armed conflict. By its nature and context, and as evidenced by the professed goals of PIJ, Hamas, AAMB, and PFLP, suicide bombings and other murderous attacks are designed to destroy and intimidate the Israeli population and topple Israel.

iii.    Arab Bank regularly accepted millions of dollars in deposits from state sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners, who were members of PIJ, Hamas, AAMB, and PFLP that engaged in suicide bombings against Plaintiffs and other Israeli civilians.

iv.    At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds were being paid to families of members of PIJ, Hamas, AAMB, and PFLP, and that these same FTOs carried out suicide bombings and other murderous attacks against Plaintiffs and other Israeli and non-Israeli civilians.

v.    At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds and monetary awards for the families of suicide bombers were twice as large as those given to those families of mere prisoners and provided an incentive to PIJ, Hamas, AAMB, and PFLP members to engage in suicide bombings.

vi.    Arab Bank's conduct further provided organizational incentives to PIJ, Hamas, AAMB, and PFLP to continue to plan, and operate suicide bombings. Given the evidence that the Intifada Committee Account 98 and Account 90 funds were earmarked for the families of prisoners and those killed while perpetrating terrorist attacks, Arab Bank incentivized and contributed to suicide bombings.

vii.    Arab Bank knew that the Account 98 and Account 90 funds that were raised, deposited, transferred and disbursed through a system it helped to develop materially contributed to the creation of a self-sustaining a system of terrorist financing, suicide bombings and other murderous attacks.

viii.    Therefore, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law within the meaning of the Convention, the Bombing Convention and the law of nations prohibiting terrorist financing.

234.    In the alternative, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law, to wit, terrorist financing, by directly or indirectly providing funds to PIJ, Hamas, AAMB, and PFLP with the intention or knowledge that those funds would be used to carry out an offense as defined by the Convention, the Bombing Convention and international law, as follows:

> i.    Starting on or about October, 2000, PIJ, Hamas, AAMB, and PFLP engaged in suicide bombings and other murderous attacks involving the use of explosives, incendiary weapons, and other lethal devices which were designed to cause death and serious bodily injury.

> ii.    PIJ's, Hamas's, AAMB's, and PFLP's suicide bombings and other murderous attacks also involved the intentional delivery, placement, discharge, and/or detonation of explosives, incendiary weapons, and lethal devices in public places, State, government, and public facilities, and in public transportation system(s), including buses.

> iii.    PIJ's, Hamas's, AAMB's, and PFLP's suicide bombings and other murderous attacks constitute a violation of international law as they constitute an offense under the Bombing Convention.

> iv.    Arab Bank regularly accepted millions of dollars in deposits from state sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government

80

policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners, who were members of PIJ, Hamas, AAMB, and PFLP that engaged in suicide bombings and other murderous attacks against Plaintiffs and other Israeli civilians.

v.       At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds were being paid to families of members of PIJ, Hamas, AAMB, and PFLP, and that these same FTOs carried out suicide bombings and other murderous attacks against Plaintiffs and other Israeli civilians.

vi.      At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds and monetary awards for the families of suicide bombers were twice as large as those given to those families of mere prisoners and provided an incentive to PIJ, Hamas, AAMB, and PFLP members to engage in suicide bombings and other murderous attacks.

vii.     Arab Bank's conduct further provided organizational incentives to PIJ, Hamas, AAMB, and PFLP to continue to plan, and operate suicide bombings and other murderous attacks. Given the evidence that the Intifada Committee Account 98 and Account 90 funds were earmarked for the families of prisoners and those killed while perpetrating terrorist attacks, Arab Bank incentivized and contributed to suicide bombings and other murderous attacks.

viii.    Arab Bank knew that the Account 98 and Account 90 funds that were raised, deposited, transferred and disbursed through a system it helped to

81

develop materially contributed to the creation of a self-sustaining a system of terrorist financing, suicide bombings and other murderous attacks.

ix.     Therefore, Arab Bank aided and abetted, intentionally facilitated, and/or recklessly disregarded a violation of international law within the meaning of the Convention, the Bombing Convention and the law of nations prohibiting terrorist financing.

235.     Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in the financing of terrorism in violation of the law of nations.

