**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
--------------------------------------------------------x
ORAN ALMOG, et al.,

        Plaintiffs,      <u>OPINION AND ORDER</u>
                      **04-CV-5564 (NG)(VVP)**
   -against-

ARAB BANK, PLC,

        Defendant.
--------------------------------------------------------x
GILA AFRIAT-KURTZER, et al.,

        Plaintiffs,

                   **05-CV-0388 (NG)(VVP)**
   -against-

ARAB BANK, PLC,

        Defendant.
--------------------------------------------------------x
**GERSHON, United States District Judge:**

   More than 1,600 plaintiffs, consisting of United States and foreign nationals, bring claims for damages against Defendant Arab Bank, PLC, for knowingly providing banking and administrative services to various organizations identified by the U.S. government as terrorist organizations, that sponsored suicide bombings and other murderous attacks on innocent civilians in Israel.[1] The U.S. nationals assert claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. §§ 2331 *et seq*., essentially identical to those brought in *Linde v. Arab Bank*, 04-CV-02799, *Litle v. Arab Bank*, 04-CV-05449, and *Coulter v. Arab Bank*, 05-CV-00365, which were addressed

---

[1]   Plaintiffs include individuals injured in the alleged attacks and family members of those killed and injured in the attacks.

in *Linde v. Arab Bank, PLC*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) ("*Arab Bank I*").[2]  The foreign

nationals make similar factual allegations, but assert violations of the law of nations and base

jurisdiction on the Alien Tort Claims Act ("ATS"), 28 U.S.C. § 1350.[3]  Both the U.S. nationals and

the foreign nationals also assert federal common law claims, namely, assisting in the intentional

injury of others, reckless disregard of injury to others, wrongful death, survival, and negligent and

intentional infliction of emotional distress.  Defendant moves to dismiss the amended complaints

for lack of subject matter jurisdiction, pursuant to Rule 12(b)(1) of the Federal Rules of Civil

Procedure, and for failure to state a claim, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.

## FACTUAL ALLEGATIONS AND CLAIMS

Plaintiffs allege that, since the formation of Israel in 1948, Palestinian paramilitary and

terrorist organizations have sought to destroy it through, *inter alia*, the systematic murder of Jews

and other civilians in Israel.[4]  In December 1987, a collective Palestinian uprising, or *intifada*,

---

[2]        In addition to the above-captioned suits and the *Linde*, *Litle*, and *Coulter* suits, Arab Bank is the sole defendant in five other related cases: *Bennett v. Arab Bank*, 05-CV-03183, filed on July 1, 2005; *Roth v. Arab Bank*, 05-CV-03738, filed on August 5, 2005; *Miller v. Arab Bank*, 05-CV-05518, filed on November 28, 2005; *Weiss v. Arab Bank*, 06-CV-01623, filed on April 7, 2006, in which there is a motion to dismiss pending; and *Jesner v. Arab Bank*, 06-CV-03869, filed on August 9, 2006.  There is also a pending motion to dismiss newly-added plaintiffs in the *Coulter* suit.

[3]        The foreign nationals consist mostly of Israeli citizens but also include Afghani, Argentinian, Australian, Belarusian, Canadian, French, Iranian, Iraqi, Peruvian, South African, Turkmenian, Ukranian, and Uzbeki citizens.

[4]        The facts alleged are assumed true for purposes of defendant's motions to dismiss. *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006).  The allegations of Arab Bank's conduct and plaintiffs' theories of liability are virtually identical in the Almog and Afriat-Kurtzer complaints and will be summarized together.  Allegations unique to individual plaintiffs in the amended complaints will be summarized separately.

erupted against Israel in the West Bank and in Gaza.  In late September 2000, a second Palestinian *intifada*, or Al Aqsa Intifada or Intifada Al Quds (the "Second Intifada"), erupted after the collapse of peace negotiations between the State of Israel and the Palestinian Authority.  Each *intifada* was characterized by systematic and widespread terror campaigns designed to kill Jews and Israelis, as well as to coerce the civilian population of Israel to cause Israel to cede territory to the Palestinians and ultimately to destroy the Jewish state.  With the outbreak of the Second Intifada, several terrorist organizations intensified the terror campaign of widespread and systematic suicide bombings and other murderous attacks in Israel, the West Bank, and the Gaza Strip, resulting in the death and injury of thousands of individuals, the majority of which were innocent civilians.

Plaintiffs identify the Islamic Resistance Movement ("HAMAS"), the Palestinian Islamic Jihad ("PIJ"), the Al Aqsa Martyrs' Brigade ("AAMB"), and the Popular Front for the Liberation of Palestine ("PFLP") (collectively "the terrorist organizations") as prominent terrorist organizations in the Second Intifada, operating in Palestinian-controlled territory and acting with the united purpose of eradicating the State of Israel through a campaign of terror, genocide, and crimes against humanity.  HAMAS was named a Specially Designated Terrorist entity ("SDT") by the U.S. government in 1995 and designated a Foreign Terrorist Organization ("FTO") by the U.S. Secretary of State in 1997.  The PIJ was named as an SDT in 1995 and designated an FTO by the U.S. Secretary of State in 1997.  The PFLP was named an SDT in 1995 and an FTO in 1997.  Finally, HAMAS, the PIJ, and the AAMB were each designated a Specially Designated Global Terrorist Entity ("SDGT").  Plaintiffs allege that these terrorist organizations openly adhere to a shared mission, "to topple and eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic and/or Palestine state . . . ."  The terrorist organizations seek to

accomplish their shared goal by cooperating in the planning and commission of suicide bombings and other murderous attacks and by providing financial support to the relatives of "martyrs" and those injured in or imprisoned for perpetrating attacks. This has resulted in the systematic and continuous killing and injury of thousands of unarmed innocent civilians in Israel, the West Bank, and the Gaza Strip.

Plaintiffs allege that several purported charitable organizations, including the Popular Committee for Support of the Intifada (the "Popular Committee"), the Coalition of Benevolence (the "Coalition"), the Humanitarian Relief Association (the "HRA"), the Al-Ansar Society, and the Tulkarem Charitable Committee, are in fact front organizations for the terrorist organizations and act as fund-raising apparatuses that raise and launder funds to subsidize the Second Intifada and to bankroll the terrorist organizations. Plaintiffs allege that two specific committees were created in Saudi Arabia to raise funds to aid in the proliferation of the objectives of HAMAS, the PIJ, the AAMB, and the PFLP: (1) the Popular Committee for Assisting the Palestinian Mujahideen (the "Mujahideen Committee"); and (2) in 2002, the Saudi Committee for Aid to the Al-Quds Intifada (the "Saudi Committee"). These two organizations set up accounts labeled "Account 98" accounts at various banks in Saudi Arabia, including the Arab National Bank (of which defendant Arab Bank owns a 40% interest), to raise funds for the families of "martyrs" of HAMAS, the AAMB, the PIJ, and the PFLP. In addition, public and private donations were deposited in numerous accounts established in various financial institutions in the Middle East, primary among them Arab Bank, for the explicit purpose of providing funds to families of "martyrs" of HAMAS, the PIJ, the AAMB, and the PFLP.

According to the amended complaints, Arab Bank "knowingly and intentionally, both

directly and indirectly, aided and abetted and intentionally facilitated the attacks by HAMAS, the PIJ, the AAMB, and the PFLP by soliciting, collecting, transmitting, disbursing and providing the financial resources that allowed those organizations to flourish and to engage in a campaign of terror, genocide, and crimes against humanity in an attempt to eradicate the Israeli presence from the Middle East landscape." According to plaintiffs, Arab Bank is one of the largest financial institutions in the Middle East and is headquartered in Jordan. It operates through various sister institutions, subsidiaries, and affiliates, which collectively make up the Arab Bank Group. To this end, Arab Bank owns a 40% interest in Saudi Arabia's Arab National Bank. Arab Bank has over 400 branch offices in over twenty-five countries, including branches located in Jordan, Saudi Arabia, the West Bank, the Gaza Strip, and the United States. Its U.S. branch, located in New York, provides financial services that include clearing and correspondent banking services to its foreign bank branches, affiliated banking institutions (those that are owned or controlled by Arab Bank Group), and other foreign banks.

Plaintiffs allege that Arab Bank was part of a formalized system of financing that HAMAS, the PIJ, the AAMB, and the PFLP rely upon to plan, fund, and carry out the suicide bombings and other murderous attacks. Specifically, plaintiffs allege that Arab Bank materially supported the efforts and goals of the terrorist organizations in two ways. First, Arab Bank provided banking services, including maintaining accounts, for HAMAS and other terrorist organizations. With respect to HAMAS specifically, plaintiffs allege that Arab Bank provided banking services to HAMAS directly by collecting funds into HAMAS accounts in its Beirut, Lebanon and Gaza Strip branches. Supporters knew to donate to HAMAS directly through Arab Bank because the HAMAS website directed supporters to make contributions to Arab Bank's Gaza Strip branch and because

there were various advertisements publicized throughout the Middle East calling for donations to Arab Bank accounts. Arab Bank knew that the donations were being collected for terrorist attacks.

Plaintiffs also allege that Arab Bank maintained accounts and solicited and collected funds for the various charitable organizations, including the Popular Committee, organizations that are part of the Coalition, the HRA, the Al-Ansar Society and the Tulkarem Charitable Committee, all of which it knew are affiliated with the various terrorist organizations. In addition, plaintiffs allege that Arab Bank maintained accounts for individual supporters of terrorist organizations, such as HAMAS and al Qaeda. Arab Bank knew that the accounts of these various organizations and individuals were being used to fund the suicide bombings and other attacks sponsored by the terrorist organizations. Finally, Arab Bank laundered funds for the terrorist and front organizations, including the Holy Land Foundation for Relief and Development ("HLF"), which raised funds for HAMAS in the United States.

Plaintiffs' second factual theory is that Arab Bank administered the financial infrastructure by which the Saudi Committee distributed a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks. Despite its knowledge that the Saudi Committee was distributing this benefit to families of "martyrs," Arab Bank essentially served as a "paymaster" through its branch offices within the West Bank and the Gaza Strip. Plaintiffs allege that the Saudi Committee, as of November 2001, had paid millions of dollars to suicide bombers or their beneficiaries through Arab Bank. Additionally, Arab Bank has transmitted millions of dollars to, among others, various institutions and individuals on behalf of the Saudi Committee.

According to plaintiffs' allegations, Arab Bank played an integral role in the structured

financial process by which the funds in the "Account 98" accounts were transferred to their intended beneficiaries. The first step was to create and maintain a database of persons eligible to receive payments. To accomplish that, the Saudi Committee prepared a list of potential beneficiaries, including the families of "martyrs" and of prisoners. After verifying the names of the beneficiaries, their contact information, and their injury with Palestinian officials, the Saudi Committee coordinated with Arab Bank. Specifically, the Saudi Committee consulted with Arab Bank and local representatives of HAMAS to finalize the lists of beneficiaries.

The next step, as alleged by plaintiffs, was to transfer the funds contained in the "Account 98" accounts in the various banks to accounts at Arab Bank for the beneficiaries. The Saudi Committee opened an account at Arab Bank in the beneficiary's name and deposited a standard amount of U.S. dollars or Saudi Riyals into the account. Because Saudi Riyals cannot be conveniently converted to Israeli currency, Arab Bank facilitated that conversion by routing those funds through its New York branch, where they were converted to U.S. dollars and then to Israeli currency. Thus, "Account 98" funds "often, if not always," went through Arab Bank's branch in New York before being transferred to accounts in the Middle East.

Plaintiffs allege that, after the funds were transferred to designated accounts in the Arab Bank branches in the West Bank and the Gaza Strip, Arab Bank distributed the money to beneficiaries with appropriate documentation. To ensure that only families of bona fide "martyrs" received disbursements, the Saudi Committee required beneficiaries to present registration cards to Arab Bank to receive remittances. The registration card was an official certification from the Palestinian Authority establishing the bona fides of the "martyr." Arab Bank allegedly provided instructions to the general public on how to qualify and collect money. Thus, plaintiffs claim that

Arab Bank not only disbursed the funds to the beneficiaries, but also participated in the formalized process that required the families of "martyrs" to obtain official certification of their deceased relatives' status as bona fide "martyrs."

According to plaintiffs, the Saudi Committee paid and transmitted benefits to approximately 200 fallen "martyrs" through the program administered by Arab Bank in the first year of its existence alone. They also allege that the Saudi Committee openly declared that its funds were transmitted and distributed to the families of "martyrs" through Arab Bank. Plaintiffs allege that there is a direct correlation between the number of attacks, including suicide bombings, and the amount of funds held by the Mujahideen and Saudi Committees. Plaintiffs allege that the payment and promise of payment to families of "martyrs" incentivized and encouraged potential suicide bombers. Thus, plaintiffs allege that Arab Bank facilitated and provided an incentive for the suicide bombings and other murderous attacks in that the individual attackers knew that, if they committed an attack, their families would be supported by the funds held in their names by Arab Bank.

Each plaintiff alleges that he or she is a victim, or family member of a victim, of the actions of suicide bombers and murderers who were supported, encouraged, and enticed by funds collected and disbursed by Arab Bank. In their amended complaints, plaintiffs provide the names of various suicide bombers and gunmen whose families received payment through the financing process described above and whose attacks caused the injuries or deaths which are the subject of these suits. While the allegations of each plaintiff are unique, to summarize each plaintiffs' allegations would be impractical given the number of plaintiffs; thus, this opinion will summarize only the allegations of a few representative individuals from each of the amended complaints.