## COUNT FOUR

## AIDING AND ABETTING, COMPLICITY, PARTICIPATING IN A JOINT VENTURE, AND/OR RECKLESS DISREGARD TO ENGAGE IN ACTS OF GENOCIDE IN VIOLATION OF THE LAW OF NATIONS

236.     Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

237.     Genocide has been universally recognized as a clear and definite norm of international law which is universally accepted by the civilized world and such conduct is so widely condemned that it has achieved the status of a universally recognized or *jus cogens*

violation, and, therefore, is a violation of the law of nations such that the commission of genocide by a party subjects it to liability to aliens in United States courts under the ATCA.

238.    The Convention on the Prevention and Punishment of the Crime of Genocide ("Convention on Genocide"), 78 U.N.T.S. 277 adopted in 1948 and ratified by more than 120 nations further defines "genocide" as: "[a]ny of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such: (a) killing members of the group; (b) causing serious bodily injury or mental harm to members of the group; (c) deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part." The Convention goes on to note that "Persons committing genocide shall be punished, whether they are constitutionally responsible rulers, public officials or private individuals."

239.    The most recent examples of the international community including the United States re-adopting the Convention on Genocide's standard definition of genocide are the International Criminal Tribunal of the Former Yugoslavia ("ICTY") and the International Criminal Tribunal for Rwanda ("ICTR"). *See* Statute of the International Criminal Tribunal for the Former Yugoslavia ("Statute of the ICTY"), Art. 4 (adopted by the U.N. Security Council in Resolution No. 808 (May 3, 1993)), U.N. Doc. S/25704; Statute of the International Criminal Tribunal for Rwanda ("Statute of the ICTR"), Art. 2 (adopted by the U.N. Security Council in Resolution No. 955), U.N. Doc. S/INF/50 (1994). The definition contained within the Statute of the ICTY and the Statute of the ICTR expand upon that articulated by the Convention on Genocide by criminalizing conduct that "[i]mpos[es] measures intended to prevent births within the group" and "[f]orcibly transferring children of the group to another group."

240.    The international community has also adopted this expanded definition of genocide with the Rome Statute of the International Criminal Court ("The Rome Statute"). *See* The Rome Statute, U.N. GAOR, 52d Sess., Annex II, at 4, U.N. Doc. A/CONF.183/9 (1998), Art. 6. The Rome Statute has not been ratified by the United States for reasons unrelated to the definition of genocide; however, its adoption of definitions universally accepted within the international community through the Statute of the ICTY and the Statute of the ICTR shows how this definition of genocide has become part of the "law of nations."

241.    Genocide is a violation of the Law of Nations actionable under the ATCA for private actors. *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995) (cited approvingly in *Sosa v. Alvarez-Machain*, 124 S.Ct. 2739, 2766 n.20 (2004).

242.    Furthermore, On November 4, 1988 the Genocide Convention Implementation Act of 1987 (the Proxmire Act), Pub. L. 100-606, was signed into law by President Ronald Reagan. As stated in the text of Senate Resolution 307 (107th Congress, 2nd Session), by this action, the United States Code (18 U.S.C. § 1091) was amended "to criminalize genocide under the United States law." Senate Resolution 307 further called upon "the people and Government of the United States to rededicate themselves to the cause of bringing an end to the crime of genocide (as postulated under international law and with passage of this act under US law)."

243.    The ten year campaign of terror carried out by extremist groups including but not limited to Hamas, AAMB, PIJ, and the PFLP against Israelis and Jews is nothing short of a genocidal campaign of terror.

244.    Hamas' founding charter, titled "Mithaq Harakat al-Muqawamah al-Islamiyya" dated August 18, 1988, pledges the group to carry out armed struggle in order to destroy Israel and its Jewish citizens and to establish an Islamic Palestinian state in place of Israel.  This

84

genocidal ideology is laid out in a *hadith* – a traditional recitation of the sayings of the Prophet Mohammad and his companions not recorded in the Quran – which was adopted as Article 7 of its charter, and it reads: "The time will not come until Muslims will fight the Jews (and kill them); until the Jews hide behind rocks and trees, which will cry: O Muslim! The Jew is hiding behind me, come on and kill him!"

245.    Article 8, the slogan of the Hamas movement: "Allah is its goal, the Prophet its model, the Qur'an its Charter, jihad its path, and death for the cause of Allah its most sublime belief."

246.    Article 13 states: "There is no solution for the Palestinian question except through jihad. All initiatives, proposals and international conferences are a waste of time and vain endeavors."

247.    And Article 28 states: "Israel, Judaism and Jews challenge Islam and the Muslim people: 'May the cowards never sleep.'"