The following allegations are from the Almog amended complaint:

On February 22, 2004, an AAMB suicide bombing of a bus in Jerusalem killed eight people and injured over sixty others, including family members of plaintiffs who are Iraqi, Moroccan, and Israeli citizens.

On October 4, 2003, a PIJ suicide bombing at the Maxim Restaurant in Haifa killed twenty-one people, including family members of plaintiffs who are Israeli and U.S. citizens.

On May 19, 2003, a PIJ suicide bombing at the Amakim Mall in Afula, killed three and wounded seventy people, including family members of plaintiffs who are Ukranian and Israeli citizens.

On April 30, 2003, a suicide bombing in a beach-side pub in Tel Aviv killed two and injured over fifty people, including family members of plaintiffs who are United States, French, Israeli, United Kingdom, South African, Canadian, and Australian citizens.

On October 20, 2002, a HAMAS sniper shot and killed Keivan Chen, son of plaintiff Rahel Cohen, a citizen of Iran.

On December 1, 2001, two HAMAS suicide bombers detonated explosive devices in Jerusalem, killing eleven people, including family members of plaintiffs who are French and Israeli citizens.

On June 18, 2001, a HAMAS suicide bombing of a dance club in Tel Aviv killed and injured several youths, including family members of plaintiffs who are Russian, Israeli, Belarusian, Turkmenian, Uzbeki, and Ukranian citizens.

The allegations in the Afriat-Kurtzer amended complaint arise from a single suicide bombing on January 22, 1995, at the Beit Lid junction near Netanya. The PIJ claimed responsibility for the attack, which killed nineteen people and injured many others, whose family members are plaintiffs

of Israeli, Argentinian, and U.S. citizenry.

Based on these allegations, both the Almog and Afriat-Kurtzer plaintiffs assert the following claims:[5]  In Count One, the U.S. nationals claim that Arab Bank violated various provisions of the ATA.[6]  Specifically, the U.S. nationals allege Arab Bank violated: (1) 18 U.S.C. § 2339A by providing material support, such as financial services, knowing or intending that such services would be used to carry out prohibited criminal acts; (2) 18 U.S.C. § 2339B(a)(1) by knowingly providing material support, such as financial services, to a terrorist organization; (3) 18 U.S.C. § 2339B(a)(2) by failing to retain possession of or maintain control over funds or report to the Secretary of the Treasury the existence of funds in which terrorist organizations had an interest when it became aware that it had possession of, or control over, such funds; and (4) 18 U.S.C. § 2339C by directly and indirectly collecting funds to finance terrorism.

In Count Two, the U.S. nationals allege that Arab Bank aided and abetted violations of the ATA by collecting and disbursing funds knowing they would be used to, *inter alia*, support, encourage, and reward terrorist activities in Israel, including suicide bombings and murder.

In Count Three, the foreign nationals claim that Arab Bank violated the law of nations by financing the suicide bombings and other murderous attacks directed at civilians committed by HAMAS, the PIJ, the AAMB, and the PFLP.  They further allege that Arab Bank aided and abetted and intentionally facilitated a violation of international law by providing funds to or collecting funds

---

[5]     Because the Almog and Afriat-Kurtzer plaintiffs assert the identical claims in each count of their respective amended complaints, references to a "Count" include counts of both the Almog and Afriat-Kurtzer pleadings, unless otherwise indicated.

[6]     The claims in Counts One and Two are alleged by the U.S. nationals only.  The claims in Counts Three through Five are alleged by the foreign nationals only.  The claims in Counts Six through Ten are alleged by all plaintiffs.

for HAMAS, the PIJ, the AAMB, and the PFLP, intending or knowing that such funds would be used to carry out an offense under international law.

The foreign nationals allege in Count Four that Arab Bank aided and abetted, was complicit in, intentionally facilitated, and participated in a joint venture to engage in acts of genocide in violation of the law of nations by providing financial and other practical assistance, encouragement or moral support to HAMAS, the PIJ, the AAMB, and the PFLP.

In Count Five, the foreign nationals claim that Arab Bank aided and abetted, was complicit in, intentionally facilitated, and participated in a joint venture to engage in the planning, preparation, or execution of crimes against humanity in violation of the law of nations by providing financial and other practical assistance, encouragement, or moral support to HAMAS, the PIJ, the AAMB, and the PFLP.

The remainder of the Counts of both amended complaints allege various torts said to arise under federal common law. Specifically, Count Six alleges that Arab Bank assisted in the intentional injury of others by a third party by allowing its facilities to be used by HAMAS, the PIJ, the AAMB, and the PFLP in order to support and encourage suicide bombings and other murderous attacks; Count Seven alleges that Arab Bank recklessly disregarded injury to others; Count Eight alleges claims for wrongful death; Count Nine alleges "survival" claims; and Count Ten alleges claims for negligent and intentional infliction of emotional distress.

## DISCUSSION

## I.      Pleading and Motion to Dismiss Standards

Under Rule 8(a) of the Federal Rules of Civil Procedure, a pleading sets forth a claim for relief if it contains: (1) a short and plain statement of the grounds upon which the court's jurisdiction

depends, (2) a short and plain statement of the claim showing that the pleader is entitled to relief, and (3) a demand for judgment for the relief the pleader seeks. Under this simplified pleading standard, a court should not dismiss a complaint unless no relief could be granted under any set of facts that could be proved consistent with the complaint. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted, the court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006). On the issue of subject matter jurisdiction, the court may look beyond the pleadings in determining international law. *Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 255 n.30 (2d Cir. 2003). When reviewing a motion to dismiss under both Rule 12(b)(1) and Rule 12(b)(6), a court should decide the jurisdictional question first. *Rhulen Agency, Inc. v. Alabama Ins. Guar. Ass'n*, 896 F.2d 674, 678 (2d Cir. 1990).

## II.     Anti-Terrorism Act Claims

### A.     Brief Background of the ATA

There have been a series of acts of Congress each entitled the "Anti-Terrorism Act." The first Anti-Terrorism Act was enacted in 1987. *See* Pub. L. No. 100-204, §§ 1001-1005, 101 Stat. 1406 (1987). The ATA of 1987 contained Congressional findings and determinations, including the determination that the Palestine Liberation Organization ("PLO") is a terrorist organization. *Id.* § 1002. The first ATA also enacted 22 U.S.C. § 5202, which prohibits certain actions with regard to the PLO. *Id.* § 1003.

The second Anti-Terrorism Act was enacted in 1990, and it created several terrorism-related

provisions, as well as re-designating § 2331 of Title 18 of the U.S. Code to § 2332. *See* Pub. L. No. 101-519, § 132, 104 Stat. 2240, 2250 (1990). The newly-redesignated § 2332 provided for criminal penalties for conduct occurring outside the United States that harmed, either by death or serious bodily injury, U.S. nationals. *Id.* The newly-enacted § 2331 provided definitions for various terms as used in that particular chapter of Title 18. *Id.* The other sections of the Anti-Terrorism Act of 1990, §§ 2333-2338 (excluding sections 2332a-h), provided, *inter alia*, U.S. nationals with civil remedies for acts of international terrorism, the district courts with jurisdiction, and a statute of limitations period for civil claims. *Id.*

In 1991, the Anti-Terrorism Act of 1990 was repealed in its entirety. *See* Pub. L. No. 102-27, § 402, 105 Stat. 130, 155 (1991), *as amended*, Military Construction Appropriations Act, Pub. L. No. 102-136, § 126, 105 Stat. 637, 643 (1991) (stating that "[e]ffective November 5, 1990, chapter 113A of title 18, United States Code, is amended to read as if section 132 of Public Law 101-519 [the Anti-Terrorism Act of 1990] had not been enacted"). The substantive provisions of the Anti-Terrorism Act of 1990 were reenacted in 1992. *See* Federal Courts Administration Act of 1992, Pub. L. No. 102-572, § 1003, 106 Stat. 4506, 4521-24 (1992). Although the substance of the provisions remained virtually unchanged, the newly-enacted public law did not designate a short title, previously the Anti-Terrorism Act, for the collection of provisions.[7] The terrorism-related provisions, as reenacted, are codified in §§ 2331-2338 of chapter 113B of Title 18 of the U.S. Code (excluding sections 2332a-h). The remainder of the sections of Chapter 113B of Title 18 of the U.S. Code, §§ 2332a-h and §§ 2339-2339D, which also relate to terrorism, were enacted by various other

---

[7]     For the sake of simplicity, however, I use the acronym "ATA" to refer to the terrorism-related provisions contained in Chapter 113B of Title 18 of the U.S. Code.

laws, including the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-

132, 110 Stat. 1214 (1996), and the Uniting and Strengthening America by Providing Appropriate

Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA PATRIOT Act"), Pub. L.

No. 107-56, 115 Stat. 272 (2001).[8]

## B. Anti-Terrorism Act Claims

Arab Bank moves to dismiss the claims of the U.S. nationals brought under the ATA on

essentially the same grounds raised in *Arab Bank I*.[9] For the reasons stated in the opinion in that

case, Arab Bank's motion to dismiss the ATA claims is denied in part and granted in part.

Like the plaintiffs in *Arab Bank I*, the current plaintiffs bring their suit pursuant to 18 U.S.C.

§ 2333, which provides that any U.S. national may sue for an injury sustained "by reason of an act

of international terrorism." 18 U.S.C. § 2333(a). "International terrorism" is defined as activities

that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the
> criminal laws of the United States or of any State, or that would be a criminal

---

[8] *See also, e.g.,* AEDPA, Pub. L. No. 104-132, § 303, § 321, § 521, § 702, 110 Stat. 1214 (1996) (enacting 18 U.S.C. § 2332b (Acts of Terrorism Transcending National Boundaries), § 2332c (Use of Chemical Weapons) (repealed by Pub. L. No. 105-277, § 201(c)(1), 112 Stat. 2681-871 (1998)), § 2332d (Financial Transactions), and § 2339B (Providing Material Support or Resources to Designated Foreign Terrorist Organizations)); USA PATRIOT Act, Pub. L. No. 107-56, § 803(a), 115 Stat. 272, 376 (2001) (enacting 18 U.S.C. § 2339 (Harboring or Concealing Terrorists)); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, § 60023, § 120005, 108 Stat. 1796, 1980, 2022 (1994) (enacting 18 U.S.C. § 2332a (Use of Weapons of Mass Destruction) and § 2339A (Providing Material Support to Terrorists)); and Implementation of the International Convention for the Suppression of Terrorist Bombings, Pub. L. No. 107-197, § 102, § 202, 116 Stat. 721, 724 (2002) (enacting 18 U.S.C. § 2332f (Bombings of Places of Public Use, Government Facilities, Public Transportation Systems and Infrastructure Facilities) and § 2339C (Prohibitions Against the Financing of Terrorism)).

[9] Arab Bank specifically directed this court's attention to its briefs in support of its motions to dismiss in the *Linde*, *Litle*, and *Coulter* cases.

violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended--
     (i) to intimidate or coerce a civilian population;
     (ii) to influence the policy of a government by intimidation or coercion; or
     (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum[.]

18 U.S.C. § 2331(1).

     Plaintiffs allege that Arab Bank violated: (1) 18 U.S.C. § 2339A by providing material support or resources to terrorists;[10] (2) 18 U.S.C. § 2339B(a)(1) by providing material support to foreign terrorist organizations;[11] (3) 18 U.S.C. § 2339B(a)(2) by failing to retain possession of or maintain control over funds or report to the Secretary of Treasury the existence of funds in which terrorist organizations had an interest when it became aware that it had possession of, or control

---

[10]     Section 2339A defines the term "material support or resources" to include the provision of any property, service, including currency or monetary instruments or financial securities, or financial services.

[11]     Section 2339B(a)(1) prohibits knowingly providing material support or resources to a foreign terrorist organization. To violate this subsection, a person must have knowledge that the organization: (1) is a designated terrorist organization; (2) has engaged or engages in terrorist activity; or (3) has engaged or engages in terrorism. Section 2331(3) defines the term "person" as "any individual or entity capable of holding a legal or beneficial interest in property."

Section 2339B(g)(6) defines the term "terrorist organization" as "an organization designated as a terrorist organization under section 219 of the Immigration and Nationality Act."

over, such funds;[12] and (4) 18 U.S.C. § 2339C by financing terrorism.[13]  As described in *Arab Bank I*, violations of Sections 2339A, 2339B(a)(1), and 2339C can serve as predicate crimes giving rise to liability under the ATA.  *See Arab Bank I*, 384 F. Supp. 2d at 580-81 (citing *Boim v. Quranic Literacy Inst. and Holy Land Found. For Relief And Dev.*, 291 F.3d 1000, 1014-15 (7th Cir. 2002)).  Thus, for the reasons stated in *Arab Bank I* with respect to those claims, plaintiffs have sufficiently alleged that they were injured by reason of an act of international terrorism.  However, plaintiffs' claims under § 2339B(a)(2) "are neither criminal violations nor acts of international terrorism, as defined by the statute" and must therefore be dismissed.  *See id.* at 590 (stating that "this claim is an attempt to recast civil violations of the reporting requirements as criminal acts of providing material support").

Civil aiding and abetting liability, as well as conspiracy liability, is available under the ATA, and Arab Bank's alleged conduct falls within the scope of such liability.  *Id*. at 582-85 (citing *Boim*, 291 F.3d at 1018-21 and *Halberstam v. Welch*, 705 F.2d 472, 488-89 (D.C. Cir. 1983)).  With respect to conspiracy, plaintiffs adequately allege that Arab Bank knowingly and intentionally

---

[12]     Section 2339B(a)(2) requires any financial institution that becomes aware that it has possession of, or control over, any funds in which a foreign terrorist organization, or its agent, has an interest, to: (A) retain possession of, or maintain control over, such funds; and (B) report to the Secretary of Treasury the existence of such funds.