248.    After his release from an Israeli prison and return to Gaza in October of 1997, Sheikh Ahmed Yassin, the founder and spiritual head of Hamas, declared that Israel must "disappear from the map." He added: "we have an aim and an enemy, and we shall continue our jihad against the enemy. A nation without a *jihad* is a nation without a purpose."

249.    Abdel Majeed Shoman, chairman of the Arab Bank, was interviewed in the Jordanian newspaper *Al-Dustour* in July 2000. In this interview, Shoman echoed the views of Yassin and was quoted as stating, "for him a just solution would be the return of all Palestinian lands to their legitimate historical residents, i.e., the Palestinian people and the Arab nation. Shuman said he was against a Palestinian compromise [based on] a partial return [which included] the loss of some land, and that the Jews had no right to the land of Palestine."

250.    The U.S. Department of Justice has described Hamas's charter as stating "that the purpose of Hamas is to create an Islamic Palestinian state throughout Israel by eliminating the State of Israel through violent jihad...Hamas is opposed to any peaceful solution to the Palestinian territorial conflict, as such a proposition is at odds with Hamas' stated goal of annihilating the State of Israel...."

251.    With the outbreak of the second *intifada*, Hamas and other Palestinian terrorist organizations – notably PIJ, the AAMB, and the PFLP – intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks within Israel, the West Bank and Gaza. Like Hamas, PIJ, AAMB, and PFLP are similarly committed to the destruction of the State of Israel. According to some estimates, attempted attacks have numbered approximately 21,000 and have targeted Jews and other civilians, resulting in the death and injury of thousands of individuals, mostly civilians.

252.    Hamas, PIJ, AAMB, and PFLP are engaged in a campaign of genocide. These groups have killed citizens and non-citizens of the State of Israel and caused serious bodily injury and mental harm to citizens and non-citizens of the State of Israel with the intent to destroy the State of Israel. These acts fit squarely within the well-settled international law definition of genocide as set forth in the Genocide Convention.

253.    Article 3 of the Convention on Genocide notes that among the acts which are punishable are "(a) Genocide; (b) Conspiracy to commit genocide; (c) Direct and public incitement to commit genocide; (d) Attempt to commit genocide; and (e) Complicity in genocide."

254.    The concept of complicit liability for conspiracy or aiding and abetting is well-developed in international law. Under International Law one is responsible for a crime which is

committed when that party provides "knowing practical assistance or encouragement which has a substantial effect on the perpetration of the crime."

255.    Under the Allied Control Council Law No. 10 (Dec. 20, 1945), criminal liability extends not only to principals who committed acts of genocide or war crimes but also those who were connected with any plans or enterprises involving the commission of such crimes.

256.    Under The Agreement for the Prosecution and Punishment of Major War Criminals of the European Axis, and Establishing the Charter of the Military Tribunal, Article , 82 U.N.T.S. 279, "leaders, organizers, instigators, and accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the foregoing crimes are responsible for all acts performed by any persons in execution of such a plan."

257.    Cases emanating from the ICTY and the ICTR have confirmed that aiding and abetting is a concept duly ingrained in international law to provide a colorable claim pursuant to the jurisdiction conferred by the ATCA.

258.    In 1793, the first among equals of the Founding Fathers President George Washington himself proclaimed that "whatsoever of the citizens of the United States shall render himself liable for punishment...under the law of nations, by committing, aiding or abetting hostilities...will not receive the protection of the United States, against such punishment."

259.    In 1795, the Attorney General of the United States echoed George Washington's proclamation: "The government does not seem bound to do more than has already been done by the President, who, by his proclamation of the 22nd of April, 1793, warned all citizens of the United States against all such proceedings" and went on to cite the proclamation.

260.    In 1807, chief Justice Marshall wrote in the famous opinion of *Ex Parte Bollman and Ex Parte Swartwout* in the trial of two of Aaron Burr's co-conspirators that: "if war be

actually levied, that is, if a body of men be actually assembled for the purpose of effecting by force a treasonable purpose, all those who perform any part, however minute, or however remote from the scene of the action, and who are actually leagued in the general conspiracy, are to be considered as traitors."

261.    General federal common law also recognizes complicit liability under theories of Joint Venture liability, Agency, and Reckless Disregard.