[13] Section 2339C(a)(1) makes it a crime to directly or indirectly, unlawfully and willfully provide or collect funds intending, or knowing, that such funds will be used to carry out: (A) an act which constitutes an offense within the scope of, among other treaties, the International Convention for the Suppression of Terrorist Bombings; or (B) any other act intended to cause death or serious bodily injury to a civilian, or to a person not taking an active part in the hostilities in a situation of armed conflict with the purpose of intimidating a population, or to compel a government to do or to abstain from doing any act.

Section 2339C also defines certain terms.  The term "provides" is defined to include giving, donating, and transmitting, and the term "collects" is defined to include raising and receiving.

provided services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was committed in furtherance of the common scheme. Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank supplied necessary financial services to the organizations and administered the "martyr" benefit plan. These allegations support not only the existence of an agreement, but also Arab Bank's knowing and intentional participation in the agreement's illegal goals. *See id.* at 584. With respect to aiding and abetting liability, the financial services provided by Arab Bank, and the administration of the benefit plan, are alleged to have provided substantial assistance to international terrorism and encouraged terrorists to act. *See id.* Thus, Arab Bank's alleged conduct is a sufficient basis for liability under the broad scope of the ATA.

Finally, plaintiffs' allegations are sufficient with respect to Arab Bank's knowledge and intent. *See id.* at 585-87. None of the provisions of the ATA imposes a heightened pleading standard, nor do any require that Arab Bank have had the specific intent to cause the specific acts which injured plaintiffs. *See Arab Bank I*, 384 F. Supp. 2d at 585-86. It is sufficient that Arab Bank played a role in a well-publicized plan to reward terrorists killed and injured in suicide bombings and other attacks in Israel; knew that the groups to which it provided services were engaged in terrorist activities; and knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism. *See id.* at 588.

In conclusion, as in *Arab Bank I*, the claims in Count One of both the Almog and Afriat-Kurtzer amended complaints alleging violations of 18 U.S.C. § 2339B(a)(2) (failure to retain funds and to report the existence of certain funds) are dismissed. *See id.* at 589-90. The motion to dismiss is denied as to all other ATA claims in Counts One and Two pursuant to the reasoning in *Arab Bank*

I.[14]

## III. Alien Tort Claims Act Claims

The ATS provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. On its face, the statute requires that plaintiffs must 1) be aliens, 2) claiming damages for a tort only, 3) resulting from a violation of the law of nations or a treaty of the United States. *Flores*, 414 F.3d at 242. Arab Bank moves to dismiss the claims of the foreign nationals brought under the ATS, arguing that this court lacks jurisdiction and that plaintiffs have failed to state a claim because plaintiffs have failed to plead a violation of the law of nations. Neither the Almog nor the Afriat-Kurtzer plaintiffs assert that the torts they allege are in violation of a treaty of the United States; rather, they assert a violation of the law of nations. The essential issues in contention are therefore whether plaintiffs have pled a violation of the law of nations that should be recognized by this court under the ATS, and whether Arab Bank can be liable for aiding and abetting those violations.[15]

Any discussion of the ATS must begin with the Supreme Court's recent decision in *Sosa v.*

---

[14]    Defendant argues that the claims of three plaintiffs are time-barred under the ATA. Defendant's argument with respect to these plaintiffs will be addressed in the *Coulter* motion currently pending before the court.

[15]    In the context of the ATS, the phrase "law of nations" is consistently used interchangeably with the phrases "norm of international law" and "international law." *See Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) (using interchangeably the phrases "norm of international law" and "law of nations"); *United States v. Yousef*, 327 F.3d 56, 104 n.38 (2d Cir. 2003) (per curiam) (stating that, although the phrases are not entirely synonymous, the phrases "international law" and the "law of nations" frequently are used interchangeably). In addition, the law of nations can encompass customary international law, and, to the extent that it does, the phrase "customary international law" is also used interchangeably with the phrase "the law of nations." *See Flores*, 414 F.3d at 237 n.2.

*Alvarez-Machain*, 542 U.S. 692 (2004).  Humberto Alvarez-Machain, the plaintiff in *Sosa*, was a Mexican national who had been indicted for the torture and murder of an agent of the United States Drug Enforcement Agency (the "DEA").  *Id*. at 697-98.  The DEA authorized a plan whereby a group of Mexican nationals, including Jose Francisco Sosa, seized Alvarez-Machain and brought him back to the United States for trial.  *Id*.  Alvarez-Machain brought a civil action against Sosa, among others, seeking damages under the ATS for a violation of the law of nations, namely, arbitrary arrest and detention.  *Id*. at 699.  The defendant argued that the ATS provides courts only with subject matter jurisdiction and neither creates nor authorizes a court to recognize a cause of action for an alleged violation of the law of nations.  *Id*. at 712.

The Supreme Court, in *Sosa*, stated that, "although the ATS is a jurisdictional statute creating no new causes of action . . . . [t]he jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time" the ATS was enacted. *Id*. at 724.  Thus, under the ATS, courts can hear a limited category of claims "defined by the law of nations and recognized at common law."  *Sosa*, 542 U.S. at 712.  The Court reasoned:

> [T]here is every reason to suppose that the First Congress did not pass the ATS as a jurisdictional convenience to be placed on the shelf for use by a future Congress or state legislature that might, someday, authorize the creation of causes of action or itself decide to make some element of the law of nations actionable for the benefit of foreigners. The anxieties of the preconstitutional period cannot be ignored easily enough to think that the statute was not meant to have a practical effect. . . . the reasonable inference from the historical materials is that the statute was intended to have practical effect the moment it became law.

*Id*. at 719, 724.  The Court assumed that the "First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations . . . ."  *Id*. at 724.

In particular, the Court stated, "[i]t would take some explaining to say now that federal courts must

avert their gaze entirely from any international norm intended to protect individuals." *Id*. at 730.

As the *Sosa* Court noted, the federal courts have previously recognized causes of action under the ATS for a violation of the law of nations. *Id*. at 731. For example, in *Filartiga v. Pena-Irala*, 630 F.2d 876, 885, 890 (2d Cir. 1980), the seminal Second Circuit ATS case, which is cited repeatedly and favorably in *Sosa*, the Second Circuit recognized a cause of action for violation of the law of nations under the ATS. In *Filartiga*, the plaintiffs Dolly M.E. Filartiga and Joel Filartiga, citizens of Paraguay, brought an action under the ATS against the Inspector General of Police in Asuncion, Paraguay, for allegedly torturing and killing Joel Filartiga's son. 630 F.2d at 878. The court held that an act of torture committed by a state official against an alien of the same nationality violates the law of nations and is thus actionable under the ATS. *Id*. at 884-85.

Having held that, under the ATS's jurisdictional grant, federal courts can recognize a cause of action that arose after enactment of the ATS, the *Sosa* Court set out the standard for doing so: "federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."[16] 542 U.S. at 732. The norm of international law may not be merely aspirational; rather, it must be specific and well-defined. *Id*. at 738. The Court rejected Alvarez-Machain's contention that there was an international norm against arbitrary detention on the ground that it was not specific enough to create a federal remedy. *Id*. ("Whatever may be said for the broad principle Alvarez advances, in the present, imperfect world, it expresses an aspiration that exceeds any binding customary rule having the specificity we

---

[16] These include the violation of safe conducts, infringement of the rights of ambassadors, and piracy. *Sosa*, 542 U.S. at 724.

require. Creating a private cause of action to further that aspiration would go beyond any residual common law discretion we think it appropriate to exercise."). The Court then considered the specific conduct alleged by Alvarez-Machain and concluded that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id*.

*Sosa* instructs that courts consider the *current* state of the law of nations in deciding whether to recognize a claim under the ATS. *Id*. at 733. As the *Filartiga* Court stated, "courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today." 630 F.2d at 881. That rules of international law evolve and ripen over time was acknowledged by the Supreme Court as early as 1900 in *The Paquete Habana*, 175 U.S. 677, 694 (1900) ("[T]he period of a hundred years which has [elapsed since the enactment of the ATS] is amply sufficient to have enabled what originally may have rested in custom or comity, courtesy or concession, to grow, by the general assent of civilized nations, into a settled rule of international law.").

The current law of nations "is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Flores*, 414 F.3d at 248; *see also Sosa*, 542 U.S. at 714-15. First, then, in order for a rule to become a norm of international law, States must universally abide by or accede to it. *Flores*, 414 F.3d at 248; *Filartiga*, 630 F.2d at 881 ("The requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one."). The question is not one of whether the rule is often violated, but whether virtually all States recognize its validity. *Filartiga*, 630 F.2d at 884 (citing the Department

of State, Country Reports on Human Rights for 1979, published as Joint Comm. Print, House Comm. on Foreign Affairs, and Senate Comm. on Foreign Relations, 96th Cong. 2d Sess. (Feb. 4, 1980), Introduction at 1.). Thus, that a norm of international law is honored in the breach does not diminish its binding effect as a norm of international law. *Filartiga*, 630 F.2d at 884 n.15; *cf. Sosa*, 542 U.S. at 738 n.29.

Second, States must abide by or accede to the rule from a sense of *legal obligation* and not for moral or political reasons. *Flores*, 414 F.3d at 248. Whether States abide by or accede to a rule out of a sense of legal obligation is shown by, among other things, state practice.

Third, "[i]t is only where the nations of the world have demonstrated that the wrong is of *mutual*, and not merely *several*, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute." *Filartiga*, 630 F.2d at 888 (emphasis added). Matters of "mutual" concern are those involving States' actions performed with regard to each other. *Flores*, 414 F.3d at 249. Matters of "several" concern are "matters in which States are separately and independently interested." *Id.* "[O]ffenses that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the nations of the world have demonstrated that such wrongs are of mutual concern and capable of impairing international peace and security." *Id.* (internal quotation marks, citations, and alterations omitted).

The sources of law from which a court discerns the current state of the law of nations were specified by the Supreme Court in *Paquete Habana*:

> International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as questions of right depending upon it are duly presented for their determination. For this purpose, where there is no treaty and no controlling executive or legislative act or judicial decision, resort

must be had to the customs and usages of civilized nations, and, as evidence of these, to the works of jurists and commentators who by years of labor, research, and experience have made themselves peculiarly well acquainted with the subjects of which they treat. Such works are resorted to by judicial tribunals, not for the speculations of their authors concerning what the law ought to be, but for trustworthy evidence of what the law really is.[17]

---

[17]     In accordance with *Paquete Habana*, both parties have submitted affidavits by various commentators regarding current international law.

Plaintiffs have submitted declarations by:

1) Ruth Wedgwood, Edward Burling Professor of International Law and Diplomacy at the Nitze School of Advanced International Studies, at John Hopkins University, in Washington, D.C., who specializes in scholarship and teaching in public international law, the law of armed conflict, international criminal law, international human rights law, United Nations politics, and the constitutional law of foreign affairs. In 2002, Professor Wedgwood was elected by 148 State parties to a four-year term as the U.S. member of the United Nations Human Rights Committee in Geneva, and she is currently Vice President of the American Society of International Law.

2) Yoram Dinstein, former President of Tel Aviv University (1991-1998) and Professor of International Law and Yanowicz Professor of Human Rights. He has served twice as the Charles H. Stockton Professor of International Law at the U.S. Naval War College in Newport, RI. Professor Dinstein is a member of the Institute of International Law and the San Remo International Institute of Humanitarian Law.

3) Mark A. Drumbl, Associate Professor and Ethan Allen Faculty Fellow at Washington & Lee University School of Law. Professor Drumbl has published various articles and has contributed to several books on topics of international law.

Defendant has submitted declarations by:

1) Eric A. Posner, Kirkland and Ellis Professor of Law at the University of Chicago. Professor Posner teaches courses in public international law, foreign relations law, and theories of international law. He specializes in international law, and he is a widely-published scholar on various topics of international law.

2) Stephan Talmon, University Lecturer in Public International Law at the University of Oxford, United Kingdom. Professor Talmon specializes in research and teaching public international law, including the law of international organizations, international criminal law, international environmental law, international humanitarian law, and international human rights law. He regularly advises governments and private clients on questions of public international law, and he has published various articles and has contributed to several books on topics concerning

175 U.S. 677, 700 (1900); *see also Sosa*, 542 U.S. at 734; *Filartiga*, 630 F.2d at 880.  As the

*Filartiga* Court noted, 630 F.2d at 881 n.8, this method of discerning the current state of the law of

nations is consistent with Article 38 of the Statute of the International Court of Justice ("ICJ"),

which provides in pertinent part:

> 1. The Court, whose function is to decide in accordance with international law such disputes as are submitted to it, shall apply:
>
>> (a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
>>
>> (b) international custom, as evidence of a general practice accepted as law;
>>
>> (c) the general principles of law recognized by civilized nations;
>>
>> (d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of the rules of law.[18]

art. 38, June 26, 1945, 59 Stat. 1055, 1060, T.S. No. 993.

Accordingly, treaties, also referred to as conventions or covenants, that create legal

obligations on the States party to them, constitute primary evidence of the law of nations.  *Flores*,

414 F.3d at 256.  A State's ratification of a treaty is evidence of its intent to be legally obligated  by

the principles embodied in the treaty and therefore evidences the "customs and practices" of that

---

international law.

[18]     Article 59 of the ICJ states that "[t]he decision of the Court has no binding force except between the parties and in respect of that particular case."