262.    The Comments to the *Restatement (Second) of Torts* § 876 state, "Advice or encouragement to act operates as a moral support to a tortfeasor and if the act encouraged is known to be tortious it has the same effect upon the liability of the adviser as participation or physical assistance. If the encouragement or assistance is a substantial factor in causing the resulting tort, the one giving it is himself a tortfeasor and is responsible for the consequences of the other's act.

263.    Under Joint Venture liability, each member of the joint venture is liable for the acts of its co-venturers. By allowing Hamas to maintain bank accounts and supervising the disbursement of funds to the families of genocidal murderers and maimers from Hamas, PIJ, AAMB, PFLP and others, the Arab Bank, PLC, had entered into a joint venture with these actors thus subjecting it to liability for the acts of its co-venturers. In this instance, these were acts conducted in furtherance of a plan of genocide against the State of Israel devised by Hamas, PIJ, AAMB, PFLP and others. This plan was known by the Arab Bank, PLC, and the acts performed by Arab Bank, PLC, were performed with the intent to further the genocidal goals of its co-venturers.

264.    Under reckless disregard, Arab Bank, PLC would be liable to Plaintiffs if it may be shown that the bank acted in the face of an unjustifiably high risk of harm to Plaintiffs or that

it had actual knowledge of the substantial risk posed to Plaintiffs which it disregarded to the detriment of the Plaintiffs. Here, Arab Bank, PLC was well aware of the genocidal goals of PIJ, Hamas, AAMB, and PFLP. Nevertheless, it provided funds to the families of the genocidal murderers and maimers of these organizations thus incentivizing additional acts in furtherance of these genocidal goals with disregard for the substantial risk posed to the Plaintiffs.

265.    Arab Bank aided and abetted, intentionally facilitated, was complicit in, and/or recklessly disregarded the planning, preparation or execution of genocide by providing organized and systematic financial and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of genocide, with knowledge that its actions would assist Hamas, PIJ, AAMB, and PFLP in the commission of genocide.

**WHEREFORE**, Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again contributing to facilitating or aiding and abetting a campaign of genocide against the people of the State of Israel in violation of the law of nations and to prevent the Defendant's reckless disregard of the campaign of genocide against the people of the State of Israel in violation of the law of nations.

## COUNT FIVE

### AIDING AND ABETTING, INTENTIONALLY FACILITATING, AND/OR RECKLESSLY DISREGARDING CRIMES AGAINST HUMANITY IN VIOLATION OF INTERNATIONAL LAW

266.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

267.    The suicide bombings and other murderous attacks committed by PIJ, Hamas, AAMB, and PFLP against Plaintiffs and the unarmed Israeli population constitute a crime against humanity in violation of the law of nations.

268.    Strong condemnation of crimes against humanity rests on a clear and definite norm of international law which is universally accepted by the civilized world. See, e.g. Charter of the International Military Tribunal, Aug. 8, 1945, art. 6I, 59 Stat. 1546, 1547, E.A.S. NO. 472, 82 U.N.T.S. 284; Statute of the ICTY, Art. 5; Statute of the ICTR, Art. 3; see also The Rome Statute, Art. 7.

269.    Crimes against humanity are likewise defined with a specificity sufficiently comparable to international law violations that were familiar when the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, was enacted.    The core elements of a crime against humanity in violation of international law, as codified in the above sources and recognized in international law generally, are murder and other heinous acts against human life, physical welfare, and dignity that are undertaken as part of a widespread or systematic attack against a civilian population. These crimes are punishable whether committed in peacetime or in war.

270.    Starting on or about October, 2000, PIJ, Hamas, AAMB, and PFLP engaged in numerous suicide bombings and other murderous attacks that were part of a systematic and widespread attack on a civilian population, in which they murdered and seriously injured

Plaintiffs, several thousand innocent Israeli civilians and foreign visitors to Israel, in furtherance of the overarching goal of toppling Israel and persecuting and completely destroying Plaintiffs and the Israeli population.

271.    PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks were systematically committed. Their suicide bombings and other murderous attacks required a high degree of careful planning, coordination, funding, and orchestration by and between PIJ, Hamas, AAMB, PFLP and others, such as Arab Bank, PLC. Suicide bombings and other murderous attacks also involve recruitment, the provision of explosives, the targeting of Plaintiffs and other members of the Israeli civilian population, and payments to families of suicide bombers.