According to the Charter of the United Nations, all Members of the United Nations are *ipso facto* parties to the Statute of the International Court of Justice.  *Yousef*, 327 F.3d at 101 n.34 (citing the Charter of the United Nations, art. 93, June 26, 1945, 59 Stat. 1031, T.S. No. 993, and stating that the United States ratified the Charter of the United Nations on July 28, 1945).

State.[19]  *Id*. at 256.  Treaties ratified by at least two States provide some evidence of the law of nations; if enough States ratify a treaty, a norm of international law may be established.  The more States that have ratified a treaty, especially those States with greater relative influence in international affairs, the greater the treaty's evidentiary value.  *Id*. at 256-57.  Likewise, a treaty's evidentiary value is increased if the State parties actually implement and abide by the principles set forth in the treaty either internationally or within their own borders.[20]  *Id*.  In addition to treaties, United Nations Security Council resolutions, which are binding on all Member States, are evidence of the law of nations.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 374 F. Supp. 2d 331, 338 (S.D.N.Y. 2005) (citing Chapter 5 of the United Nations Charter, art. 25).

Finally, under *Sosa*, in deciding whether to recognize a claim under the ATS, a court must consider the practical consequences of making the claim available to litigants in the federal courts.  542 U.S. at 732-33.  For instance, there may be collateral consequences, such as implications on foreign relations, that advise against recognizing a claim.  *Id*. at 727.  The Court in *Sosa* also cautioned  courts to tread lightly in exercising their discretion because courts generally have to look for "legislative guidance before exercising innovative authority over substantive law" and because the "decision to create a private right of action is one better left to legislative judgment in the great majority of cases."  *Id*. at 726, 727.

---

[19]     States are not bound by simply signing a treaty–signing serves only to authenticate the text of the treaty.  *Flores*, 414 F.3d at 256.  A treaty is legally binding on a State only when it ratifies the treaty.  *Id*.

[20]     Thus, in the United States, a treaty that is self-executing (i.e., immediately creates rights and duties that are enforceable by domestic tribunals), or that has been executed through implementation by an Act of Congress, giving rise to legally enforceable rights in our courts, provides greater evidence of the customs and practices of the United States than a treaty that has not been executed.  *Flores*, 414 F.3d at 257 n.34.

It is against this backdrop and mindful of *Sosa*'s direction that the court's "judicial power should be exercised on the understanding that the door is still ajar subject to vigilant doorkeeping, and thus open to a narrow class of international norms today," *Sosa*, 542 U.S. at 729, that I address the motion to dismiss the ATS claims. The first issue I address is whether plaintiffs have pled a violation of the law of nations. Later, I address whether the allegations against Arab Bank are sufficient for it to be held liable for those violations.

### A. Violation of the Law of Nations

#### 1. Genocide and Crimes Against Humanity

Acts of genocide and crimes against humanity violate the law of nations and these norms are of sufficient specificity and definiteness to be recognized under the ATS. *See Flores*, 414 F.3d at 244 n.18 ("Customary international law rules proscribing crimes against humanity, including genocide, and war crimes, have been enforceable against individuals since World War II."); *Kadic v. Karadzic*, 70 F.3d 232, 241-42 (2d Cir. 1995) ("In 1946, the General Assembly of the United Nations declared that genocide is a crime under international law that is condemned by the civilized world, whether the perpetrators are private individuals, public officials or statesmen." (internal quotation marks omitted)); *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d 7, 136 (E.D.N.Y. 2005) ("[C]rimes against humanity are also deemed to be part of jus cogens–the highest standing in international legal norms. Thus, they constitute a non-derogable rule of international law."); *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8386, 2002 WL 319887, at *9 (S.D.N.Y. Feb. 28, 2002) (stating that crimes against humanity violate "a norm that is customary, obligatory, and well-defined in international jurisprudence").

Defendant does not contest the availability of genocide or crimes against humanity claims

under the ATS but argues that plaintiffs have not sufficiently pled a claim for genocide and crimes

against humanity.[21]  The Convention on the Prevention and Punishment of the Crime of Genocide

("Genocide Convention") defines genocide as:

> any of the following acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group, as such:
>
> > (a) Killing members of the group;
> >
> > (b) Causing serious bodily or mental harm to members of the group;
> >
> > (c) Deliberately inflicting on the group conditions of life calculated to bring about its physical destruction in whole or in part;
> >
> > (d) Imposing measures intended to prevent births within the group;
> >
> > (e) Forcibly transferring children of the group to another group.

Genocide Convention, art. 2, Dec. 9, 1948, 78 U.N.T.S. 227, *implemented in* Genocide Convention

Implementation Act of 1987 (the Proxmire Act), 18 U.S.C. § 1091 (2000).[22]  The Second Circuit has

found a violation of the international norm proscribing genocide where the plaintiffs alleged that the

defendant "personally planned and ordered a campaign of murder, rape, forced impregnation, and

other forms of torture designed to destroy the religious and ethnic groups of Bosnian Muslims and

Bosnian Croats."  *Kadic*, 70 F.3d at 242.

Article 7 of the Rome Statute of the International Criminal Court (the "Rome Statute"),

---

[21]     Defendant also argues that the claim must be dismissed because, other than during the Holocaust and in Rwanda, there is "no international consensus that genocide has occurred in other situations."  But there need not be an international consensus that genocide has occurred in a particular place and at a particular time before a claim of genocide may be brought; the issue of consensus relates to whether there is such a norm.  As stated above, acts of genocide indisputably violate the law of nations.

[22]     The Genocide Convention has been ratified by more than 120 States, including the United States (Nov. 25, 1988).

defines crimes against humanity:

> 1. For the purpose of this Statute, "crime against humanity" means any of the following acts when committed as part of a *widespread or systematic attack directed against any civilian population*, with knowledge of the attack:
>
>> (a) Murder;
>>
>> (b) Extermination;
>>
>> . . . .
>>
>> (h) Persecution against any identifiable group or collectivity on political, racial, national, ethnic, cultural, religious, gender . . . or other grounds that are universally recognized as impermissible under international law, in connection with any act referred to in this paragraph or any crime within the jurisdiction of the Court;
>>
>> . . . .
>>
>> (k) Other inhumane acts of a similar character intentionally causing great suffering, or serious injury to body or to mental or physical health.
>
> 2. For the purpose of paragraph 1:
>
>> (a) "Attack directed against any civilian population" means a course of conduct involving the multiple commission of acts referred to in paragraph 1 against any civilian population, pursuant to or in furtherance of a State or organizational policy to commit such attack;
>>
>> (b) "Extermination" includes the intentional infliction of conditions of life, inter alia the deprivation of access to food and medicine, calculated to bring about the destruction of part of a population . . . .

July 17, 1998, 37 I.L.M. 999, 1004-05 (emphasis added).[23]

"Customary international law defines 'widespread' as 'massive, frequent, large scale action,

carried out collectively with considerable seriousness and directed against a multiplicity of victims,'

---

[23] Although the United States has not joined the International Criminal Court, U.S. law recognizes the definition of crimes against humanity as stated in the Rome Statute. *See Wiwa*, 2002 WL 319887, at *9-10.

and 'systematic' as 'thoroughly organised action, following a regular pattern on the basis of a common policy and involving substantial public or private resources.'" *Wiwa*, 2002 WL 319887, at *10 (quoting *Prosecutor v. Rutaganda*, Case No. ICTR-96-3-T, ¶ 69 (Dec. 6, 1999)). To be a crime against humanity, the emphasis must not be on the individual but rather on the collective–the individual is victimized not because of his or her individual attributes but because of membership in a targeted civilian population. *Id*. (citing *Prosecutor v. Tadic*, Case No. IT-94-1-T, Opinion and Jud., ¶ 644 (May 7, 1997)). Although the requirement of widespread or systematic action ensures that a plaintiff must allege not just one act but, instead, a course of conduct, "a single act by a perpetrator, taken within the context of a widespread or systematic attack against a civilian population entails individual criminal responsibility and an individual perpetrator need not commit numerous offences to be held liable." *Id*.

Applying the standards provided in the Genocide Convention and the Rome Statute to the facts alleged here, plaintiffs have successfully stated claims for genocide and crimes against humanity. The amended complaints allege that HAMAS, the PIJ, the AAMB, and the PFLP act with the united purpose and shared mission to eradicate the State of Israel, murder or throw out the Jews, and liberate the area by replacing it with an Islamic or Palestinian State through the use of suicide bombings and other shockingly egregious violent acts. These goals reflect an intent to target people based on criteria prohibited by both the Genocide Convention and the Rome Statute.[24]

Plaintiffs allege that the terrorist organizations seek to accomplish their shared goal by

---

[24]    Defendant's argument that plaintiffs will be unable to prove the required genocidal intent is insufficient to warrant dismissal of the pleadings. A motion to dismiss tests a complaint's legal sufficiency, not plaintiffs' proof. *See Kadic*, 70 F.3d at 244 ("Of course, at this threshold stage in the proceedings it cannot be known whether appellants will be able to prove the specific intent that is an element of genocide . . . .").

cooperating in the planning and commission of suicide bombings and other murderous attacks using explosives, incendiary weapons, and lethal devices in public places, which has resulted in the systematic and continuous killing and injury of thousands of unarmed innocent civilians in Israel, the West Bank, and the Gaza Strip. These are precisely the sorts of acts proscribed in both the Genocide Convention and the Rome statute.

Plaintiffs also allege that the terrorist organizations have developed and implemented a sophisticated financial structure through which they seek to accomplish their goals. The amended complaints describe dozens upon dozens of instances in which hundreds of innocent civilians were killed, and countless others injured, in attacks caused by individuals sponsored by the terrorist organizations. The acts as alleged constitute the "widespread" and "systematic" action necessary for claims of genocide and crimes against humanity. Even the acts other than suicide bombings, specifically those that defendant contends are nothing more than street crimes, may be sufficient for liability if plaintiffs can prove they were committed as part of a genocidal scheme or crimes against humanity.

2.     <u>Suicide Bombings and Other Murderous Attacks on Innocent Civilians Intended to Intimidate or Coerce a Civilian Population</u>

The third international norm which plaintiffs allege Arab Bank has violated is the financing of suicide bombings and other murderous attacks on innocent civilians which are intended to intimidate or coerce a civilian population. The underlying norm thus differs from the genocide norm with respect to the purpose of the perpetrators, and it differs from the more general crimes against humanity norm in that it specifically condemns bombings and other attacks intended to coerce or intimidate a civilian population. This particular claim for liability under the ATS is similar to the U.S. nationals' claims under the ATA, but the alien plaintiffs do not rely on domestic law; rather,

they rely on the body of international law described above under the discussion of genocide and crimes against humanity, plus the additional sources of international law in the ensuing discussion.

In 1997, the United Nations General Assembly adopted the International Convention for the Suppression of Terrorist Bombings ("Bombing Convention"). G.A. Res. 52/164, ¶ 1, U.N. Doc A/RES/52/164 (Dec. 15, 1997). The Bombing Convention states in pertinent part:

Article 2

1.  Any person commits an offence within the meaning of this Convention if that person unlawfully and intentionally delivers, places, discharges or detonates an explosive or other lethal device in, into or against a place of public use, a State or government facility, a public transportation system or an infrastructure facility:

   (a)  With the intent to cause death or serious bodily injury; or

   (b)  With the intent to cause extensive destruction of such a place, facility or system, where such destruction results in or is likely to result in major economic loss.

   . . . .

Article 5

Each State Party shall adopt such measures as may be necessary, including, where appropriate, domestic legislation, to ensure that criminal acts within the scope of this Convention, in particular where they are intended or calculated to provoke a state of terror in the general public or in a group of persons or particular persons, are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature and are punished by penalties consistent with their grave nature.

Dec. 15, 1997, S. TREATY DOC NO. 106-6 (1998), *implemented in* 18 U.S.C. § 2332f, Pub. L. No. 107-197, 116 Stat. 721 (2002). This Convention focuses on the principal method of attacking civilians alleged in the amended complaints in that it specifically makes it an offense to bomb public places or public transportation systems with the intent to cause death or serious bodily harm. The Bombing Convention particularly condemns such acts when they are, as alleged here, intended to

31

provoke a state of terror in the general public or a group of persons. It specifies that such acts are not justifiable by any racial, ethnic, religious, political, or other similar considerations. In terms of its evidentiary weight, the Bombing Convention is significant. It has been ratified by over 120 United Nations Member States, including the United States (June 26, 2002). *Cf. Kadic,* 70 F.3d at 241 (noting that the Genocide Convention "has been ratified by more than 120 nations, including the United States . . . ."). In addition, the United States has implemented the Bombing Convention in the Terrorist Bombings Convention Implementation Act of 2002. *See* Pub. L. No. 107-197, 116 Stat. 721 (2002), *enacting* 18 U.S.C. § 2332f.[25]

Two years after the Bombing Convention was adopted by the General Assembly, the International Convention for the Suppression of the Financing of Terrorism ("Financing Convention") was also adopted by the General Assembly of the United Nations. G.A. Res. 54/109,

---

[25]     Section 2332f(a) of Title 18 of the U.S. Code states in its entirety:

(a) Offenses.--

>  (1) In general.--Whoever unlawfully delivers, places, discharges, or detonates an explosive or other lethal device in, into, or against a place of public use, a state or government facility, a public transportation system, or an infrastructure facility--

>>  (A) with the intent to cause death or serious bodily injury, or

>>  (B) with the intent to cause extensive destruction of such a place, facility, or system, where such destruction results in or is likely to result in major economic loss,

>  shall be punished as prescribed in subsection (c).