272.    PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks were widespread in nature. Plaintiffs and the entire Israeli civilian population were targeted and thousands of unarmed innocents were injured or killed. Suicide bombings and other murderous attacks have taken place in public and private locations, during the day and night, and have involved attacks against men and women, both young and old, and children. In addition to the suicide bombings that were carried out, hundreds of similar suicide bombings have been thwarted prior to implementation.

273.    PIJ's, Hamas', AAMB's, and PFLP's suicide bombings and other murderous attacks therefore constitute a violation of the law of nations as they are crimes against humanity.

274.    Arab Bank, PLC knowingly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded crimes against humanity in violation of the law of nations. Aiding and abetting and/or joint venture and reckless disregard are actionable claims pursuant to the ATCA. *See supra.* paras. 254-264.

275.    Arab Bank helped to develop the financial system that provided monetary incentives to members of PIJ, Hamas, AAMB, and PFLP to engage in crimes against humanity.

276.    Arab Bank regularly accepted millions of dollars in deposits from state-sponsored charities, official state donations, and private contributions, with actual knowledge and awareness that these same funds were raised and deposited for the sole purpose of supporting Palestinian genocidal murderers and maimers and their families; routed these same deposits into bank accounts created and maintained by government mandate and official government policy; transferred funds from those accounts to other participating banks; and disbursed those funds to, among others, Palestinian genocidal murderers and maimers and their families, as well as the families of prisoners, who as members of PIJ, Hamas, AAMB, and PFLP, committed crimes against humanity against Plaintiffs, other Israeli civilian and foreign visitors to Israel.

277.    At all times, Arab Bank knew that its receipt, transfer, and disbursement of Account 98 and Account 90 funds were being paid to families of members of PIJ, Hamas, AAMB, and PFLP, and that these same militants carried out indiscriminate suicide bombings and other murderous attacks against Plaintiffs, other Israeli civilians and foreign visitors to Israel.

278.    Arab Bank aided and abetted, intentionally facilitated and/or recklessly disregarded the planning, preparation or execution of the crimes against humanity by providing organized and systematic financial and other practical assistance, encouragement or moral support which had a substantial effect on the perpetration of crimes against humanity, with knowledge that their actions would assist Hamas, PIJ, AAMB, and PFLP in the commission of crimes against humanity.

279.    Plaintiffs and their family members suffered death or serious physical and/or mental injuries as a proximate result of Arab Bank's conduct.

**WHEREFORE,** Plaintiffs, who are aliens, demand judgment in their favor against Defendant and demand damages in an amount to be determined by a jury, not less than the statutory amount of $75,000, for damages arising out of wrongful death, survival, loss of consortium, loss of solatium, and/or loss of services, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendant from ever again engaging in crimes against humanity against the people of the State of Israel in violation of the law of nations.

## COUNT SIX

# ASSISTING IN THE INTENTIONAL INJURY OF OTHERS BY A THIRD PARTY

280.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

281.    Defendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it, and discussed herein throughout, were being used to support, encourage, entice and make possible the suicide bombings and other murderous attacks described herein.

282.    Through both its actions and its inactions, Defendant allowed its facilities to be used by Hamas, AAMB, PIJ, PFLP, and other terrorist organizations and their supporters in order to support, encourage, entice and make possible the intentional and foreseeable acts of those groups including, but not limited to, its campaign of genocide, war crimes, crimes against humanity, and other heinous acts of international terrorism described herein.

283.    Defendant's actions and inactions served to create an unreasonable risk of harm to others including but not limited to the Plaintiffs, victims of the suicide bombings and other murderous attacks, and their families, through the foreseeable acts of Hamas, AAMB, PIJ, PFLP and other terrorist organizations and their supporters.

284.    At the time of its conduct, Defendant realized or should have realized the likelihood that the accounts were being used in such a way, and that Hamas, AAMB, PIJ, PFLP and other terrorist organizations, as well as their supporters, might avail themselves of the opportunity to commit such a tort or crime.

285.    As a result of the foregoing Plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

**WHEREFORE,** Plaintiffs demand judgment as follows:

1.    Against Defendant, for compensatory damages in favor of each of the Plaintiffs in an amount to be determined at trial but not less than $75,000.

2.    Against Defendant in favor of all Plaintiffs who are U.S. nationals for treble damages pursuant to 18 U.S.C. § 2333.

3.    Against Defendant in favor of all Plaintiffs who are not U.S. nationals for punitive damages in an amount sufficient to prevent the Defendant from ever again supporting, encouraging, enticing, rewarding, carrying-out and making possible terrorist or similar acts.