>  (2) Attempts and conspiracies.--Whoever attempts or conspires to commit an offense under paragraph (1) shall be punished as prescribed in subsection (c).

¶ 1, U.N. Doc A/RES/54/109 (Dec. 9, 1999).  It has been ratified by over 130 countries, including

the United States (June 26, 2002).  The United States implemented the Financing Convention via

the Suppression of the Financing of Terrorism Convention Implementation Act of 2002.  *See* 18

U.S.C. § 2339C.[26]  The Convention makes it an offense to finance certain acts, including those

proscribed in the Bombing Convention.  Article 2 of the Financing Convention states:

> 1. Any person commits an offence within the meaning of this Convention if that
> person by any means, directly or indirectly, unlawfully and wilfully, provides or

---

[26]     Section 2339C(a) of Title 18 of the U.S. Code states in its entirety:

(a) Offenses.--

> (1) In general.--Whoever, in a circumstance described in subsection
> (b), by any means, directly or indirectly, unlawfully and willfully
> provides or collects funds with the intention that such funds be used,
> or with the knowledge that such funds are to be used, in full or in
> part, in order to carry out--
>
> > (A) an act which constitutes an offense within the scope of
> > [among other treaties, the Bombing Convention], as
> > implemented by the United States, or
> >
> > (B) any other act intended to cause death or serious bodily
> > injury to a civilian, or to any other person not taking an active
> > part in the hostilities in a situation of armed conflict, when the
> > purpose of such act, by its nature or context, is to intimidate
> > a population, or to compel a government or an international
> > organization to do or to abstain from doing any act,
>
> shall be punished as prescribed in subsection (d)(1).
>
> (2) Attempts and conspiracies.--Whoever attempts or conspires to
> commit an offense under paragraph (1) shall be punished as
> prescribed in subsection (d)(1).
>
> (3) Relationship to predicate act.--For an act to constitute an offense
> set forth in this subsection, it shall not be necessary that the funds
> were actually used to carry out a predicate act.

collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

> (a) An act which constitutes an offence within the scope of and as defined in [the Bombing Convention]; or

> (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act.

Dec. 9, 1999, S. TREATY DOC. NO. 106-49 (2000). Thus, the Financing Convention, along with the Bombing Convention, specifically condemns suicide bombings and other murderous attacks against innocent civilians intended to intimidate or coerce a population. Once again, this Convention provides that such acts "are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature." Financing Convention, art. 6.

The prohibition against attacks on innocent civilians that is reflected in both of these Conventions is not a new one. The three-century-old "principle of distinction," which requires parties to a conflict to at all times distinguish between civilians and combatants, forbids the deliberate attacking of civilians. *See* 2 L. OPPENHEIM, INTERNATIONAL LAW § 214*ea*, at 524 (H. Lauterpacht ed., 7th ed. 1961); 1 JEAN-MARIE HENCKAERTS & LOUISE DOSWALD-BECK, CUSTOMARY INTERNATIONAL HUMANITARIAN LAW 3-4 (2005). State practice establishes the principle of distinction as a long-established norm of the customary law of armed conflict. HENCKAERTS & DOSWALD-BECK, *supra*, at 3. This principle is also reflected in Common Article

3 of the Geneva Conventions of 1949 (the "Geneva Conventions"),[27] which provides in pertinent

part:

> In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:
>
> (1) *Persons taking no active part in the hostilities*, including members of armed forces who have laid down their arms and those placed *hors de combat* by sickness, wounds, detention, or any other cause, *shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria*.
>
> To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
>
> (a) violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
> . . . .

Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed

Forces in the Field, Aug. 12, 1949, 6 U.S.T. 3316; Geneva Convention for the Amelioration of the

Condition of Wounded, Sick and Shipwrecked Members of Armed Forces at Sea, Aug. 12, 1949,

6 U.S.T. 3316; Geneva Convention Relative to the Treatment of Prisoners of War, Aug. 12, 1949,

6 U.S.T. 3316; Geneva Convention Relative to the Protection of Civilian Persons in Time of War,

art. III, Aug. 12, 1949, 6 U.S.T. 3316 (emphasis added).

Under the customary law of armed conflict, as reflected in the Geneva Conventions, all

"parties" to a conflict, including insurgent military groups, must adhere to these most fundamental

requirements. *Kadic*, 70 F.3d at 243. While the principle of distinction and the Geneva Conventions

---

[27] The Geneva Conventions, which are among the major treaties on the law of war, *Hamdan v. Rumsfeld*, 126 S.Ct. 2749, 2781 (2006), have been ratified by more than 180 States, including the United States, which implemented them via 18 U.S.C. § 2441, Pub. L. No. 104-192, 110 Stat. 2104 (1996).

apply expressly only in situations of armed conflict, their long-standing existence supports the conclusion, made explicit in the Bombing and Financing Conventions, that attacks against innocent civilians of the type alleged here are condemned by international law.

United Nations Security Council Resolution 1566 also supports this conclusion. It states, in pertinent part, that the Security Council:

> 3. *Recalls* that criminal acts, including against civilians, committed with the intent to cause death or serious bodily injury, or taking of hostages, with the purpose to provoke a state of terror in the general public or in a group of persons or particular persons, intimidate a population or compel a government or an international organization to do or to abstain from doing any act, which constitute offences within the scope of and as defined in the international conventions and protocols relating to terrorism, are under no circumstances justifiable by considerations of a political, philosophical, ideological, racial, ethnic, religious or other similar nature, and *calls upon* all States to prevent such acts and, if not prevented, to ensure that such acts are punished by penalties consistent with their grave nature.

S.C. Res. 1566, ¶ 3, U.N. Doc. S/RES/1373 (Oct. 8, 2004). Resolution 1566 specifically condemns attacks against civilians intended to intimidate a civilian population, regardless of who commits the attacks or what the motivation behind such attacks may be. While such resolutions cannot be relied on as a sole source of international law, they are informative as to what the current state of international law is. *See Filartiga*, 630 F.2d at 882 n.9 (observing that non-self-executing agreements serve as evidence of binding principles of international law and relying on several United Nations General Assembly Resolutions); *Presbyterian Church of Sudan*, 374 F. Supp. 2d at 338*; Bodner v. Banque Paribas*, 114 F. Supp. 2d 117, 128 (E.D.N.Y. 2000) ("Plaintiffs refer to United Nations resolutions and the work of the Nuremberg tribunals as further evidence of the content of customary international law and the Court finds that such analogies have merit.").

In the face of all these sources evidencing universal condemnation of the types of acts alleged here, Arab Bank does not address the actual conduct condemned by these sources. Rather,

it argues that the underlying suicide bombings and other murderous acts alleged in Count Three, which it says are "commonly referred to as terrorism," Def. Mem. at 15, cannot be a violation of the law of nations because there is no consensus on the meaning of "terrorism." In support of its argument, Arab Bank relies on *United States v. Yousef*, a pre-*Sosa* case, in which the court stated that "customary international law currently does not provide for the prosecution of 'terrorist' acts under the universality principle, in part due to the failure of States to achieve anything like consensus on the definition of terrorism." 327 F.3d 56, 97 (2d Cir. 2003) (per curiam).

Arab Bank's reliance on *Yousef* is misplaced. First, the court in *Yousef* was reviewing whether the district court had criminal jurisdiction under the universality principle and not whether the district court should recognize a claim under the civil jurisdictional grant of the ATS. The *Yousef* Court held that "the universality principle permits jurisdiction over only a limited set of crimes that *cannot be expanded judicially*" whereas *Sosa* held, with regard to the ATS, that federal courts *can* recognize new causes of action, albeit with restraint, under the ATS. *Compare Yousef*, 327 F.3d at 103 (emphasis added), *with Sosa*, 542 U.S. at 725.

Second, the court in *Yousef*, in addressing the issue as framed by the parties, whether "terrorism" was a violation of the law of nations, criticized the lower court's reliance on the Restatement (Third) of the Foreign Relations Law of the United States, a non-authoritative source, for the finding that "terrorism" violates international law. 327 F.3d at 98-103, n.37. The parties in *Yousef* had not addressed specific international law sources, and the district court relied, not on such sources, but on the Restatement. The appellate briefs also did not address accepted sources of international law. The court in *Yousef* emphasized that the proper sources for determining international law are the sources described in *Kadic* and *Filartiga*, that is, the sources this court

relies on here. *See id.*

Defendant also errs in relying on the following language in *Yousef*: "nor have we shaken ourselves free of the cliché that 'one man's terrorist is another man's freedom fighter.'" *Id.* at 107. This court does not accept that the Court of Appeals, in referring to this cliché, was accepting, as defendant suggests it did, what Professor Wedgwood aptly calls this "antinomian" principle. On the contrary, if anything, the Court of Appeals seemed concerned that defining terrorism in a way that would receive international agreement could exclude outrageous conduct that should properly be condemned. *See, e.g., id.* at 108 n.42 ("This attempt to distinguish 'terrorists' from 'freedom fighters' potentially could legitimate as non-terrorist certain groups nearly universally recognized as terrorist, including the Irish Republican Army, Hezbollah, and Hamas.").

In any event, in this case, there is no need to resolve any definitional disputes as to the scope of the word "terrorism," for the Conventions expressing the international norm provide their own specific descriptions of the conduct condemned. Although the Conventions refer to such acts as "terrorism," the pertinent issue here is only whether the acts as alleged by plaintiffs violate a norm of international law, however labeled. *See Sosa*, 542 U.S. at 738 (examining whether the specific conduct alleged by plaintiff violated a norm of international law). In exploring that question, this court has examined the very sources of international law found to be valid by the Second Circuit in *Kadic*, *Filartiga* and *Yousef*, and by the Supreme Court in *Sosa*. These authoritative sources establish that the specific conduct alleged–organized, systematic suicide bombings and other murderous attacks on innocent civilians intended to intimidate or coerce a civilian population–are universally condemned.

In a similar way, the *Yousef* court, after holding that there was no jurisdiction under the

universality principle, held that there was jurisdiction in the district court to try the defendant for bombing a Philippines Airlines flight under the Montreal Convention, which expressly addresses offenses against aircraft. 327 F.3d at 108-110. It did so because it found that the conduct charged, "whether it is termed 'terrorist'–constitutes the core conduct proscribed by the Montreal Convention and its implementing legislation." *Id.* at 97-98; *cf. Filartiga*, 630 F.2d at 882 ("For although there is no universal agreement as to the precise extent of the 'human rights and fundamental freedoms' guaranteed to all by the Charter, there is at present no dissent from the view that the guaranties include, at a bare minimum, the right to be free from torture."); *but see Saperstein v. Palestinian Authority*, No. 04-CV-20225, 2006 WL 3804718, at *7 (S.D. Fla. Dec. 22, 2006) (stating that, because politically motivated terrorism has not reached the status of a violation of the law of nations, "if the conduct of the Defendants is construed as terrorism, then Plaintiffs have not alleged a violation of the law of nations"). In sum, regardless of whether there is universal agreement as to the precise scope of the word "terrorism," the conduct involved here is specifically condemned in the Conventions upon which this court relies.

Arab Bank attempts to undermine the weight of the international sources discussed above by arguing that state practice does not support the existence of a universal norm. The basis for this argument is that "some 80 nations in Africa, in the Arab world and elsewhere expressly exempt from the definition of terrorism conduct that they believe furthers the rights of self-determination of a people." Oral Argument, Tr. at 7, July 31, 2006. To begin with, Arab Bank ignores that the international sources relied upon here themselves evidence state practice. As stated in *Flores*, 414 F.3d at 256, treaties evidence the "customs and practices" of the States that ratify them. This is so because ratification of a treaty that embodies specific norms of conduct evidences a State's

acceptance of the norms as legal obligations. Here, the international sources specifically articulate a universal standard that condemns the conduct alleged.

In addition, Arab Bank's state practice argument is based upon a flawed premise and is devoid of factual support. As for the premise, Arab Bank's argument is that the acts alleged here–organized, systematic suicide bombings and other murderous acts intended to intimidate a civilian population–are viewed by some States as acceptable acts in furtherance of the right to self-determination. However, Arab Bank offers no authority for the proposition that the right to self-determination can be effectuated in violation of the law of nations. On the contrary, Professor Talmon, on whose declaration defendant relies in making its argument, recognizes that acts of self-determination must be in accordance with principles of international law. Professor Talmon's declaration states in pertinent part:

> In view of the Israeli-Palestinian conflict the 1998 Arab Convention on Combating Terrorism ("Arab Convention"), the 1999 Convention of the Organization of the Islamic Conference on Combating International Terrorism ("OIC Convention"), and 1999 Convention of the Organization of African Unity on the Prevention and Combating of Terrorism ("OAU Convention") expressly exclude certain acts of violence from the scope of these conventions. For example, Article 3(1) of the OAU Convention provides:
>
> > "the struggles waged by peoples *in accordance with the principles of international law* for their liberation or self-determination, including armed struggle against colonialism, occupation, aggression and domination by foreign forces shall not be considered as terrorist acts."
>
> Similar provision[s] are found in Article 2(a) of the Arab Convention and Article 2(a) of the OIC Convention. The Arab League represents 10, the OIC 56 and the OAU (now: African Union) 52 member States. The organizations under whose auspices these Conventions were drawn up have a membership of 80 States in total.

Talmon Decl. 12, July 18, 2005 (emphasis added) (footnotes omitted). Indeed, the Bombing Convention, the Financing Convention and Resolution 1566 all expressly acknowledge that violation

of the principles embodied in those documents are under no circumstances justifiable by political, philosophical, ideological, racial, ethnic, or religious considerations. Moreover, there have been no formal reservations to either of the Conventions purporting to assert that a right to self-determination justifies committing otherwise condemned acts.[28] On the contrary, even the statements relied upon, which are made by officials of varying official stature, never expressly state that the type of conduct alleged here is a legitimate means of asserting the right to self-determination.