4.    Against Defendant in favor of Plaintiffs for any and all costs incurred in connection with the prosecution of this action, including reasonable attorney's fees.

5.    Such other and further relief as justice requires.

94

## COUNT SEVEN

### RECKLESS DISREGARD

286.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

287.    Defendant knew, or should have known, that the funds deposited in the specific accounts established and maintained by it, and discussed herein throughout, were used to support, encourage, entice and make possible the suicide bombings and other murderous attacks described herein.  As a result, Defendant was aware, or should have been aware, of a risk so great that it was highly probable that serious harm and/or death could result from their acts in collecting and distributing such funds.

288.    Defendant recklessly disregarded this known and substantial risk thereby setting in motion the suicide bombings and other murderous attacks that were foreseeable to Defendant and which were the direct and proximate cause of the injury and/or death of Plaintiffs and/or their decedents.

289.    As a result of the foregoing Plaintiffs have been damaged in an amount not less than the statutory amount of $75,000.

**WHEREFORE**, Plaintiffs demand judgment as follows:

1.    Against Defendant, for compensatory damages in favor of each of the Plaintiffs in an amount to be determined at trial but not less than $75,000.

2.    Against Defendant in favor of all Plaintiffs who are U.S. nationals for treble damages pursuant to 18 U.S.C. § 2333.

3.    Against Defendant in favor of all Plaintiffs who are not U.S. nationals for punitive damages in an amount sufficient to prevent the Defendant from ever again

supporting, encouraging, enticing, rewarding, financing, carrying-out and making possible terrorist or similar acts.

4.  Against Defendant in favor of Plaintiffs for any and all costs incurred in connection with the prosecution of this action, including reasonable attorney's fees.

5.  Such other and further relief as justice requires.

## COUNT EIGHT

### WRONGFUL DEATH

290.  Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

291.  Plaintiffs herein bring this consolidated action pursuant to F.R.C.P. 42 for the wrongful death proximately caused by the Defendant engaging in, materially supporting or sponsoring, financing, aiding and abetting, scheming and/or otherwise conspiring to commit or cause to occur acts of murder and wrongful death, specifically, the suicide bombings and other shockingly egregious acts of international terrorism discussed herein.

292.  Surviving family members or estates of those wrongfully killed are entitled to recover damages from Defendant for these illegal and wrongful deaths. The family members or estates are entitled to recover full damages incurred, as fair and just compensation for the injuries resulting from these wrongful deaths. Those responsible for these deaths must be held accountable for the losses incurred.

293.  The injuries and damages suffered by the Plaintiffs were proximately caused by the intentional, malicious, reckless, criminal, violent, grossly negligent or negligent acts of the Defendants as described herein.

96

294.    As a direct and proximate result of the wrongful deaths of the decedents, their heirs and families have suffered financially and been deprived of all future aid, income, assistance, services, comfort, companionship, affection and financial support of their loved ones.

295.    As a direct and proximate result of Arab Bank's conduct in knowingly, intentionally and directly aiding and abetting, intentionally facilitating, and/or recklessly disregarding the intentional commission of murderous suicide bombings by PIJ, Hamas, AAMB, and PFLP against plaintiffs resulting in the wrongful death of decedents, the heirs and families of those murdered suffer and will continue to suffer permanent, physical and emotional distress, severe trauma, and lasting physical, emotional, and psychological injuries.

296.    As a further result of intentional, willful, wanton, malicious, reckless, criminal, negligent, wrongful, illegal and tortious acts and conduct of Arab Bank, the Plaintiffs have incurred actual damages including but not limited to ongoing medical expenses related to psychological trauma, physical injuries, and other expenses and losses for which they are entitled to full and fair recovery.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendant in an amount in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, fees and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate and deter Defendants from ever again committing acts of international terrorism.

## COUNT NINE

### SURVIVAL

297.    Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

97

298.    As a result of the intentional, malicious, reckless, criminal, grossly negligent and negligent acts of Defendant as described herein, those killed in the murderous attacks described herein, were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault. Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending death and physical and emotional trauma, intentionally inflicted physical pain. Decedents were mentally, physically and emotionally damaged, harmed, trapped, and falsely imprisoned prior to their personal physical injury and deaths.