Turning to the lack of factual support for defendant's state practice argument, it is significant that the United States prohibits the specific conduct alleged in the cases at hand. *See* 18 U.S.C. § 2332f (implementing the Bombing Convention); 18 U.S.C. § 2339C (implementing the Financing Convention); *see also* 18 U.S.C. §§ 2331 *et seq.* (setting forth the criminal penalties and civil remedies for enforcement of these laws); *cf. Flores*, 414 F.3d at 257, n.33 (citing *Yousef*, 327 F.3d at 92 n.25 ("While it is not possible to claim that the practice or policies of any one country,

---

[28]       Only one State, Pakistan, has submitted a declaration to the Bombing Convention relating to acts in furtherance of self-determination. The government of Pakistan, in making a formal declaration with respect to the Bombing Convention, stated that "nothing in this Convention shall be applicable to struggles, including armed struggle, for the realization of right of self-determination launched against any alien or foreign occupation or domination, in accordance with the rules of international law." Even by its own declaration, that State acknowledges that any acts must be in accordance with the rules of international law.

The States of Egypt, Jordan, and the Syrian Arab Republic made similar declarations with respect to the Financing Convention. The State of Egypt stated: "[w]ithout prejudice to the principles and norms of general international law and the relevant United Nations resolutions, the Arab Republic of Egypt does not consider acts of national resistance in all its forms, including armed resistance against foreign occupation and aggression with a view to liberation and self-determination, as terrorist acts within the meaning of article 2, paragraph 1, subparagraph (b), of the Convention." Jordan stated: "The Government of the Hashemite Kingdom of Jordan does not consider acts of national armed struggle and fighting foreign occupation in the exercise of people's right to self-determation [sic] as terrorist acts within the context of paragraph 1(b) of article 2 of the Convention." The Syrian Arab Republic stated: "the Syrian Arab Republic considers that acts of resistance to foreign occupation are not included under acts of terrorism."

including the United States, has such authority that the contours of customary international law may be determined by reference only to that country, it is highly unlikely that a purported principle of customary international law in direct conflict with the recognized practices and customs of the United States and/or other prominent players in the community of States could be deemed to qualify as a *bona fide* customary international principle.")).  Arab Bank has offered no evidence that it is lawful in any State to engage in organized, systematic murderous attacks on civilians for the purpose of coercing or intimidating the civilian population.  *Cf. Filartiga*, 630 F.2d at 884  ("We have been directed to no assertion by any contemporary state of a right to torture its own or another nation's citizens.").  Both sides to this litigation note that the Palestinian Authority has explicitly condemned suicide bombings and that it "arrests, convicts, and sentences to imprisonment terrorists who kill Israeli citizens in the occupied territories."  Def. Reply  Mem. at 20; Pl. Opposition Mem. at 4 n.7, 31 n.31.  The international sources cited above, coupled with the fact that no State has expressly stated that such conduct would be legal in its country, provide further support for the conclusion that the alleged conduct violates a norm of international law.  *Cf. Filartiga*, 630 F.2d at 880 ("In light of the universal condemnation of torture in numerous international agreements, and the renunciation of torture as an instrument of official policy by virtually all of the nations of the world (in principle if not in practice), we find that an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations.").

The next issue to be addressed is whether the international norm is of mutual, and not merely several, concern.  Suicide bombings and other murderous attacks to intimidate or coerce a civilian population are indisputably of mutual concern.  *See Flores*, 414 F.3d at 249 (stating that "other

offenses that may be purely intra-national in their execution, such as official torture, extrajudicial killings, and genocide, do violate customary international law because the nations of the world have demonstrated that such wrongs are of mutual . . . concern and capable of impairing international peace and security" (internal citation and quotations omitted)).  The Bombing Convention states that the occurrence of terrorist attacks by means of explosives or other lethal devices is a matter of grave concern to the international community as a whole.[29]  The Financing Convention states that "the financing of terrorism is a matter of grave concern to the international community as a whole."[30] Preamble, Dec. 9, 1999, S. TREATY DOC. NO. 106-49 (2000).  In addition, Congress has found that "international terrorism affects the interstate and foreign commerce of the United States by harming international trade and market stability, and limiting international travel by United States citizens as well as foreign visitors to the United States."[31]  AEDPA, Pub. L. No. 104-132,

----

[29]    As noted above, although the Bombing Convention refers to acts of terrorism, it explicitly describes the acts which it condemns as the unlawful and intentional use of an explosive in a place of public use with the intent to cause death or serious bodily injury.

[30]    Again, although the Financing Convention refers to acts of terrorism, the specific acts which it condemns the financing of are those which violate the Bombing Convention or "any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population . . . ."  Art. 2(1)(b), Dec. 9, 1999, S. TREATY DOC. NO. 106-49 (2000).

[31]    As stated above, the ATA defines  "international terrorism"as activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended-
        (i) to intimidate or coerce a civilian population;
        (ii) to influence the policy of a government by intimidation or coercion; or
        (iii) to affect the conduct of a government by mass destruction, assassination or kidnapping; and

§ 301(a)(4), 110 Stat. 1214, 1247 (1996). Indeed, the scope of the nationalities represented by plaintiffs in this very case illustrates one type of impact on the international community that arises when innocent civilians are targeted to be attacked.

In sum, in light of the universal condemnation of organized and systematic suicide bombings and other murderous acts intended to intimidate or coerce a civilian population, this court finds that such conduct violates an established norm of international law. The court further finds that the conduct alleged by plaintiffs is sufficiently specific and well-defined to be recognized as a claim under the ATS. This becomes evident when the conduct alleged here and condemned by the law of nations is viewed in contrast to the conduct alleged in cases where it was found not to be sufficiently specific or well-defined. For instance, in *Flores* the plaintiffs, who alleged that they developed lung disease from pollution arising from defendant's copper mining and refining operations within the plaintiffs' country, asserted international norms of the "right to life" and the "right to health." 414 F.3d 254-55. Those rights were insufficiently definite because they were "vague and amorphous," "boundless and indeterminate," "abstract rights and liberties devoid of articulable or discernible standards and regulations."[32] *Id.* (internal citations and quotations omitted). Similarly, in *Sosa*, the Court stated that "[a]ny credible invocation of a principle against

_____

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum.

18 U.S.C. § 2331(1).

[32] The court also held that plaintiffs failed to demonstrate the existence of a more "narrowly-defined customary international law rule against *intra* national pollution" because they did not submit evidence sufficiently establishing such a norm. *Flores*, 414 F.3d at 255-66.

arbitrary detention that the civilized world accepts as binding customary international law requires a factual basis beyond relatively brief detention in excess of positive authority." 542 U.S. at 737. It noted that such a rule "expresses an aspiration that exceeds any binding customary rule having the specificity we require" and held that "a single illegal detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id*. at 738. Here, in contrast, the conduct alleged falls precisely within the norm evidenced by the sources discussed. As already explained, plaintiffs' allegations essentially track the conduct specifically condemned in the Financing and Bombing Conventions, as well as in the ATA sections which implement those Conventions. Thus, the norm is of sufficiently definite content and acceptance among nations of the world as the historical paradigms familiar when § 1350 was enacted.

This court's consideration of whether to exercise its discretion to recognize a claim under the ATS is informed by the legislative guidance provided by Congress. *See Sosa*, 542 U.S. at 726-27 (expressing concern about the importance of legislative guidance and judgment in creating new common law claims). Although Congress has not created a cause of action under the ATS, it has created criminal penalties and, with respect to U.S. nationals, civil liability for the acts alleged by plaintiffs. *See* 18 U.S.C. § 2332f and § 2339C; *see also Arab Bank I*, 384 F. Supp. 2d 571 (finding that the acts alleged here violate the ATA).

Finally, the collateral consequences about which the *Sosa* Court expressed concern seem limited here. The Court in *Sosa* specifically noted the potential consequences on U.S. foreign policy that could accompany recognition of new claims under the ATS. The Court stated:

> Another possible limitation that we need not apply here is a policy of case-specific deference to the political branches. For example, there are now pending in Federal

District Court several class actions seeking damages from various corporations alleged to have participated in, or abetted, the regime of apartheid that formerly controlled South Africa. See *In re South African Apartheid Litigation*, 238 F. Supp. 2d 1379 (JPML 2002) (granting a motion to transfer the cases to the Southern District of New York). The Government of South Africa has said that these cases interfere with the policy embodied by its Truth and Reconciliation Commission, which "deliberately avoided a 'victors' justice' approach to the crimes of apartheid and chose instead one based on confession and absolution, informed by the principles of reconciliation, reconstruction, reparation and goodwill." The United States has agreed. In such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy.

*Sosa*, 542 U.S. at 733 n. 21 (some internal citations omitted). The United States, undoubtedly aware of the current litigation, has opted to make no statement to the court regarding its position on the cases at hand. *Cf. Presbyterian Church of Sudan v. Talisman*, No. 01 Civ. 9882, 2005 WL 2082846 (S.D.N.Y. Aug. 30, 2005) (upholding a claim even where the United States submitted a Statement of Interest expressing concerns regarding the impact of the litigation on U.S. foreign affairs and on Canada's foreign policies towards Sudan).

Based upon all of the factors set forth above, organized, systematic suicide bombings and other murderous attacks against innocent civilians for the purpose of intimidating a civilian population are a violation of the law of nations for which this court can and does recognize a cause of action under the ATS.

### B.    Arab Bank's Liability

Whether Arab Bank is liable for its alleged conduct under the ATS, like the question of whether the suicide bombings and attacks alleged by plaintiffs violate the law of nations, is a question of international law. *Sosa*, 542 U.S. at 732 n.20; *Talisman Energy, Inc.*, 374 F. Supp. 2d at 333 (*Talisman II*). In a variety of ATS cases, courts have concluded that international law

provides for the imposition of liability on a party that does not directly perform the underlying act.[33]

There is nothing novel or unusual under international law about imposing such liability.[34]  And the

Genocide, Bombing, and Financing Conventions explicitly condemn acts of complicity or aiding

and abetting by non-primary actors.  Indeed, under the Financing Convention, the acts of Arab Bank

---

[33]     *Talisman I* and *Talisman II* have collected a large number of such cases.  *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 320-21 (S.D.N.Y. 2003) (*Talisman I*); *Talisman II*, 374 F. Supp. 2d at 337-38.  *See also Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1157-58 (11th Cir. 2005) (per curiam); *Abebe-Jira v. Negewo*, 72 F.3d 844, 845-48 (11th Cir. 1996); *Kiobel v. Royal Dutch Petroleum Co.*, 456 F. Supp. 2d 457, 463-64, (S.D.N.Y. 2006) (stating that "where a cause of action for violation of an international norm is viable under the ATS, claims for aiding and abetting that violation are viable as well"); *In re Terrorist Attacks on September 11, 2001*, 392 F. Supp. 2d 539, 565 (S.D.N.Y. 2005); *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 52-54; *Bodner*, 114 F. Supp. 2d at 122; *cf. Hilao v. Estate of Marcos*, 103 F.3d 767, 779 (9th Cir. 1996) (upholding a jury instruction that a foreign leader could be found liable if he "'directed, ordered, conspired with, or aided' in torture, summary execution, and disappearance, or that he had knowledge of that conduct and failed to use his power to prevent it" under the Torture Victim Protection Act, which was enacted as a note to the ATS).

[34]     Going back over 200 years, contemporaneous with the enactment of the ATS, aider and abettor liability was contemplated under the ATS.  As Attorney General Bradford stated in 1795:

> It is stated by the memorialists that certain American citizens trading to the coast of Africa, on the 28th of September last, voluntarily joined, conducted, *aided, and abetted* a French fleet in attacking the settlement, and plundering or destroying the property of British subjects on that coast. . . .

> [T]here can be no doubt that the company or individuals who have been injured by these acts of hostility have a remedy by a civil suit in the courts of the United States; jurisdiction being expressly given to these courts in all cases where an alien sues for a tort only, in violation of the laws of nations, or a treaty of the United States . . . .

Opinion of Attorney General Bradford, 1 U.S. Op. Atty. Gen. 57, 58, 59 (1795) (emphasis added).  Attorney General Bradford also noted that the President had warned that citizens of the United States "committing, aiding, or abetting hostilities" in violation of the law of nations will not receive the protection of the United States.  *Id*. at 59.  While we cannot know precisely the scope of aiding and abetting liability contemplated by Attorney General Bradford, it seems reasonable to conclude that he recognized that some level of participation, short of committing the act directly, was sufficient to give rise to liability.

alleged by plaintiffs amount to primary violations, as the entire focus of that Convention is on stopping the financing of terrorists and terrorist organizations which support offenses against civilians as defined in the Convention.