299.    As a result of Defendant's criminal and tortious conduct, those killed suffered damages including pain and suffering, severe trauma, fear, anxiety, permanent physical and emotional distress, ultimate loss of life and life's pleasures, companionship and consortium, loss of family, career, earnings and earning capacity, loss of accretion to their estates, and other immeasurable items of damages to be shown at trial. Plaintiffs herein seek and are entitled to survival damages for those tortured and killed in these suicide bombings and other murderous attacks.

**WHEREFORE**, Plaintiffs demand judgment in their favor against Arab Bank, in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing such terrorist acts.

## COUNT TEN

## NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

300. Plaintiffs incorporate herein by reference the averments contained in all preceding paragraphs.

301. Arab Bank knowingly, intentionally and directly aided and abetted, intentionally facilitated, and/or recklessly disregarded the intentional commission of suicide bombings and other murderous attacks by PIJ, Hamas, AAMB, and PFLP which resulted in the decedents' deaths and substantial emotional injuries to the personal injury plaintiffs, and their family members.

302. Arab Bank intended or knew or should have known, that its conduct would lead to the killing of or injury to innocent persons and resulting severe emotional distress. Arab Bank intended, knew, or should have known that the suicide bombings and other murderous attacks committed by PIJ, Hamas, AAMB, and PFLP would kill, maim, and/or permanently injure innocent people, leaving devastated family members to grieve for their losses with ongoing physical, psychological and emotional injuries and ongoing post traumatic stress disorder.

303. The actions of Arab Bank were unconscionable and done with an intentional, malicious, willful, and/or reckless disregard for the rights and lives of those murdered, those injured, and the surviving family members.

304. As a direct and proximate cause of Arab Bank's intentional misconduct and/or reckless disregard for human life, Plaintiffs have suffered and will continue to suffer severe, debilitating, permanent emotional, physical and psychiatric disorders, ongoing emotional distress and anxiety, physical and mental distress, and significant mental injury and impairment causing

ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for all minor Plaintiffs.

305.    Arab Bank, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment in their favor against Arab Bank in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing acts of international terrorism.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

Ronald L. Motley, Esq. (SC Bar No. 4123)
Jodi Westbrook Flowers, Esq. (SC Bar No. 66300)
Donald Migliori, Esq. (RI Bar No. 4936; MA Bar
      No. 567562; and MN Bar No. 0245951)
Michael Elsner, Esq. (NY ME-8337; VA 41424;
      SC 72893)
Justin B. Kaplan, Esq. (TN Bar No. 022145)
John M. Eubanks, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone:  (843) 216-9000

Of Counsel

Jason McCue, Esq.
H2O LAW
40-43 Chancery Lane
London WC2A 1JQ
United Kingdom

Gavriel Mairone, Esq. (IL 6181698)
MANN& MAIRONE
11 East Adams Street, Suite 1600
Chicago, IL 60603

Rehov Ha-Chilazon 12
Ramat Gan, Israel


Lord Dan Brennan
Matrix Chambers
Gray's Inn
London WC1R 5LN
United Kingdom


Attorneys for Plaintiffs


Dated: January 21, 2004

ongoing and long-term expenses for medical treatment, services, and counseling and long-term care, particularly for all minor Plaintiffs.

305. Arab Bank, by engaging in this intentional, unlawful conduct, intentionally, grossly negligently, or negligently inflicted emotional distress upon the Plaintiffs.

**WHEREFORE,** Plaintiffs demand judgment in their favor against Arab Bank in an amount to be determined by a jury, not less than the statutory amount of $75,000, plus interest, costs, and such other monetary and equitable relief as this Honorable Court deems appropriate to prevent Defendants from ever again committing acts of international terrorism.

### JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully Submitted,

Ronald L. Motley, Esq. (SC Bar No. 4123)
Jodi Westbrook Flowers, Esq. (SC Bar No. 66300)
Donald Migliori, Esq. (RI Bar No. 4936; MA Bar
  No. 567562; and MN Bar No. 0245951)
Michael Elsner, Esq. (NY ME-8337; VA 41424;
  SC 72893)
Justin B. Kaplan, Esq. (TN Bar No. 022145)
John M. Eubanks, Esq.
MOTLEY RICE, LLC
28 Bridgeside Boulevard, P.O. Box 1792
Mount Pleasant, South Carolina 29465
Telephone: (843) 216-9000

Of Counsel

Jason McCue, Esq.
H2O LAW
40-43 Chancery Lane
London WC2A 1JQ
United Kingdom