Standards for imposing liability where a non-primary actor is alleged to be liable for a violation of the law of nations emerge from the case law and Conventions. *Talisman I* sets forth the international law applicable in assessing aider and abettor liability under the ATS. In that case, the court relied on Article 7(1) of the Statute of the International Criminal Tribunal for the former Yugoslavia ("ICTY") and Article 6(1) of the Statute of the International Criminal Tribunal for Rwanda ("ICTR"), both of which provide for liability for planning, instigating, ordering, committing, or otherwise aiding and abetting in the planning, preparation or execution of acts of genocide or crimes against humanity. *Talisman I*, 244 F. Supp. 2d at 322. The court stated that "the *actus reus* of aiding and abetting in international criminal law requires practical assistance, encouragement, or moral support which has a substantial effect on the perpetration of the crime." *Talisman I*, 244 F. Supp. 2d at 323 (quoting *Prosecutor v. Furundzija*, Case No. IT-95-17/1-T, Judgment, ¶ 235, Dec. 10, 1998). "While the assistance must be substantial, it 'need not constitute an indispensable element, that is, a *conditio sine qua non* for the acts of the principal.'" *Id*. at 324 (quoting *Furundzija* ¶ 209). Participation in a crime is substantial if "the criminal act most probably would not have occurred in the same way had not someone acted in the role that the accused in fact assumed." *Id*. (quoting *Tadic* ¶ 688). The court also made clear that "some knowledge that the assistance will facilitate the crime is necessary." *Id*.

*Talisman II*, decided after the Supreme Court's decision in *Sosa*, reassessed the issue in light

of *Sosa* and fully endorsed the analysis in *Talisman I*.[35]  374 F. Supp. 2d at 337-41.  The court

explained that ICTY and ICTR decisions are appropriate sources for clarifying the content of aider

and abettor liability in international law because the entire purpose of the ICTY and ICTR is to

adjudicate violations of customary international law; although the tribunals do not create new rules

of customary international law, they occupy a special role in enunciating the current content of

customary international law norms.  *Id.* at 338.  The court noted that "ICTY and ICTR opinions

typically engage in nuanced and exhaustive surveys of international legal sources, and as such, they

are exceedingly useful as persuasive evidence of the content of customary international law norms."

*Id.* at 338.  The court also held that the international standards of liability with respect to the conduct

of non-primary actors were defined with the specificity required to meet the requirements of *Sosa*.

*Id.* at 340-41.[36]

     In contrast to the vast body of law finding aiding and abetting liability available under the

ATS, one district court judge in this circuit has found otherwise.  *See In re South African Apartheid*

*Litig.*, 346 F. Supp. 2d 538 (S.D.N.Y. 2004) ("*South African Apartheid Litig.*"), *appeal filed*.  The

court's reasoning is not persuasive.  First, the court in *South African Apartheid Litig.* concluded that

---

[35]    *Talisman I* was decided by the late Judge Allen G. Schwartz.  *Talisman II* was
decided by Judge Denise Cote.

[36]    The standards set forth in *Talisman I* and *Talisman II* have been applied by other
courts, *see, e.g.*, *In re Agent Orange Prod. Liab. Litig.*, 373 F. Supp. 2d at 54, *Cabello*, 402 F.3d at
1148, 1158-59, *Bowoto v. Chevron Corp.*, No. C 99-02506, 2006 WL 2455752, at *4 (N.D. Cal.
Aug. 22, 2006), and are persuasive.  In a later decision, *Presbyterian Church of Sudan v. Talisman*
*Energy, Inc.*, 453 F. Supp. 2d 633, 668 (S.D.N.Y. 2006) ("*Talisman III*"), the court granted
defendant's motion for summary judgment, reasoning that the plaintiffs had not "identified sufficient
evidence to raise a material question of fact that Talisman can be found liable for aiding and
abetting . . . because among other things they have not identified evidence that Talisman itself
performed any act that could be construed as substantial assistance to the Government in its
violation of international law."

the ATS did not provide for aiding and abetting liability because the ATS itself " presently does not provide for aider and abettor liability." *Id*. at 550. However, *Sosa* makes clear that the ATS is purely a jurisdictional statute under which courts can recognize a cause of action under the law of nations. 542 U.S. at 724. Thus, the ATS itself does not provide the theory of liability; rather, courts must look to international law. Second, insofar as *South African Apartheid Litig.* held that *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164 (1994), precludes aiding and abetting liability under the ATS, it erroneously applied domestic law where international law is applicable. *See Talisman II*, 374 F. Supp. 2d at 335-37; *cf. Arab Bank I*, 384 F. Supp. 2d at 583-85 (holding that conspiracy and aider and abettor liability are available under the ATA notwithstanding *Central Bank of Denver*). Finally, the specific rationales relied on by the court in *South African Apartheid Litig.* for dismissing that case do not apply here. Unlike the Apartheid Convention, the Bombing and Financing Conventions, both of which provide for liability of non-primary actors, as discussed below, have been ratified by a majority of the member States of the United Nations, including the United States, Great Britain, Germany, France, Canada, and Japan. Also, the collateral consequences identified in *South African Apartheid Litig.* are not present here, nor have any adverse collateral consequences been identified by any governmental source in this case.[37]

---

[37]     The court found that the

consequences are not only far-reaching but would raise the prospect of serious impediments to the flow of international commerce. Indeed, the South African government has indicated that it does not support this litigation and that it believes that allowing this action to proceed would preempt the ability of the government to handle domestic matters and would discourage needed investment in the South African economy. Similarly, the United States government has expressed its belief that the adjudication of this suit would cause tension between the United States and South Africa and would serve to hamper the policy of encouraging positive change in developing countries via economic investment.

The Conventions establishing the norms alleged here fully support the conclusion that aiding and abetting liability is available. They also support the use of the standards described above in assessing whether Arab Bank's conduct amounts to aiding and abetting under international law. The Genocide Convention expressly provides liability for actors who conspire, incite, or are complicit in acts of genocide.[38] Article 2 of the Bombing Convention provides for liability for an accomplice or one who *in any way intentionally contributes* to the bombing of a public place, which is intended to cause death, serious bodily injury, or extensive destruction.[39] The Bombing Convention requires

_____

*South African Apartheid Litig.*, 346 F. Supp. 2d at 553. See also *Sosa*, 542 U.S. at 733 n.21, which, as noted earlier, specifically referred to *South African Apartheid Litig.*, stating that "[i]n such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy."

[38]     The Genocide Convention states, in relevant part:

The following acts shall be punishable:
          (a) Genocide;
          (b) Conspiracy to commit genocide;
          (c) Direct and public incitement to commit genocide;
          (d) Attempt to commit genocide;
          (e) Complicity in genocide.

Art. 3, Dec. 9, 1998, 78 U.N.T.S. 227.

[39]     The Bombing Convention states, in pertinent part:

3. Any person also commits an offence [within the meaning of this convention] if that person:

(a) Participates as an accomplice in an offence as set forth in paragraph 1 or 2 [of the present article]; or

(b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 2 [of the present article]; or

(c) In any other way contributes to the commission of one or more offences as set forth in paragraph 1 or 2 [of the present article] by a group of persons acting with a common purpose; such contribution shall be intentional and either be made with the

that the contributor either have the aim of furthering the "general criminal activity" or purpose of the group sponsoring the bombers or have knowledge of the intention of the sponsoring group to commit the bombings.  The Financing Convention provides for liability for directly or indirectly, unlawfully and wilfully, providing or collecting funds with the knowledge that they are to be used, in full or in part, in order to carry out violations of the Bombing Convention or attacks intended to cause death or serious bodily injury to civilians when the purpose of such acts is to intimidate a population.[40]  The Financing Convention also provides for the liability of non-primary actors.[41]  It

------

aim of furthering the general criminal activity or purpose of the group or be made in the knowledge of the intention of the group to commit the offence or offences concerned.

Art. 2 Dec. 15, 1997, S. TREATY DOC. NO. 106-6 (1998).

[40]        The Financing Convention states, in pertinent part:

1. Any person commits an offence within the meaning of this Convention if that person by any means, directly or indirectly, unlawfully and wilfully, provides or collects funds with the intention that they should be used or in the knowledge that they are to be used, in full or in part, in order to carry out:

    (a) An act which constitutes an offence within the scope of and as defined in [the Bombing Convention]; or

    (b) Any other act intended to cause death or serious bodily injury to a civilian, or to any other person not taking an active part in the hostilities in a situation of armed conflict, when the purpose of such act, by its nature or context, is to intimidate a population, or to compel a Government or an international organization to do or to abstain from doing any act.

Art. 2, Dec. 9, 1999, S. TREATY DOC. NO. 106-49 (2000).

[41]        The Financing Convention states, in pertinent part:

5. Any person also commits an offence if that person:

    (a) Participates as an accomplice in an offence as set forth in paragraph 1 or 4 of this article;

is worth noting that the U.S. statutes implementing the Bombing and Financing Conventions also provide for the liability of non-primary actors. *See* 18 U.S.C. § 2332f and § 2339C; *Arab Bank I*, 384 F. Supp. 2d at 582-85.[42]

---

(b) Organizes or directs others to commit an offence as set forth in paragraph 1 or 4 of this article;

(c) Contributes to the commission of one or more offences as set forth in paragraph 1 or 4 of this article by a group of persons acting with a common purpose. Such contribution shall be intentional and shall either:

(i) Be made with the aim of furthering the criminal activity or criminal purpose of the group, where such activity or purpose involves the commission of an offence as set forth in paragraph 1 of this article; or

(ii) Be made in the knowledge of the intention of the group to commit an offence as set forth in paragraph 1 of this article.

Art. 2, Dec. 9, 1999, S. TREATY DOC. NO. 106-49 (2000).

[42] International resolutions also support the availability of aiding and abetting liability. United Nations Security Council Resolution 1373, adopted after the September 11, 2001 suicide bombing attacks and seeking to prevent similar acts, directs States, among other things, to prohibit any one from making any funds, financial assets or economic resources or financial or other related services available for the benefit of persons who facilitate or participate in the commission of terrorist acts. Resolution 1373 provides, in pertinent part, that all States shall:

(a) Prevent and suppress the financing of terrorist acts;

(b) Criminalize the wilful provision or collection, by any means, directly or indirectly, of funds by their nationals or in their territories with the intention that the funds should be used, or in the knowledge that they are to be used, in order to carry out terrorist acts;

. . . .

(d) Prohibit their nationals or any persons and entities within their territories from making any funds, financial assets or economic resources or financial or other related services available, directly or indirectly, for the benefit of persons who commit or

Applying the standards discussed above, plaintiffs allege two factual theories regarding Arab

Bank's liability, both of which sufficiently allege Arab Bank's mental state, conduct, and the

substantial effect of its conduct in bringing about the underlying violations of the law of nations.[43]

With respect to Arab Bank's mental state and conduct, plaintiffs' first factual theory focuses

on Arab Bank's knowing provision of banking services, including the maintenance of accounts, for

HAMAS and other terrorist organizations, terrorist front organizations, and individual supporters

---

attempt to commit or facilitate or participate in the commission of terrorist acts, of
entities owned or controlled, directly or indirectly, by such persons and of persons
and entities acting on behalf of or at the direction of such persons.

S.C. Res. 1373, ¶ 1. U.N. DOC S/RES/1373 (Sept. 28, 2001).

Resolution 1373 was adopted by the Security Council of the United Nations, and, therefore,
as discussed in Section III *supra* is legally binding on all member States.

Resolution 1566, discussed *supra* at Section III.A.2, also adopted by the Security Council,
similarly contemplates liability for those who facilitate, participate or attempt to participate in the
financing, planning, preparation or commission of terrorist acts.

[43]    Although the focus of the parties' briefs is on whether aiding and abetting liability
is available under the ATS and, if so, whether defendant's alleged conduct gives rise to aiding and
abetting liability, plaintiffs have also alleged liability under different rubrics including "concerted
action," "complicity," and "intentional facilitation." This is undoubtedly because a variety of terms
for non-primary actor liability are used in the ATS cases and in the international law sources. In
light of the court's conclusions that aiding and abetting liability is available under the ATS and that
plaintiffs have adequately alleged aiding and abetting by Arab Bank, there is no need to pursue, at
this stage of the proceedings, these other theories of liability.

Plaintiffs also make brief mention of "conspiracy" as a ground for liability under the
Genocide Convention, but again that theory has not been addressed in the briefs and therefore the
availability of conspiracy liability as to the claims of international law violations raised here will not
be addressed at this time.

Plaintiffs also allege liability for Arab Bank's "reckless disregard" of the underlying
violations of the law of nations. Plaintiffs offer no basis for this allegation, and none of the
international sources discussed contemplate such liability.

of terrorist organizations. According to plaintiffs, Arab Bank knew that the accounts of these various organizations and individuals were being used to fund suicide bombings and other attacks sponsored by the terrorist organizations. Plaintiffs allege that the terrorist organizations act with an openly and publicly stated united purpose of eradicating the State of Israel through a campaign of terror, genocide, and crimes against humanity. The terrorist organizations allegedly sought to accomplish their goals principally by widespread and systematic suicide bombings, which resulted in the death and injury of thousands of individuals in Israel, the West Bank, and the Gaza Strip, the majority of who were innocent civilians.

Despite knowledge of HAMAS's purposes and its status as a Specially Designated Global Terrorist Entity, Arab Bank provided banking services to HAMAS directly by collecting funds into HAMAS accounts in its Beirut, Lebanon and Gaza Strip branches. The funds collected by Arab Bank were solicited by HAMAS through its website and through advertisements it publicized throughout the Middle East. These solicitations sought financial support for the Second Intifada. With respect to the charitable front organizations, plaintiffs allege that, despite knowledge that they were affiliated with the various terrorist organizations, Arab Bank maintained accounts and solicited and collected funds for them. In their amended complaints, plaintiffs specifically allege that the various charitable committees they identify are terrorist front organization which raise and launder funds to subsidize the Second Intifada and bankroll the terrorist organizations.

Arab Bank argues that it merely provided routine banking services. Arab Bank ignores that acts which in themselves may be benign, if done for a benign purpose, may be actionable if done with the knowledge that they are supporting unlawful acts. Nothing in the amended complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose

aims the Bank is ignorant. Given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing "routine" about the services the Bank is alleged to have provided. Thus, plaintiffs' allegations with respect to Arab Bank's knowledge and conduct are sufficient under their first factual theory.

Plaintiffs' allegations with respect to Arab Bank's mental state and conduct are also sufficient under their second factual theory, which is that Arab Bank administered the program by which the Saudi Committee distributes a comprehensive benefit of $5,316.06 to designated families of Palestinian "martyrs" and to those individuals wounded or imprisoned in perpetrating suicide bombings and other attacks on innocent civilians. The Saudi Committee openly declares that its funds are transmitted and distributed to the families of "martyrs" through Arab Bank. Plaintiffs allege that Arab Bank knew that the Saudi Committee was soliciting and paying funds to the families of "martyrs." Arab Bank is alleged to have consulted with the Saudi Committee to finalize the lists of beneficiaries of those who attacked innocent civilians. In light of the allegations that the Saudi Committee widely and publicly solicited funds that were deposited directly into accounts at Arab Bank and that Arab Bank consulted with the Saudi Committee and local representatives of HAMAS to finalize the lists of beneficiaries, the inference is unmistakable that Arab Bank knew it was administering a financial benefit to designated families of Palestinian "martyrs" and those wounded or imprisoned in perpetrating terrorist attacks, i.e., those who perpetrated the primary violations of the law of nations. *Cf. Bodner*, 114 F. Supp. 2d at 128 (holding that a violation of the law of nations is alleged under the ATS where the plaintiffs claimed that the defendant banks conspired with and aided and abetted the Vichy and Nazi regimes by blocking and confiscating deposit accounts and safety deposit boxes of the plaintiffs in advance of any official compulsion to

do so, requiring depositors to fill out detailed, anti-semitic, genealogical questionnaires, and distributing a circular of the French Banking Association detailing a common plan to seize Jewish assets). The standards for aiding and abetting liability discussed above do not require that Arab Bank had the specific intent to cause the specific acts which injured plaintiffs; under both the Conventions and the general standards of aiding and abetting liability it is sufficient that Arab Bank acted intentionally and with knowledge that its conduct would, as described below, facilitate the underlying violations when it engaged in the acts alleged.

Plaintiffs' allegations with respect to the substantial effect of Arab Bank's conduct in bringing about the underlying violations of a norm of international law are also sufficient under both factual theories. Plaintiffs have alleged that their injuries were caused by suicide bombings or other attacks perpetrated by the terrorist organizations to which Arab Bank provided banking services. Arab Bank's provision of banking services facilitated money laundering and also facilitated the payments from the Saudi Committee to the suicide bombers' beneficiaries. Through the program allegedly administered by Arab Bank, the Saudi Committee paid and transmitted benefits on behalf of approximately 200 fallen "martyrs" during the first year of the program's existence alone.

According to plaintiffs, Arab Bank played an integral role in the structured financial path through which the funds in the "Account 98" accounts–accounts set up by the Saudi and Mujahideen Committees to raise funds for the families of "martyrs"–were transferred to their intended beneficiaries. Arab Bank allegedly consulted with the Saudi Committee and local representatives of HAMAS to finalize the lists of eligible beneficiaries. It also provided instructions to the general public on how beneficiaries could qualify and collect money. Arab Bank held accounts in the beneficiaries' names to which funds contained in the "Account 98" accounts were transferred. Not

only did Arab Bank collect and maintain those funds, but it facilitated the conversion of such funds from Saudi Riyals to Israeli currency by routing the transfers through its New York branch, where the funds were converted to U.S. dollars and then to Israeli currency. Arab Bank distributed the money to beneficiaries who presented a Palestinian Authority-issued registration card establishing the bona fides of the "martyr."

Plaintiffs allege that, by its conduct, Arab Bank facilitated and provided an incentive for the suicide bombings and other murderous attacks. Specifically, plaintiffs allege that the individual attackers knew that, if they committed attacks, their families would be supported by the funds held in their name by Arab Bank. Plaintiffs delineate a direct correlation between the number of attacks, including suicide bombings, and the amount of Mujahideen Committee and Saudi Committee funds, some of which were eventually paid to the beneficiaries through Arab Bank.

Contrary to defendant's argument, plaintiffs need not prove that each perpetrator of an underlying attack was motivated by the "martyr" benefit plan in order to succeed on their claims. Their theory is that the "martyr" benefit plan, allegedly administered by Arab Bank, created an incentive for suicide bombings, whether or not it was also a motive in any particular instance. The Bank's active participation in creating such an incentive is a sufficient basis for liability under the standards of aiding and abetting liability discussed above, which imposes secondary liability on those who substantially assist violations of the law of nations. Nor is there a requirement of an allegation that the suicide bombers would not, or could not, have acted but for the assistance of Arab Bank. As discussed above, substantial assistance need not be a *conditio sine qua non* of the acts of the perpetrators. As with their ATA claims, plaintiffs readily acknowledge that, in order to prevail on their claims premised on the Bank's alleged administration of the "martyr" benefit plan, they

must prove that each of the victims was in fact killed by an attacker who was within the coverage of the plan. As to plaintiffs' claims premised on the Bank's provision of financial services to terrorist organizations, plaintiffs acknowledge that they will have to prove that the Bank provided these services to the particular group responsible for the attacks giving rise to their injuries. For all of these reasons, defendant's argument that plaintiffs have not sufficiently alleged causation is rejected.

In sum, the amended complaints adequately allege Arab Bank's knowledge that its assistance would facilitate the terrorist organizations in accomplishing the underlying violations of the law of nations and that its provision of banking and administrative services substantially assisted the perpetration of those violations. Arab Bank provided practical assistance to the organizations sponsoring the suicide bombings and helped them further their goal of encouraging bombers to serve as "martyrs." Indeed, as already noted, the allegations state a primary violation of the Financing Convention, under which it is sufficient that Arab Bank is alleged to have provided or collected funds with the knowledge that they were to be used in any way to contribute to acts that include using an explosive with the intent to cause death or serious bodily injury or to attack innocent civilians with the purpose of intimidating or coercing a civilian population.

Finally, that defendant is a private entity not acting under color of state law does not affect its liability. *See generally Sosa*, 542 U.S. at 732 n.20. The rule against genocide and crimes against humanity is enforceable against non-state actors. *Kadic*, 70 F.3d at 239-44 (discussing liability of non-State actors for genocide and war crimes but not for torture and summary execution). The third international norm alleged to have been violated here, the prohibition of suicide bombings and other murderous attacks on civilians designed to intimidate or coerce a civilian population, also creates

responsibility without regard to whether the actions are taken under color of state law. As with plaintiffs' genocide and crimes against humanity allegations, plaintiffs here allege widespread, organized and systematic attacks on civilians. There is no sound reason that a state action requirement be imposed on this norm any more than one is imposed on the genocide and crimes against humanity norms. Neither the Bombing Convention, the Financing Convention nor the other sources of international law which give rise to this norm require state action. *Cf. Kadic*, 70 F.3d at 243 (noting that the international law sources prohibiting torture define torture to require actions performed by State officials or under color of law).

In addition, contrary to defendant's argument, international law establishes that entities, as well as individuals, may be held accountable. Article 5 of the Financing Convention expressly contemplates liability for "legal entities." Similarly, Resolution 1373 contemplates the liability of "entities." *See also Bodner*, 114 F. Supp. 2d at 128 (holding that plaintiffs stated a claim under the ATS against banking institutions for aiding and abetting and facilitating acts of genocide).

That plaintiffs' allegations regarding Arab Bank's conduct are sufficient for liability under the ATS is further supported by the fact that Arab Bank's alleged conduct is exactly the type of conduct that the applicable Conventions and related U.S. laws are aimed at preventing. Both the Conventions and the ATA highlight the enabling nature of such conduct in bringing about the underlying violations of international law. Specifically, the Financing Convention states that "the number and seriousness of acts of international terrorism depend on the *financing* that terrorists may obtain." Preamble, Dec. 9, 1999, S. TREATY DOC. NO. 106-49 (2000). Congress, in enacting its prohibition under the ATA of providing material support–which is defined to include the provision of financial services–to foreign terrorist organizations, itself has found that "some foreign terrorist

organizations, acting through affiliated groups or individuals . . . use the United States as a conduit for the receipt of funds raised in other nations" and that "foreign organizations that engage in terrorist activity are so tainted by their criminal conduct that any contribution to such an organization facilitates that conduct." AEDPA, Pub. L. No. 104-132, § 301(a)(6), (7), 110 Stat. 1214, 1247 (1996).

In addition to these findings, Congress expressed that it was enacting its prohibition on material support to foreign terrorist organizations pursuant to its power under Article I, Section 8, Clause 10, of the U.S. Constitution, to "define and punish . . . Offenses against the Law of Nations" and thus appears to have recognized that providing material support to a foreign terrorist organization is a violation of the law of nations. *See* AEDPA, Pub. L. No. 104-132, § 301(a), 110 Stat. 1214, 1247 (1996).[44] This provides further support that Arab Bank's conduct renders it liable under the ATS and alleviates *Sosa*'s concern that there has been "no congressional mandate to seek out and define new and debatable violations of the law of nations . . . ." 542 U.S. at 728.

Accordingly, plaintiffs have sufficiently alleged facts giving rise to Arab Bank's liability for aiding and abetting the violations of the law of nations alleged here.

### C.  Specific Plaintiffs

Defendant argues that the claims of those plaintiffs, specifically, forty-four Almog plaintiffs

---

[44] Section 301(a)(2) of AEDPA states:

> (2) the Constitution confers upon Congress the power to punish crimes against the law of nations and to carry out the treaty obligations of the United States, and therefore Congress may by law impose penalties relating to the provision of material support to foreign organizations engaged in terrorist activity.

Pub. L. No. 104-132, § 301(a), 110 Stat. 1214, 1247 (1996).

and all of the Afriat-Kurtzer plaintiffs, who allege injuries from incidents prior to October 2000 must be dismissed as a matter of law on the ground that the systematic and widespread attacks alleged by plaintiffs as the basis for their claims under Counts Four and Five did not begin until October 2000. While the amended complaints do emphasize Arab Bank's conduct with respect to the beginning of the Second Intifada, both the Almog and Afriat-Kurtzer amended complaints make allegations regarding Arab Bank's conduct dating back to the early 1990's. The amended complaints allege that the HAMAS founding charter, dated August 18, 1988, "pledges the group to carry out armed struggle in order to destroy Israel and its Jewish citizens . . . ." Despite this, Arab Bank provided banking services to HAMAS in 1995, when it was named a Specially Designated Terrorist Entity. The amended complaints also allege, *inter alia*, that Arab Bank provided financial services and direct financial contributions to PIJ knowing that, as of 1995, it was named a Specially Designated Terrorist Entity. Thus, given the liberal pleading standard of Rules 8 and 12(b)(6), defendant's argument is rejected.

For all of the reasons stated, defendant's motion to dismiss the ATS claims contained in Counts Three, Four, and Five of both amended complaints is denied.

## IV.    Federal Common Law Claims

Plaintiffs assert various "federal common law" claims (Counts Six through Ten), under the court's federal question jurisdiction, 28 U.S.C. § 1331, which include survival and wrongful death claims. Plaintiffs have offered no sound basis for these "federal common law" claims. *See Sosa*, 542 U.S. at 729 (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938) (noting that, with few exceptions, there is no general federal common law)). Moreover, at oral argument plaintiffs agreed that such claims would be "redundant" of the ATS claims. Thus, plaintiffs' "federal common law"

claims under § 1331 are dismissed.

## V.   *Forum Non Conveniens*

Defendant alternatively argues that the amended complaints should be dismissed on the ground of *forum non conveniens* and that plaintiffs should refile their claims in Jordan.  Defendant has failed to overcome the deference accorded to plaintiffs' choice of forum, has failed to establish that Jordan provides an adequate alternative forum, and has failed to establish that private and public interests favor trial of these cases, which seek to vindicate important human rights under both domestic and international law, in Jordan.  Its request is therefore denied.  *See Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 99-108 (2d Cir. 2000) (reversing a *forum non conveniens* dismissal in favor of a British forum and stating that "[i]f in cases of torture in violation of international law our courts exercise their jurisdiction conferred by the 1789 Act only for as long as it takes to dismiss the case for *forum non conveniens*, we will have done little to enforce the standards of the law of nations.").[45]

---

[45]    Also, for the first time at oral argument, defendant argued that this case raises non-justiciable political questions.  Defendant did not make its argument in a timely fashion, and, in any event, this case does not present any of the factors that would merit dismissal.  *See Baker v. Carr*, 369 U.S. 186, 217 (1962) (reciting the factors that indicate a case contains a non-justiciable political question).  As the Second Circuit stated in *Kadic*, "[a]lthough these cases present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions.  [T]he doctrine is one of 'political questions,' not one of 'political cases.'"  70 F.3d at 249 (alteration in original) (some internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, the motions to dismiss are granted in part and denied in part. Specifically, the following claims are dismissed: The claims for violation of 18 U.S.C § 2339B(a)(2) (violation of reporting requirements) contained in Count One of both the Almog and Afriat-Kurtzer amended complaints, Count Six (assisting in the intentional injury of others), Count Seven (reckless disregard of injury to others), Count Eight (wrongful death), Count Nine (survival), and Count Ten (negligent and intentional infliction of emotional distress) of both the Almog and Afriat-Kurtzer amended complaints.  Defendant's motions to dismiss the remaining claims are denied.


**SO ORDERED.**

_____/s/_____
**NINA GERSHON**
**United States District Judge**


Dated: January 29, 2007
       Brooklyn, New York